37 A.3d 625 (2012)
304 Conn. 1
Maria PEREIRA et al.
v.
STATE BOARD OF EDUCATION et al.
Robert Walsh et al.
v.
State Board of Education et al.
Laurayne Farrar-James et al.
v.
Board of Education of the City of Bridgeport et al.
No. 18833.
Supreme Court of Connecticut.
Argued October 27, 2011.
Decided February 28, 2012.[*]
*628 Norman A. Pattis, Bethany, with whom was Kevin Smith, New Haven, for the appellants in the first case (named plaintiff Maria Pereira et al.).
Michele C. Mount, with whom was John Kardaras, for the appellants in the second case (named plaintiff Robert Walsh et al.).
Josephine Smalls Miller, with whom, on the brief, was Atiya Sample, for the appellants in the third case (named plaintiff Laurayne Farrar-James et al.).
Mark F. Kohler, assistant attorney general, with whom, on the brief, were George Jepsen, attorney general, and Maura Murphy Osborne and Michael K. Skold, assistant attorneys general, for the appellees (named defendant state board of education et al.).
John P. Bohannon, Jr., for the appellees (named defendant board of education of the city of Bridgeport et al.).
Steven D. Ecker, with whom, on the brief, was Peter M. Haberlandt, Hartford, for the appellees (defendant Robert Trefry et al.).
*629 John B. Orleans filed a brief for Bridgeport Education Fund, Inc., et al., as amici curiae.
ROGERS, C.J., and NORCOTT, PALMER, ZARELLA, McLACHLAN, EVELEIGH and HARPER, Js.
ZARELLA, J.
The dispositive issue in this reservation is whether the state board of education (state board), violated General Statutes § 10-223e (h)[1] when it authorized the commissioner of education (commissioner) to reconstitute the board of education of the city of Bridgeport (local board).[2] Specifically, we must determine whether the failure of the state board to require the local board to undergo and complete training, as mandated by § 10-223e (h), rendered void the state board's authorization to the commissioner to reconstitute the local board. In that connection, we also must address whether a resolution, which a majority of the local board passed, requesting that the state board authorize reconstitution of the local board resulted in a waiver of the state board's obligation to require training. We conclude that the state board's failure to require training rendered void its authorization of reconstitution under § 10-223e (h) and that the local board's resolution had no effect on the operation of the statute. We therefore *630 answer the dispositive question in the affirmative.

I
The following undisputed facts and procedural history are relevant to our analysis. The state board has designated the school district of the city of Bridgeport (local school district) a low achieving school district under § 10-223e (c)(1)[3] for at least seven consecutive years. The local school district also has failed to make acceptable progress toward benchmarks established by the state board, pursuant to § 10-223e (a) and (c), and has failed to make adequate yearly progress pursuant to the requirements of the federal No Child Left Behind Act of 2001, Pub.L. No. 107-110, 115 Stat. 1425, codified as amended at 20 U.S.C. § 6301 et seq. (2006 & Sup. III 2009), for at least two consecutive years while being designated as a low achieving school district. Students at virtually all levels in the local school district generally underperform on proficiency tests offered in recent years. Specifically, in the 2009-2010 school year, only 66.5 percent of students in the local school district in grades three through eight were proficient in mathematics and only 53.5 percent were proficient in reading, as measured by the Connecticut Mastery Test. Similarly, for the same period, only 32.3 percent of students in grade ten were proficient in mathematics and only 39.5 percent were proficient in reading, as measured by the Connecticut Academic Performance Test.
The local board was established by the charter of the city of Bridgeport (charter), with all the powers of and duties imposed on boards of education under Connecticut and federal laws. See Bridgeport Charter, c. 15, § 2. Pursuant to the charter, the local board consists of nine members, who must be electors of the city of Bridgeport and serve four year terms. Id., at § 1(a). Elections for the local board are staggered so that, every two years, either four or five members of the local board are elected. See id., at § 1(b) and (c). The charter further provides that, in the event of any vacancy in the membership of the local board, the remaining members will elect a new member, of the same political party as the vacated member, for the balance of the term. Id., at § 1(d).
Prior to August 5, 2011, the local board was composed of Barbara Bellinger, the president, Leticia Colon, the vice president, Delores Fuller, the secretary, and Nereyda Robles, Thomas Cunningham, Thomas Mulligan, Maria Pereira, Bobby Simmons and Sauda Baraka. All members were elected by the electors of the city of Bridgeport. In 2011, four local board members, namely, Bellinger, Fuller, Robles and Cunningham, were at the end of their four year terms, and their positions were set to be filled no later than the November, 2011 Bridgeport municipal general election. The other five members, *631 namely, Colon, Mulligan, Pereira, Simmons and Baraka, had another two years remaining on their terms as of 2011.
In 2010, some members of the local board had sought and completed certain training offered by the Connecticut Association of Boards of Education. The first training session, which was held on March 5, 2010, focused on the roles and responsibilities of the local board and its members, and provided certain tools and techniques for holding more productive local board meetings. All local board members except Simmons and Baraka attended this session. The second training session, which was held on October 5, 2010, focused on the state Freedom of Information Act and Robert's Rules of Order. All members except Simmons, Baraka and Robles attended this session. Neither of these training sessions was mandated or required by the state board.
Beginning in January, 2011, and continuing through July 5, 2011, local elected officials in the city of Bridgeport consulted with either or both the chairman of the state board, Allan B. Taylor, and then acting commissioner of education, George A. Coleman, regarding the possibility of the state board reconstituting the local board following a formal request by the local board. Local board members Simmons, Baraka and Pereira were not aware of, informed of or asked to participate in these communications any time prior to July 1, 2011.
On Friday, July 1, 2011, at 4:55 p.m., a notice of a special meeting of the local board, to take place on Tuesday, July 5, 2011, at 6 p.m., was issued by Fuller. The agenda for the special meeting, as provided in the notice, included a discussion and vote on two resolutions concerning requests and recommendations to the state board. Copies of both resolutions were attached to the notice. The local board convened the special meeting on July 5, 2011, with all nine members present. By a vote of six to three, the local board passed the resolution concerning the reconstitution request (resolution), with local board members Baraka, Pereira and Simmons voting against it. The resolution provided, inter alia, that the local board (1) was unable to function effectively, (2) could not properly and effectively oversee the local school district and meet its improvement plan, and (3) had received training to help it function more effectively as a board but that this training had not enabled it to meet its responsibilities and, further, that additional training would not be helpful.[4] In light of these circumstances, the resolution requested that the state board authorize the commissioner, pursuant to § 10-223e (h), to reconstitute the local board.
The following day, July 6, 2011, the state board held its regularly scheduled monthly meeting, which was open to the public. After the meeting was called to order, the *632 state board voted unanimously to add the local board resolution to its agenda. During the meeting, the state board received public comment regarding the resolution and then voted, five to four, to authorize the commissioner to reconstitute the local board. On July 14, 2011, Coleman sent a letter to Bellinger, the local board's president, copying all other local board members and giving notice of his intention to reconstitute the local board pursuant to the authority granted to him by the July 6, 2011 vote of the state board. On August 5 and 16, 2011, Coleman appointed seven new members to the local board: Robert Trefry; Kenneth Moales, Jr.; Michelle Black Smith-Tompkins; David Norton; Jaqueline Kelleher; Judith Bankowski; and Hernan Illingworth (reconstituted board). The effect of these appointments was to remove all previous members of the local board from their positions. By operation of § 10-223e (h), the members of the reconstituted board retain their positions for at least three years, during which time no local elections will be held for positions on the local board.
Shortly after Coleman's July 14, 2011 letter to the local board, former local board members Pereira and Simmons filed an action in the Superior Court against the state board, Coleman, Bill Finch, the mayor of the city of Bridgeport, John Ramos, the superintendent of schools for the city of Bridgeport, former local board members Bellinger, Colon, Fuller, Robles, Cunningham and Mulligan, and reconstituted board members Trefry, Moales, Smith-Tompkins, Norton, Kelleher, Bankowski and Illingworth. Around the same time, Robert Walsh, George Pipkin and Pertrinea Cash-Deedon, electors of the city of Bridgeport who had submitted over 3000 petition signatures in order to qualify as candidates for the local board, filed an action in the Superior Court against the defendants in the Pereira case, as well as Santa I. Ayala, democratic registrar of voters of the city of Bridgeport, and Alma L. Maya, the town clerk of the city of Bridgeport. Also around the same time, Laurayne Farrar-James and Shavonne Davis, residents of the city of Bridgeport, Barbara Pouchet, resident of the city of Bridgeport and potential candidate for the local board, and Bakara, former member of the local board, filed an action in the Superior Court against the local board, Ramos, Bellinger, the state department of education, Coleman and Taylor.[5]
The complaints in all three actions alleged state statutory and constitutional violations, and one or more of the complaints sought, inter alia, (1) a declaratory ruling that § 10-223e (h) is unconstitutional under the state constitution, (2) a declaratory ruling that the acts of the defendants were in violation of the state constitution, (3) a declaratory ruling that the dissolution of the local board was in violation of the requirements of § 10-223e (h), with the effect that the reconstituted board had been improperly seated, (4) a writ of mandamus ordering that Ayala, the democratic registrar, and Maya, the town clerk, accept the petitions of candidates for the local board and place them on the ballot for the Bridgeport municipal elections in 2011, (5) a temporary injunction precluding the state board, Ramos, Coleman and Taylor, among others, from taking any further action with regard to reconstituting the local board, (6) an order requiring Pereira, Simmons and Baraka to be restored as *633 members of the local board, (7) compensatory and punitive damages, and (8) any other legal or equitable relief to which they were entitled.[6]
The three cases then were transferred to the judicial district of Waterbury, Complex Litigation Docket. Recognizing the need for an expeditious resolution of the underlying issues, the parties requested that the trial court reserve the action for the advice of this court pursuant to Practice Book § 73-1.[7] Our analysis of the issues raised by the reservation follows.

II

A
The resolution of this reservation, and the underlying case, is determined by the language and application of § 10-223e (h). Specifically, we must decide whether a statutory provision in § 10-223e (h) mandating that the state board require a local board of education to undergo and complete certain training before the state board authorizes reconstitution of that local board can be waived.[8] The plaintiffs claim that the statute's provisions are mandatory and that the state board lacked the authority to authorize reconstitution of the local board because it failed to follow the statute. Additionally, the plaintiffs claim that the authority on which the defendants rely in seeking to extend the doctrine of waiver to the facts of this case is unpersuasive and that, even if waiver can apply, no grounds exist for finding that the local board waived the state board's *634 obligation under the statute. The defendants respond that the local board may and did waive the state board's obligation to require the local board to undergo and complete training before the state board authorized reconstitution.[9] We conclude that the statute's provisions are mandatory and not waivable, and, therefore, that the state board improperly authorized the reconstitution of the local board.
The proper application of § 10-223e (h) presents a question of statutory interpretation, over which our review is plenary. See, e.g., Connecticut Podiatric Medical Assn. v. Health Net of Connecticut, Inc., 302 Conn. 464, 471, 28 A.3d 958 (2011). We are guided by well established principles of statutory construction. See id.
We begin with the foundational principle that, when interpreting statutes, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . ." (Internal quotation marks omitted.) Grady v. Somers, 294 Conn. 324, 333, 984 A.2d 684 (2009).
We first consider the relevant language of General Statutes § 10-223e (h): "The State Board of Education may authorize the Commissioner of Education to reconstitute a local or regional board of education pursuant to subdivision (2) of subsection (d) of this section for a period of not more than five years. The board shall not grant such authority to the commissioner unless the board has required the local or regional board of education to complete the training described in subparagraph (M) of subdivision (2) of subsection (c) of this section. . . ." (Emphasis added.) The plain language of the statute conveys a mandatory procedure to be followed *635 if the state board should choose to authorize reconstitution, particularly through the use of the phrase "shall not grant such authority to the commissioner unless. . . ." General Statutes § 10-223e (h); see Wiseman v. Armstrong, 295 Conn. 94, 101, 989 A.2d 1027 (2010) ("[d]efinitive words, such as must or shall, ordinarily express legislative mandates of nondirectory nature . . . [and] the word shall creates a mandatory duty when it is juxtaposed with [a] substantive action verb" [citation omitted; internal quotation marks omitted]). "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially [when] the requirement is stated in affirmative terms unaccompanied by negative words. . . .
"The legislature, rather than phrasing the [statutory provision] in affirmative terms unaccompanied by negative words, as is often done with directory provisions. . . instead chose . . . negative phrasing. . . . The legislature's use of such negative terminology suggests that it intended [the statutory provision] to be mandatory." (Citations omitted; internal quotation marks omitted.) Santiago v. State, 261 Conn. 533, 540-41, 804 A.2d 801 (2002); see also Stewart v. Tunxis Service Center, 237 Conn. 71, 78, 676 A.2d 819 (1996) ("[t]he legislature's use of such negative terminology suggests that it intended [the statutory provision] to be mandatory"). In other words, the statutory language supports the conclusion that the state board may not authorize reconstitution until it has required the local board to undergo and complete the training described in § 10-223e (c)(2)(M).
Because it is necessary to our understanding of the training requirement, we also review § 10-223e (c).[10] Generally, *636 § 10-223e (c) sets forth the state board's obligation to supervise low achieving schools or school districts, and provides the various mechanisms that the state board can use to improve the conditions of those schools and school districts. Section 10-223e (c)(1) uses strong, presumptively mandatory language in describing the role that the state board occupies with regard to low achieving schools and districts: "Any school or school district identified as in need of improvement . . . shall be designated and listed as a low achieving school or school district and shall be subject to intensified supervision and direction by the State Board of Education." (Emphasis added.) General Statutes § 10-223e (c)(1). The second part of subsection (c) lists thirteen separate actions, or any combination thereof, that the state board "shall" undertake "to improve student performance and remove the school or district from the list of schools or districts designated and listed as a low achieving school or district. . . and to address other needs of the school or district. . . ." General Statutes § 10-223e (c)(2). Specifically, this list of actions includes the training provision referenced in § 10-223e (h): "[The state board shall] require local and regional boards of education to (i) undergo training to improve their operational efficiency and effectiveness as leaders of their districts' improvement plans. . . ." General Statutes § 10-223e (c)(2)(M). The plain language of § 10-223e (c), like that of § 10-223e (h), denotes a mandatory and affirmative obligation on the part of the state board to pursue one or more remedial actions to remove the low achieving designation from schools and districts. Significantly, all of these actions focus on improving local operations through providing training, aid and other supervisory techniques, without granting the state board the authority to alter or affect the constitution of a local board of education. Simply put, by referencing the training provision of § 10-223e (c)(2)(M) in § 10-223e (h), the legislature has highlighted the importance of this one action, in a series of many, that the state board shall pursue in its capacity of supervising and improving low achieving schools and districts.
Particularly significant to an understanding of the operation of § 10-223e (h) is the relevant language of General Statutes § 10-223e (d): "The State Board of Education shall monitor the progress of each school or district designated as a low achieving school or district pursuant to subdivision (1) of subsection (c) of this section and provide notice to the local or regional board of education for each such school or district of the school or district's progress toward meeting the benchmarks established by the State Board of Education *637 pursuant to subsection (c) of this section. If a district fails to make acceptable progress toward meeting such benchmarks established by the State Board of Education and fails to make adequate yearly progress pursuant to the requirements of the No Child Left Behind Act . . . for two consecutive years while designated as a low achieving school district, the State Board of Education, after consultation with the Governor and chief elected official or officials of the district, may . . . notwithstanding the provisions of chapter 146, any special act, charter or ordinance, grant the Commissioner of Education the authority to reconstitute the local or regional board of education for such school district in accordance with the provisions of subsection (h) of this section." (Emphasis added.)
Thus, when § 10-223e (h) is analyzed in the context of § 10-223e (c)(1) and (2), the logical inference is that the state board should pursue the remedial actions in § 10-223e (c)(2), with regard to the low achieving school or school district overseen by a local or regional board of education, before it pursues the seemingly severe remedy of reconstituting that local or regional board of education under § 10-223e (h). The clear and specific reference in § 10-223e (h) to § 10-223e (c)(2)(M) suggests that the reconstitution remedy in § 10-223e (h) is not meant to entirely supplant or to render superfluous the other, less drastic, remedies set forth in § 10-223e (c)(2). See, e.g., Brown & Brown, Inc. v. Blumenthal, 297 Conn. 710, 726, 1 A.3d 21 (2010) ("[w]e cannot countenance a reading of a statute that would render it superfluous"). Indeed, the apparent function of § 10-223e (c) is to provide the state board with the appropriate tools to use in fulfilling its obligation of intensified supervision of low achieving schools and districts. By specifically singling out and referencing subparagraph (M) of § 10-223e (c)(2) in § 10-223e (h), it could reasonably be concluded that the legislature intended to underscore the importance of this specific remedial action with respect to local boards of education that oversee low achieving schools or districts.[11] Accordingly, on the basis of the plain statutory language, we conclude that § 10-223e (h) mandates that the state board require a local board of education to complete the training contemplated under § 10-223e (c)(2)(M) before the state board can authorize its reconstitution.
None of the parties disputes the mandatory nature of the training requirement in § 10-223e (h).[12] Rather, the defendants contend that the training requirement can be waived, which would allow the state board to authorize reconstitution without first providing training. Section 10-223e (h) is silent as to whether the training requirement can be waived. Additionally, we cannot find, and neither party has provided us with, any other relevant statutory provision pertaining to the waiver *638 of this requirement. Cf., e.g., General Statutes § 10-184b ("[n]otwithstanding any provision of the general statutes or public or special act granting the Commissioner of Education the authority to waive provisions of the general statutes, the Commissioner of Education shall not limit the authority of parents or guardians to provide for equivalent instruction"). The defendants argue, however, that compliance with § 10-223e (h), like any other mandatory statutory provision, can be waived by a local board of education and that the state board can properly rely and act on that waiver to authorize reconstitution without requiring the statutorily mandated training.[13]
We cannot confidently conclude, on the basis of the language of the statute alone, whether the provision is waivable, and we previously have held that mandatory statutory provisions sometimes may be waived. See, e.g., Stewart v. Tunxis Service Center, supra, 237 Conn. at 80, 676 A.2d 819. In light of this ambiguity, we consult the pertinent extratextual sources to discern legislative intent. See, e.g., McCoy v. Commissioner of Public Safety, 300 Conn. 144, 150-51, 12 A.3d 948 (2011) ("[w]hen a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter" [internal quotation marks omitted]).
Before proceeding, we pause briefly to reiterate the issue before the court in this reservation and, thus, the scope of our holding. The statutory scheme at issue in this reservation is embodied in § 10-223e, which, as we subsequently explain in more detail, represented a change in Connecticut's administration of public education. Through § 10-223e, the legislature expanded the state board's involvement in the quotidian affairs of low achieving schools and school districts. The state board now has the authority to make administrative and policy determinations for these schools and districts; see General Statutes § 10-223e (c); authority that formerly was only within the purview of local or regional boards of education. The dispositive issue raised by this reservation, however, concerns not the shift in power from local boards of education to the state board under § 10-223e generally. Instead, the parties have asked us to determine the very narrow question of the specific process that the legislature intended under § 10-223e (h), a more recent addition to § 10-223e. See Public Acts 2010, No. 10-111, § 21 (amending General Statutes [Sup.2010] § 10-223e by adding, inter alia, subsection [h]). We therefore focus primarily on the legislative intent and policy behind subsection (h), as informed by the legislature's decision to initially restrict to the General Assembly the power to reconstitute local boards.[14] See *639 Public Acts, Spec. Sess. June, 2007, No. 07-3, § 32, codified at General Statutes (2008 Sup.) § 10-223e (d).
With that in mind, we turn first to remarks made by legislators during the House floor debate concerning the proposed amendment to § 10-223e that would provide the state board with a mechanism to authorize reconstitution of underperforming local or regional boards of education.[15] Representative Marilyn Giuliano, noting that reconstituting a local board of education was a "significant usurpation of powers," inquired into the procedures and "exact criteria that would give the commissioner such full-blown powers to dissolve a duly-elected, by the people, [b]oard of [e]ducation.. . ." (Emphasis added.) 53 H.R. Proc., Pt. 14, 2010 Sess., p. 4581. Responding directly to this inquiry, Representative Andrew M. Fleischmann stated that "the commissioner would first have to find that he had a school board that was overseeing a school district that was a low-achieving district consistently for several years, and that the board was actually an impediment to moving forward with reforms.. . . [I]f that's happening, and I'm not sure if it's happening in Connecticut. . . [t]he members of the board can be retrained by the [s]tate [d]epartment of [e]ducation. And if after that training that board continues to be an impediment to execution of reforms, then and only then would the commissioner consider reconstituting that board . . . ." (Emphasis added.) Id., at pp. 4581-82. Representative Vincent J. Candelora raised a similar question, to which Representative Fleischmann provided a virtually identical response, underscoring the fact that the state board could authorize the reconstitution of the local board only after the local board completed the training required by the state board for this specific purpose.[16] 53 H.R. Proc., Pt. 15, 2010 Sess., *640 p. 4675, remarks of Representatives Candelora and Fleischmann.
In addition to the foregoing remarks, we find elucidating certain relevant testimony and remarks from an education committee hearing regarding the proposed amendment to § 10-223e. During the hearing, Mark K. McQuillan, the commissioner of education at the time of the hearing in 2010, testified regarding the need for amending § 10-223e to permit the state board to authorize the reconstitution of local and regional boards of education in certain, limited circumstances. Conn. Joint Standing Committee Hearings, Education, Pt. 4, 2010 Sess., p. 1046. In discussing his understanding of the proposed amendment, McQuillan stated that reconstitution would follow the "process outlined in the legislation [and] would be very sparingly used"; (emphasis added) id.; and that it would be used "in a process that . . . would involve [the Connecticut Association of Boards of Education] and would be one that would be administered. . . with a measured but deliberate insistence that things change." (Emphasis added.) Id., at p. 1049. Following McQuillan's testimony, Representative Fleischmann, a cochairman of the education committee, noted: "There's a tension between trying to get things done and respecting the will of the people in democracy. And one of the concerns. . . would be taking a body that had been elected by the folks in a given town and dispersing them . . . and, instead, giving the power, essentially, to [the commissioner] and the [s]tate board." (Emphasis added.) Id. In response to Representative Fleischmann's concerns, McQuillan agreed that "it is very, very important that . . . the democratic-elected officials remain in the positions if they are prepared and demonstrate the capacity to do the leadership." (Emphasis added.) Id. McQuillan explained that, "when we look at the question of reconstituting a board, it isn't simply throwing them all out or suggesting that everyone has to leave. . . . [I]t would involve a process of having a procedure in place. . . ." (Emphasis added.) Id., at pp. 1049-50. Thereafter, McQuillan summarized the envisioned operation of the proposed amendment by stating that, "in rare instancesand I'm saying `in rare instances,' not the general patternwe have found that it would be necessary to have [the] authority" to reconstitute a local board.[17] (Emphasis added.) Id., at p. 1051.
During the same education committee hearing, Representative Deborah Heinrich raised her own concern about providing the state board with the authority to reconstitute local boards of education: "I'm a little confused about how one can reconstitute an elected board. And maybe I'm missing something in here, but the people elected their board and so then . . . the [s]tate [d]epartment of [education] would then turn around and say, [y]ou're no longer elected?" (Emphasis added.) Id., at pp. 1137-38. Shortly thereafter, Representative Paul Davis questioned *641 Richard Murray, a member of the board of directors of the Connecticut Association of Boards of Education, whether it was "[that association's] position . . . [that it] feel[s] okay with some sort of language that would permit the [c]ommissioner to [reconstitute a local board]?" Id., at p. 1139. Murray responded: "I think in extreme circumstances."[18] (Emphasis added.) Id.
From the foregoing testimony and remarks, we distill three general principles of legislative intent behind § 10-223e (h). First, remarks of various representatives coupled with the testimony of McQuillan make clear that reconstitution is an extreme remedy, to be used only sparingly after it becomes apparent that other remedial measures have failed to produce results. Second, the testimony and remarks track the plain language of the statute, which mandates that the state board require a local board of education to undergo and complete training before the state board authorizes reconstitution of the local board. It also appears that certain legislators anticipated that the state board would reassess its initial decision to pursue reconstitution after the local board successfully completes training.[19] In other words, the legislators and McQuillan both appeared to view the proposed statute as a new grant of authority to the state board, but one that was predicated on the state board first requiring the local board to *642 undergo and complete training, as contemplated by § 10-223e (c)(2)(M). Third, any time that a legislator expressed concern over the ramifications of allowing the state board to authorize reconstitution of a local board of education, that concern was grounded specifically in the usurpation of local democratic will. In other words, there was a concern that reconstitution, especially one without any procedural check in place, would trample on the rights of the people who had duly and democratically elected their representatives to the local board. Little concern, if any, was expressed regarding the rights of the local boards of education or the members of those boards. Indeed, there apparently was no discussion about whether local boards could seek out reconstitution or could waive the state board's obligation to require training.
On the basis of the foregoing principles, we conclude that the legislature intended the training provision to serve the following purposes. First, requiring training prior to authorizing reconstitution provides notice to a local board of educationand, theoretically, to the electors of that local boardthat the state board is considering authorizing reconstitution. Second, and related to the first, the training itself serves a substantive and remedial purpose, by providing the local board of education with an opportunity to prevent its reconstitution by successfully completing training and thereby demonstrating to the state board that it can operate effectively and that the extreme measure of reconstitution is unnecessary. Viewed this way, the training provision is premised on the importance of maintaining the continued local operations of a democratically elected board of education, as well as on providing certain due process protections.[20] Third, and most importantly, the state board does not have the authority to authorize reconstitution until it first requires the local board to undergo and complete training in accordance with § 10-223e (c)(2)(M). When viewed together, these principles share a common thread, namely, that the legislature intended that the state board would follow a clear, transparent and deliberate process if it decides to authorize reconstitution of an underperforming local board of education. Such a process would put members of a local board, the local electors of that board and the citizens of this state on notice that the state board is considering reconstitution. Thus, all of these parties would be aware of both the process and time frame in which reconstitution potentially could occur.
In that connection, we highlight the concern, expressed by numerous legislators and other interested parties,[21] that granting the state board the authority to *643 reconstitute local boards of education represented a significant enlargement of the power previously held by the state board. As McQuillan testified, prior to the enactment of § 10-223e (h), the state board could not alter or interfere with the specific composition of a local or regional board of education. As the legislative history of § 10-223e (h) demonstrates, that provision was envisioned as a specific, narrow grant of power to the state board to remove the last vestige of local control over low achieving schools and school districts. The legislative history is replete with references to the potentially far-reaching ramifications of allowing the state board to reconstitute democratically elected local boards of education and supports the conclusion that the training provision of § 10-223e (h) is intended to circumscribe the state board's power. Put differently, the legislature intended that the state board would acquire the power to authorize reconstitution if and only if the state board first satisfied the training requirement provision. With this understanding of the legislative history and intent, we cannot accept the proposition that a statutory provision, in the form of a condition precedent, meant to ensure transparency, could be waived, even by a local board of education.
Additionally, the legislative history makes clear that, to the extent that the training provision serves a protective function as well, it does not exist only for the protection of the local board of education, as the defendants contend. Rather, the protection benefits the local electors of that local board and the democratic process as a whole. See, e.g., 53 H.R. Proc., Pt. 14, 2010 Sess., p. 4581, remarks of Representative Giuliano (noting that it would be "[a] significant usurpation of powers" to "dissolve a duly-elected, by the people, [b]oard of [e]ducation" [emphasis added]).[22] Certainly, the training requirement confers some benefit on and protection to a local board of education. Nevertheless, it is apparent that the training requirement was meant to serve as a check on the state board's power, with an added benefit that it serves as a protection of the democratic will of the people who elected their local boards of education.[23] Accordingly, the legislative history supports the conclusion that the legislature did not intend the training requirement to be waivable by any party, including a local board of education seeking reconstitution.
Our conclusion is further buttressed by the longstanding policy in Connecticut of local, rather than state, control over schools and school districts, as evidenced in the statutory scheme governing local and regional boards of education. See Interlude, Inc. v. Skurat, 266 Conn. 130, 143, 831 A.2d 235 (2003) ("[i]n determining the legislative intent of a particular statute, we also look to other relevant statutes governing the same or similar subject matter, for it is well established that we consider *644 the statutory scheme as a whole and presume that the legislature intended to create a harmonious body of law" [internal quotation marks omitted]). As we noted previously, the state board is obligated to utilize various tools under § 10-223e (c)(2) to improve performance in low achieving schools and school districts. The significance of the reference in § 10-223e (h) to the training requirement in § 10-223e (c)(2)(M), as a prerequisite to the state board's authority to reconstitute a local board of education, should not be ignored. Rather than provide the state board with unfettered power to authorize reconstitution, the legislature explicitly tied the state board's power to its existing obligation under § 10-223e (c)(2) to supervise low achieving schools and districts while attempting to preserve their local composition. With the exception of reconstitution, the statutory scheme sets forth a framework in which the state board must work in conjunction with local schools and boards. Thus, these statutory provisions seek to promote local control, allowing the state board to authorize reconstitution only after working with the local school or board of education to improve its performance. In that regard, the reference in § 10-223e (h) to § 10-223e (c)(2)(M) can easily be understood as signaling the legislature's preference that the state board pursue the cooperative remedial and supervisory options under § 10-223e (c)(2) prior to eliminating all local control through reconstitution. We reiterate that such a reading is supported by the relevant legislative history.
We cannot ignore the fact that the foundational issue, both with regard to § 10-223e (h) and the operation of the state board and local boards of education, is how to provide students with the best possible education.[24] The underpinning of the statutory scheme in § 10-223e is the obligation of the state board to ensure that each child has at least "a suitable program of educational experiences. . . ." General Statutes § 10-4a (1). Nevertheless, the relevant statutes concerning the respective duties of the state board and local boards of education also demonstrate a clear policy of defining a supervisory role for the state board separate and distinct from local boards, which, by their very nature, are most responsive to the needs of the local school district and the will of the local population. For example, General Statutes § 10-220(a) provides in relevant part that "[e]ach local or regional board of education shall maintain good public elementary and secondary schools . . . [and] implement the educational interests of the state," and § 10-220(b) provides in relevant part that "[t]he board of education of each local or regional school district shall, with the participation of parents, students, school administrators, teachers, citizens, [and] local elected officials . . . prepare a statement of educational goals for such local or regional school district. . . ." (Emphasis added.) General Statutes § 10-220(b); see also General Statutes § 10-220(e) ("Each local and regional board of education shall establish a school district curriculum committee. The committee shall recommend, develop, review and approve all curricul[a] for the local or regional school district."); General Statutes § 10-4g(a) ("[t]he State Board of Education shall develop and distribute to all local and regional boards of education a model program to encourage the participation of parents and the community in *645 the local or regional educational system"); General Statutes § 10-4g (b) ("[t]he State Board of Education shall develop a program to encourage local and regional boards of education to develop and implement plans to involve parents of students in the educational process in that district and to increase community involvement in the schools"); General Statutes § 10-221(a) ("[local and regional] [b]oards of education shall prescribe rules for the management, studies, classification and discipline of the public schools"); General Statutes § 10-221(b) ("each local and regional board of education shall develop, adopt and implement written policies concerning homework, attendance, promotion and retention").
In sum, "[t]he state's responsibility for education is distributed through the. . . statutory framework. The state board is charged with the broad and general power to supervise and control the educational interests of the state." (Internal quotation marks omitted.) New Haven v. State Board of Education, 228 Conn. 699, 703, 638 A.2d 589 (1994). Section 10-220 "delegates the duty to provide and administer public education to local and regional boards of education." Id., at 703-704, 638 A.2d 589; see also West Hartford Education Assn., Inc. v. DeCourcy, 162 Conn. 566, 573, 295 A.2d 526 (1972) ("The chief function of local boards of education is to serve as policy maker on behalf of the state and for the local community on educational matters. The state has had a vital interest in the public schools from the earliest colonial times. . . . Article VIII, § 1, of the Connecticut constitution provides that `[t]here shall always be free public elementary and secondary schools in the state. The [G]eneral [A]ssembly shall implement this principle by appropriate legislation.' Obviously, the furnishing of education for the general public is a state function and duty. . . . By statutory enactment the legislature has delegated this responsibility to the local boards who serve as agents of the state in their communities.. . . Our statutes have conferred on the local board broad power and discretion over educational policy." [Citations omitted; emphasis added.]).
Indeed, this court has noted that the state board and local boards of education occupy distinct roles within the administration of Connecticut's public education system.[25] General Statutes § 10-4(a) prescribes the role of the state board as one *646 of "general supervision and control. . . ." Local boards of education, by contrast, must "fulfill the educational interests of the state by meeting certain mandates. . . . Public education mandates include the following: adequate and reasonable pupil transportation for those students who need transportation . . . special education services sufficient to meet the individualized needs of certain children in the locality . . . and the [minimum expenditure requirement]. If the local board of education fails or is unable to implement the educational interests of the state by carrying out these mandates, the state board may conduct an investigation, hold an administrative hearing pursuant to the Uniform Administrative Procedure Act [General Statutes § 4-166 et seq.], order appropriate remedial steps, and, if necessary, enforce its order in the Superior Court." (Citations omitted.) New Haven v. State Board of Education, supra, 228 Conn. at 704-705, 638 A.2d 589. As our analysis in New Haven underscores, prior to the enactment of § 10-223e (h), the state board possessed a variety of tools to ensure that local boards of education were fulfilling their statutory obligations. As we have noted, however, the state board previously lacked the power to authorize the drastic remedy of removing a locally elected board of education through reconstitution.
In that regard, the reconstitution authority found in § 10-223e (h) is an exception to the general rule that local educational matters are managed by local boards of education comprised of locally elected members. Even local boards of education overseeing low achieving schools and districts do not lose their local autonomy entirely simply because they are subject to additional supervision and direction by the state board pursuant to § 10-223e (c). Rather, the operation of the cooperative and remedial actions contemplated by § 10-223e (c)(2) provide for a combination of local and state control. Only if the state board chooses to exercise the extreme remedy of reconstitution will a local board of education be entirely supplanted by state appointed board members.[26]
We are nonetheless cognizant that the statutory scheme embodied in § 10-223e altered the respective roles of the state board and the local boards of education with respect to low achieving schools and districts. In that regard, we agree with the dissent that § 10-223e, when first enacted without subsection (h), represented a sea change in educational policy in this state. Section 10-223e shifted control and administration of underperforming schools and districts away from a purely local framework to one of increased state intervention. What is clear, however, is that the legislature, in granting the state board these additional powers under § 10-223e, did not initially provide the state board with reconstitution authority. Instead, the statute initially limited reconstitution authority to the General Assembly. See Public Acts, Spec. Sess., June, 2007, No. 07-3, § 32, codified at General Statutes (2008 Sup.) § 10-223e (d). Only after the state failed to qualify for federal Race to the Top funding did the legislature amend § 10-223e by adding subsection (h) to grant the state board the authority to reconstitute a local board of education. See, e.g., 53 H.R. Proc., Pt. 14, 2010 Sess., p. 4554, remarks of Representative Fleischmann ("the amendment that stands before us [which includes granting the state board reconstitution authority] is essentially Connecticut's Race to the Top education reform legislation for the year"). It is therefore apparent that the legislature *647 did not intend that the state board's reconstitution authority would supersede the existing, comprehensive statutory scheme that provided for other means of supervising and intervening in local educational issues.[27]
In light of the foregoing discussion, we conclude that the legislature did not intend § 10-223e (h) to supplant Connecticut's long-standing policy of preferring and preserving locally elected boards of education.[28] Although the balance of that *648 control has shifted in recent years with regard to low achieving schools and school districts, we remain unconvinced that the legislature intended to allow the state board to authorize reconstitution of an elected local board of education in any manner other than that specified by the statute. As we noted previously, in simplest terms, the training provision represents the legislature's intent that, in the rare event that a local board of education should be reconstituted, reconstitution would occur in a methodical, deliberate and transparent manner. This provides the local electors, local board and other citizens of the state with notice of the process and the time frame in which reconstitution potentially could occur.

B
Notwithstanding the foregoing, the defendants rely on the proposition that both constitutional and statutory rights are waivable.[29] E.g., Rosado v. Bridgeport Roman Catholic Diocesan Corp., 292 Conn. 1, 57, 970 A.2d 656, cert. denied sub nom. Bridgeport Roman Catholic Diocesan Corp. v. New York Times Co., ___ U.S. ___, 130 S.Ct. 500, 175 L.Ed.2d 348 (2009); New Haven v. Local 884, Council 4, AFSCME, AFL-CIO, 237 Conn. 378, 385, 677 A.2d 1350 (1996). The defendants claim that "[t]he object of [§ 10-223e (h)] is not about the performance of any individual board member but the ability of the local board, as an agent of the state in *649 providing education, to make adequate progress. . . . Training is thus a requirement the local board as a collective body, not its individual members, may waive." (Citations omitted; emphasis added.) We therefore read the defendants' waiver argument to mean that the training requirement in § 10-223e (h) exists solely for the protection of the local board, and, for that reason, the board may choose to waive that protection.
In order to adequately address and dispose of the defendants' argument, we begin by briefly reviewing the doctrine of waiver, with particular focus on the principles espoused in the cases on which the defendants rely. "Waiver is the intentional relinquishment or abandonment of a known right or privilege. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); C.R. Klewin Northeast, LLC v. Bridgeport, [282 Conn. 54, 86, 919 A.2d 1002 (2007)]. As a general rule, both statutory and constitutional rights and privileges may be waived. New Haven v. Local 884, Council 4, AFSCME, AFL-CIO, [supra, 237 Conn. at 385, 677 A.2d 1350]. Waiver is based [on] a species of the principle of estoppel and [when] applicable it will be enforced as the estoppel would be enforced. . . . Estoppel has its roots in equity and stems from the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed. . . . Waiver does not have to be express . . . but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) Rosado v. Bridgeport Roman Catholic Diocesan Corp., supra, 292 Conn. at 57-58, 970 A.2d 656. Finally, only the party who benefits from or is protected by the right may waive that right. See 28 Am.Jur.2d 662, Estoppel and Waiver § 196 (2011) ("[w]aiver is generally applicable to all personal rights and privileges" [emphasis added]); see also id., at § 200, p. 667 ("Parties may not waive statutory rights where a question of public policy is involved. Likewise, a law established for a public reason cannot be waived or circumvented by a private act or agreement."). Thus, as a threshold matter, in addressing the defendants' waiver argument, we must determine (1) whether the training provision constitutes a right, which would render the waiver doctrine applicable, and (2) if the training provision constitutes a right, the nature of that right and the party or parties who benefit from or are protected by the right.
We begin by noting that the state board is a statutorily created state agency; see General Statutes § 10-1 et seq.; and, therefore, is a body of limited authority that can act only pursuant to specific statutory grants of power. See, e.g., Ethics Commission v. Freedom of Information Commission, 302 Conn. 1, 8, 23 A.3d 1211 (2011). "It is well established that an administrative agency possesses no inherent power. Its authority is found in a legislative grant, beyond the terms and necessary implications of which it cannot lawfully function." (Internal quotation marks omitted.) Id.; see also Kinney v. State, 213 Conn. 54, 60 n. 10, 566 A.2d 670 (1989) ("administrative agencies. . . must act strictly within their statutory authority" [citation omitted]); State v. White, 204 Conn. 410, 419, 528 A.2d 811 (1987) ("agencies must . . . act according to. . . strict statutory authority"). In the absence of a grant of authority from the legislature, any action taken by an agency is "void." (Internal quotation marks omitted.) Stern v. Connecticut Medical Examining *650 Board, 208 Conn. 492, 498, 545 A.2d 1080 (1988).
That § 10-223e (h) conveys to the state board the power to authorize the reconstitution of a local or regional board of education is clear and not subject to debate, as the preceding analysis demonstrates. Section 10-223e (h) allows the state board itself to authorize reconstitution, provided that the state board first requires the local board of education to undergo and complete training. In order to determine whether the state board properly authorized reconstitution of the local board in the present case, we must identify the scope of the authority granted by the statute.
We briefly reiterate that the stated and overarching purpose of § 10-223e is to improve the quality of education available to students in Connecticut's public schools by the improving accountability and performance of schools and school districts. See General Statutes § 10-223e (a) ("In conformance with the No Child Left Behind Act . . . the Commissioner of Education shall prepare a state-wide education accountability plan. . . . Such plan shall identify the schools and districts in need of improvement, require the development and implementation of improvement plans and utilize rewards and consequences."). Section 10-223e, and in particular § 10-223e (c)(2), contains various tools that the state board, in its supervisory role of educational matters, may utilize to fulfill this purpose. In light of the numerous options available to the state board prior to the enactment of § 10-223e (h), we construe the reconstitution authority delegated to the state board in § 10-223e (h) narrowly, so as not to supplant the other remedies already available to the state board. Cf. Thomas v. Dept. of Developmental Services, 297 Conn. 391, 404, 999 A.2d 682 (2010) ("the legislature, in amending or enacting statutes, always [is] presumed to have created a harmonious and consistent body of law" [internal quotation marks omitted]). This construction aligns with general principles of statutory construction concerning (1) the determination of the mandatory nature of a statute; see 3 J. Sutherland, Statutory Construction (7th Ed. Singer 2008) § 57:10, pp. 52-53 ("[when] a statute grants authority to do a thing and prescribes the manner of doing it, the rule is clear that the provision as to the manner of doing the thing is mandatory, even though the doing of it in the first place is discretionary"); id., at § 57:12, p. 58 ("[a] statute which confers a new right, power, privilege or immunity, and prescribes a mode for its acquisition, preservation, enforcement or enjoyment is strictly construed and given mandatory effect"); and (2) statutes that confer authority to administrative agencies. See id., at § 64:1, p. 449 ("[s]ince [agency] enabling legislation, through which all subordinate governmental instrumentalities must receive their authority, is a grant of sovereign power, it is subject to the usual rule of strict construction applicable to such grants"); id., at § 65:2, pp. 508-509 ("[s]ince administrative agencies are purely creatures of legislation without inherent or common-law powers, the general rule applied to statutes granting powers to them is that only those powers are granted which are conferred either expressly or by necessary implication").
Simply put, the state board cannot reconstitute a local board of education without first requiring the local board to undergo and complete training. Requiring training is therefore a condition precedent to the state board's ability to authorize reconstitution. In other words, the state board lacks the power to authorize reconstitution until it first has required the local board to undergo and complete *651 the training contemplated by § 10-223e (c)(2)(M).[30] The legislature has limited the state board's power to authorize reconstitution to the particular circumstance in which the state board has first required the local board of education to undergo and complete training.[31] Because the training provision defines the scope of the grant of power from the legislature to the state board, the local board of education, as a separate agent of the state, cannot alter the scope of this grant of power. See Kinney v. State, supra, 213 Conn. at 60 n. 10, 566 A.2d 670 ("administrative agencies. . . must act strictly within their statutory authority and cannot unilaterally modify, abridge or otherwise change . . . provisions because the act's enabling legislation does not expressly grant that power" [citation omitted]). It therefore follows that the local board cannot expand this grant of power by waiving the training obligation. This is an obligation that the legislature imposed on the state board and one that defines the scope of the legislature's grant of power to the state board. Only the legislature may alter the scope of its grant of power to the state board. Put differently, a waiver would alter the grant of power by allowing the state board to sidestep its legislatively mandated obligation to require training.[32]
*652 Accordingly, we conclude, on the basis of the language and purpose of § 10-223e (h), and the relevant legislative history, that (1) the training provision is a condition precedent to the state board's authority to authorize reconstitution, (2) the failure to satisfy the training provision renders the state board powerless to authorize reconstitution, and (3) because the training provision concerns the scope of the legislature's grant of power to the state board, the local board, as a separate agent of the state and a body inferior to the legislature, could not alter the scope of the grant by waiving the provision. Cf. Dufraine v. Commission on Human Rights & Opportunities, 236 Conn. 250, 265, 673 A.2d 101 (1996) ("[A]n administrative agency, as a tribunal of limited jurisdiction, must act strictly within its statutory authority. . . . [Thus, the] trial court exceeded its authority under [General Statutes] § 46a-84 when it bypassed this required step in the complaint process [and required the administrative agency to act in a manner not authorized by statute]." [Citations omitted; internal quotation marks omitted.]); State v. State Employees' Review Board, 231 Conn. 391, 406-407, 650 A.2d 158 (1994) ("[T]he statutes governing the [state employees' review board (review board)] contain no provision for the review board to retain jurisdiction and monitor compliance with its orders. An administrative agency, as a tribunal of limited jurisdiction, must act strictly within its statutory authority. . . . [An administrative agency] possesses no inherent power. Its authority is found in a legislative grant, beyond the terms and necessary implications of which it cannot lawfully function. . . . Absent a grant of authority, any sanction meted out by the board is necessarily void. . . . Thus, the trial court's attempt to cure the problem that it perceived as a result of a lack of finality by ordering the review board to retain jurisdiction over [the] appeal imposed an authority on the review board that its governing statutes do not contemplate." [Citations omitted; emphasis added; internal quotation marks omitted.]).
While this completes our analysis of § 10-223e (h), we nevertheless address the defendants' claim that the training provision benefits the local board and, therefore, that the local board can choose to waive that benefit. We accept the defendants' premise insofar as it embodies the concept that statutory rights are generally waivable by the party who benefits from or is protected by the right. Nevertheless, to determine whether the particular right embodied in the training provision is waivable, we must determine the nature of the right itself. In our waiver jurisprudence, we have identified several specific circumstances in which the waiver doctrine may be appropriate.[33] The *653 facts underlying the present case do not fit squarely within any of those circumstances. The only arguably relevant case that the defendants raise in support of their claim that "[e]ven if [the training provision is] characterized as a mandatory requirement, it is subject to waiver, and the [local] [b]oard chose to waive it," is Stewart v. Tunxis Service Center, supra, 237 Conn. 71, 676 A.2d 819. In that case, we held that the statutory time limit in General Statutes § 31-300 pertaining to the 120 day period within which workers' compensation decisions shall be issued, was mandatory but waivable. Id., at 73-74, 676 A.2d 819. A closer examination of our holding in Stewart, however, reveals that it does not stand for the general proposition, advanced by the defendants, that any mandatory statutory provision can be waived. Stewart does not address what types of mandatory statutes may be waived or who may waive such provisions. Rather, we determined in Stewart only that the mandatory nature of a statute or provision does not, by itself, dictate whether the statute or provision is waivable.[34] See id., at 78-80, 676 A.2d 819; cf. New Haven v. Local 884, Council 4, AFSCME, AFL-CIO, supra, 237 Conn. at 384-90, 677 A.2d 1350.[35]
Moreover, although it is generally true that privately held statutory and constitutional rights are waivable, not every mandatory statutory provision can be waived, even by the party who benefits or is protected under the statute. See 28 Am.Jur.2d, supra, at § 200, p. 667 ("Waivers of statutory rights are not favored. . . . Parties may not waive statutory rights [when] a question of public policy is involved. Likewise, a law established for a public reason cannot be waived or circumvented by a private act or agreement."); see also Santiago v. State, supra, 261 Conn. at 543-44, 804 A.2d 801 ("Although we acknowledge that, typically, noncompliance with a mandatory statutory provision may be waived, either explicitly or implicitly, by the parties . . . those exceptions *654 to the general rule requiring strict compliance with a mandatory statutory provision were created in recognition of the fact that a party may relinquish its right to demand strict adherence to a mandatory statutory provision by virtue of its own failure to enforce that right. . . . In light of this statutory objective, it is apparent that the [statutory requirement] serves important public and institutional policy objectives that are independent of, and perhaps even paramount to, the state's interest as a party to the litigation. Thus. . . any purported waiver by the state of the [statutory requirement] simply is not an adequate substitute for compliance with that requirement in light of the policy objectives of the statutory provision that embraces that requirement." [Citations omitted.]); cf. Ambroise v. William Raveis Real Estate, Inc., 226 Conn. 757, 766-67, 628 A.2d 1303 (1993) ("[When] . . . a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then the remedy exists only during the prescribed period and not thereafter. . . . In such cases, the time limitation is not to be treated as an ordinary statute of limitation, but rather is a limitation on the liability itself, and not of the remedy alone. . . . [U]nder such circumstances, the time limitation is a substantive and jurisdictional prerequisite, which may be raised . . . at any time, even by the court sua sponte, and may not be waived." [Internal quotation marks omitted.]).
We previously have held that "[o]ne cannot waive a public obligation created by statute . . . but he may waive a statutory requirement the purpose of which is to confer a private right or benefit." (Citation omitted.) Hatch v. Merigold, 119 Conn. 339, 343, 176 A. 266 (1935), citing L'Heureux v. Hurley, 117 Conn. 347, 356, 168 A. 8 (1933). At the time we stated this, we did not define the scope of what we meant by the term "public obligation," and we do not appear to have done so since then.[36] Despite this lack of a clear definition, we find the following reasoning highly instructive: "[W]aiver is not . . . allowed to operate so as to infringe [on] the rights of others, or to transgress public policy or morals.
"The public interest may not be waived. [When] a law seeks to protect the public as well as the individual, such protection to the state cannot, at will, be waived by any individual, an integral part thereof. The public good is entitled to protection and consideration and if, in order to effectuate that object, there must be enforced protection to the individual, such individual must submit to such enforced protection for the public good. . . . Accordingly, a statutory right conferred on a private party, but affecting the public interest, *655 may not be waived or released if such waiver or release contravenes the statutory policy." (Citation omitted; emphasis added; internal quotation marks omitted.) In re Application for Petition for Writ of Habeas Corpus by Dan Ross, 272 Conn. 676, 719-20, 866 A.2d 554 (2005) (Lavery and Dranginis, Js., dissenting); see also Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) ("[when] a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed [when] it would thwart the legislative policy which it was designed to effectuate"). Indeed, further research reveals that we initially based this reasoning on the simple concept that "[o]ne cannot give what one does not possess. One may waive a personal obligation of another to the one waiving. One cannot waive an obligation owed by another to the public." L'Heureux v. Hurley, supra, 117 Conn. at 355-56, 168 A. 8. Thus, when an obligation is "a public obligation created by statute," it cannot be waived by any individual or group of individuals.[37] Id., at 356, 168 A. 8; see also Beasley v. Texas & Pacific Railway Co., 191 U.S. 492, 498, 24 S.Ct. 164, 48 L.Ed. 274 (1903) (Holmes, J.) ("the very meaning of public policy is the interest of others than the parties and that interest is not to be at the mercy of the [parties] alone").
We believe that the training requirement in § 10-223e (h) embodies a public obligation that, through the act of the General Assembly, inures to the benefit of the citizens of Connecticut as a whole. We reach this conclusion in view of the fact that this provision is meant to ensure that, if it is necessary to reconstitute a local board of education, reconstitution will occur in a methodical, deliberate and transparent manner. In this sense, the provision creates a process that benefits no person or group individually. It benefits the citizens of this state by mandating a transparent process, it protects the local electors and the democratic process, and it furthers a policy of maintaining a locally elected board of education to the maximum extent possible, even when that board is *656 subjected to increased state supervision and control. In that sense, the training provision serves, at the very least, the twin purposes of providing notice that the state board is considering authorizing reconstitution of a local board and of affording that local board another chance, following training, to demonstrate that it can operate effectively without the need to resort to the severe measure of reconstitution. At a minimum, the goal that the legislature envisioned through the training requirement consists of protecting the democratic process by providing locally elected boards of education with every possible opportunity to become more effective, without the need to resort to the extreme action of reconstitution. These considerations support our conclusion that the training provision is a public obligation and sufficiently distinguishable from the time limit provision that was at issue in Stewart, or, for that matter, the arbitration provision at issue in Local 884, Council 4, AFSCME, AFL-CIO.[38]
In sum, because the training provision serves the public interest of Connecticut as a whole, we are not persuaded that the local board, even as a democratically elected representative body of the electors of the city of Bridgeport, could act to waive the provision. Put differently, the legislature, as the representative body of the citizens of Connecticut, has determined that requiring local boards of education to undergo training before the state board can authorize their reconstitution is in the public interest. Because the legislature has determined that it is in the interest of the state as a whole to have a methodical, deliberate and transparent process for reconstitution, it simply cannot follow that the local board could waive, on behalf of the electors of the city of Bridgeport, this statewide public obligation.
In light of the defendants' failure to provide this court with any reasonable justification in support of their waiver argument, we follow our previous decisions and decline to extend the doctrine of waiver to a mandatory statutory provision that exists for the benefit of the public rather than a specific individual. Accordingly, we conclude that the training requirement in § 10-223e (h) is both mandatory and not subject to waiver.[39]

*657 III
The foregoing analysis dispenses with the bulk of the arguments proffered by the defendants in this reservation. We address only one additional argument in more detail, as we believe doing so will further emphasize why the training provision in § 10-223e (h) is not waivable. In essence, the defendants claim that this court should not construe the training requirement to be so important as to override a resolution of a local board seeking reconstitution by the state board. As we understand this claim, the defendants are arguing that, once a local board has reached its own determination that it is operating dysfunctionally, has attempted to undergo its own training, and has concluded that it would not benefit from the training envisioned by § 10-223e (h), imposing the training requirement on the local board would elevate form over substance.[40] We disagree with this claim.
*658 We begin with the legislative intent and policy rationale behind the training requirement. For largely the same reasons that we discussed in connection with the defendants' waiver argument; see part II of this opinion; the statute's legislative history and significant policy considerations germane to Connecticut's education system compel the conclusion that the training requirement is not a mere procedural speed bump for the state board to overcome prior to authorizing the commissioner to reconstitute a local or regional board of education.
Additionally, the defendants' argument in this regard lacks merit for two other reasons. First, if we accepted the defendants' argument that the training requirement should be dismissed as being unimportant or futile, at least when a local board of education has undergone some sort of arguably relevant training, we would be concluding, essentially, that a public agency such as the state board and the public officials that compose it have no good faith obligation to fulfill statutory requirements that are directed at them. This is contrary to common sense and, more importantly, the oath of office that public officials must take. See General Statutes § 1-25 (delineating forms of oaths, which require individual to swear or affirm that he or she will "faithfully discharge, according to law, the duties of [his or her] office"); see also Bridgeport Municipal Code § 2.04.020 ("[e]very officer of the city shall, before he enters upon the duties of his office, make oath or affirmation before some competent authority for the faithful and impartial discharge of the duties of such office"); Bridgeport Charter c. 2, § 6(b) ("[a]ll elected and appointed officials of the city shall be sworn to the faithful discharge of their respective duties"). Moreover, with specific regard to the present case, there is no dispute that § 10-223e (h) refers to the mandate that the state board require a local board of education to undergo and complete training but not to the authority of a local board to seek out its own training. As we noted previously, § 10-223e (c)(2) sets forth the state board's obligation to improve all low achieving schools and districts by dictating that the state board work in conjunction with the local schools and boards of education. The defendants' position would allow the state board to sidestep its statutory obligation to work in cooperation with the local board before authorizing reconstitution. In other words, if we were to accept the defendants' argument, we essentially would be allowing the state board to forgo a statutory obligation that the legislature intended the state board to fulfill. In this regard, an application of the waiver doctrine to the present case premised on the notion that training is unimportant or futile is equivalent to wholly disregarding the will of the legislature. As we stated in part II of this opinion, the legislature has signaled in numerous instances that it expects the state board and local boards of education to work together in every manner possible to maintain local control and operations of the educational system.
Even if we were to accept the proposition that, at some point, requiring training *659 would be futile,[41] in the present case, the state board and local board's determination to that effect was premature. Neither the state board nor the local board could have adequately assessed whether training would be futile because (1) neither board knew what type of specific training the local board would receive, as the state board never had required training of any local board of education prior to authorizing reconstitution in this case, and (2) the local board members, having never been in the position of potentially having their board be reconstituted, were unable to know whether training would be helpful in that circumstance. Simply put, the defendants' futility argument does nothing more than beg this court to accept the premise that a public official need not attempt to carry out his or her responsibilities. Even more troublesome is that, taken to its logical end, the defendants' argument would allow the state board to reconstitute local boards of education without requiring any training at all. As we have stated elsewhere in this opinion, this clearly is not the result intended by the legislature, which sought to provide protections to the public by requiring the state board to fulfill certain statutory obligations prior to authorizing reconstitution.
Additionally, and on a more fundamental level, the claim that the training requirement is effectively not a requirement for the state board ignores the plain language of the statute and well accepted principles of statutory construction. If the legislature did not intend for the state board to require local boards of education to undergo and complete training before the state board authorizes their reconstitution, it would have used different language or omitted that language from the statute altogether. The fact that the legislature inserted the training requirement and directed that requirement to the state board strongly suggests that (1) the legislature intended that the state board would determine when it would require the local board to undergo and complete training, and (2) only this specific type of training would give the state board the authority to authorize reconstitution of the local board.[42] Moreover, neither the plain language *660 of the statute nor the legislative history indicates that an exception to the training requirement exists if the state board were to conclude that such training would be unnecessary or futile, and we do not believe it is appropriate to read such an exception into the statute in light of the record presented by this case. Cf. Forest Walk, LLC v. Water Pollution Control Authority, 291 Conn. 271, 284, 968 A.2d 345 (2009) ("[i]n the absence of any indication of legislative intent, we cannot engraft additional requirements onto an otherwise silent provision").
On the basis of the legislative history, policy considerations and the well-founded principle that we presume that the legislature acts intentionally when it includes certain words or provisions within a statute; see, e.g., Housatonic Railroad Co. v. Commissioner of Revenue Services, 301 Conn. 268, 303, 21 A.3d 759 (2011) ("We presume that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant. . . ." [Internal quotation marks omitted.]); we reject the defendants' claim that the training requirement is illusory or that it can be satisfied by evidence of participation in training by the local board of education on its own initiative.
In emphasizing the different roles of the state board and local boards of education, we do not suggest that the state's role is limited, especially with regard to low achieving schools or districts, or that the state does not have the ultimate responsibility of providing appropriate educational opportunities. Indeed, as we previously noted, the state board's supervisory role includes many responsibilities that concern the day-to-day administration of low achieving schools and districts, and the state board possesses broad powers to carry out those responsibilities. As the foregoing analysis demonstrates, however, Connecticut has not entirely abandoned a policy of delegating the vast majority of educational administration to local boards of education, even with regard to local oversight of low achieving schools and districts. Section 10-223e (h) must be construed in light of that policy. At a minimum, there is no reasonable basis for concluding that the legislature intended that § 10-223e (h) would upend the balance of operations and control between the state board and local boards of education in any circumstance other than the specific one envisioned by the statute. There is no suggestion that the legislature expects local boards of education to seek out reconstitution themselves. Instead, the legislature empowered the state board, and the state board only, with the power to authorize reconstitution, but that authority is circumscribed to the extent that the state board must first require the local board of education to undergo training. Neither the statute nor legislative history provides that local boards of education may make their own determination as to whether training or reconstitution is appropriate.
Thus, the fundamental distinction between the majority opinion and the dissent is not the concern for the educational needs of Bridgeport students. Rather, it is our answer to the question of whom the training provision is intended to protect. In light of the language of the statute and the relevant legislative history, we do not view the training provision as protective of any particular individual or group. The *661 dissent, however, without any analysis or authority to support its position, claims that it protects the local board. Because we are unwilling to accept such an assumption when there is authority to the contrary, we reach an outcome different from that of the dissent.
For the foregoing reasons, we conclude that the state board's failure to require the local board to undergo and complete training, as required by § 10-223e (h), rendered void the state board's authorization to the commissioner to reconstitute the local board. Accordingly, we answer the first question presented in this reservation in the affirmative.[43] We decline to answer the remaining four questions because our answer to the first disposes of all other underlying issues.
The case is remanded to the trial court with direction to set a date for a special election for the local board. The special election will include all four seats that would have been filled on the basis of voting in the 2011 Bridgeport municipal elections. Because not all former local board members can be reinstated at this time, as some of their terms of office have expired, and because a local board must continue to function until a new local board can be elected, we stay the effect of our decision pending final certification of the special election results by the town clerk. Therefore, the trial court shall direct that the seven current members of the reconstituted board remain in office until the special election has been completed. At that time, the trial court shall reinstate the five members of the local board whose terms of office have not expired, to serve along with the four newly elected members.
The answer to the reserved question of whether the state board of education violated § 10-223e (h) when it authorized the commissioner of education to reconstitute the board of education of the city of Bridgeport is: Yes. The case is remanded to the trial court with direction to proceed in accordance with this court's directive in the preceding paragraph.
No costs shall be taxed in this court to either party.
In this opinion ROGERS, C.J., and NORCOTT, McLACHLAN, EVELEIGH and HARPER, Js., concurred.
McLACHLAN, J., concurring.
I agree with and join the well reasoned majority opinion. I write separately, however, to highlight a significant point addressed by Justice Harper. In his concurrence, he points out the necessity of parental and community involvement in order for our public schools to be successful. I heartily agree. No matter how magnificent the facility, and regardless of the credentials and commitment of the teachers, if the school system is not supported by the parents and the community at large, the children, when they come to school, cannot be engaged fully in the educational process. Therefore, I agree with Justice Harper that anything that may alienate parents and the community from the schools leaves students without *662 the support and encouragement that they need to succeed.
HARPER, J., concurring.
A closely divided state board of education (state board) voted to reconstitute the board of education of the city of Bridgeport (Bridgeport board) without requiring that board to complete training that the legislature has mandated as a precondition to reconstitution.[1] See General Statutes § 10-223e (h). In determining implicitly that training need not be provided, the state board acted wholly in reliance on a resolution adopted by six of the nine members of the Bridgeport board purporting to waive the training requirement on the ground of futility. I agree with the conclusions reached by the majority in determining that the state board's decision to reconstitute was unlawful. In so concluding, I emphasize that the Bridgeport board's resolution, in which the board attempted to waive its right to training to induce the state board to reconstitute the Bridgeport board (reconstitution resolution), did not, and could not as a matter of law, negate the state board's mandatory statutory obligation to require completion of that training or serve as a basis to displace duly elected members of the Bridgeport board. I believe that the majority's resolution of the issue of whether the Bridgeport board could waive this right is consistent with the apparent legislative intent.
In writing separately, I wish to highlight my disagreement with the dissent's suggestion that permitting a local board of education to waive preconditions to state intervention necessarily honors the principle of local control and best advances the educational interests of schoolchildren in low performing schools. I also wish to bring to light certain concerns that the plaintiffs[2] have raised, in their complaints and in arguments to this court, regarding allegedly improper motives for the reconstitution resolution and the deprivation of the Bridgeport electorate's voice in their own children's education. These concerns give context to the plaintiffs' claims and explain the deep passions that motivated their opposition to reconstitution. In acknowledging these issues, however, I am mindful that the plaintiffs agreed not to litigate the merits of all of their allegations in favor of a more expeditious resolution of the case by reserving questions of law to this court and stipulating to the limited facts necessary to resolve those legal issues. It is on the basis of this stipulation and attached exhibits[3] that we ultimately must render our decision.
I first note that the resolution adopted by six members of the Bridgeport board to forgo training cannot logically be separated from the intended effect of that decisionto displace duly elected board members through a state created reconstituted board. Nothing in the record suggests that the state or the state board had considered reconstitution prior to the state *663 board's receipt of the Bridgeport board's resolution, despite serious deficits in the Bridgeport schools for seven years.[4] The record plainly manifests that, in acting favorably on the resolution, the state board relied on representations by certain Bridgeport board members and city officials that, due to fundamental disagreements between three board members and the majority of the board that resulted in "dysfunction," reconstitution was the only possible course of action and that such action must be taken immediately.[5] These claims were accepted by a bare majority of the state board, despite the fact that elections were imminent for three seats on the Bridgeport board and that the Bridgeport charter provides a mechanism to fill school board vacancies should others choose to step down. See Bridgeport Charter, c. 15, § 1(d). The three members of the Bridgeport board who opposed the resolution made clear their interest in continuing to serve, their belief in their capacity to fulfill their obligations, and their view that those board members who felt otherwise should act consistently with the democratic process by either declining to seek reelection or relinquishing their seats. The only members of the community who spoke at the meeting opposed reconstitution generally or the lack of transparency in the process, a subject I later address. Therefore, although the Bridgeport board's reconstitution resolution legally could not, in and of itself, displace duly elected board members, it is appropriate to consider the resolution as the cause of that action.
In light of the actual effect of the Bridgeport board's purported waiver, I take issue with the dissent's assumption that the legislature intended to permit the Bridgeport board to waive statutorily mandated training and that such a result necessarily is consistent with the principle of local control and is in the best interests of the children of the Bridgeport public schools. There can be no doubt that "[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society. . . ." Wright v. Council of Emporia, 407 U.S. 451, 469, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); accord San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 49, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("[t]he persistence of attachment to government at the lowest level where education is concerned reflects the depth of commitment of its supporters"); see also Milliken v. Bradley, 418 U.S. 717, 741-42, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) ("local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to [the] quality of the educational process"). Undoubtedly, many citizens in this state cherish this exercise of direct control in their children's educational process, and they exercise this control when they have their say at the ballot box regarding who will make decisions involving that educational process. It is universally accepted *664 that children perform better in school when their parents are involved in their education. Significantly, this premise is reflected in the federal act that was the impetus for our legislature's enactment of § 10-223e.[6] The federal No Child Left Behind Act of 2001, Pub.L. No. 107-110, 115 Stat. 1425, codified as amended at 20 U.S.C. § 6301 et seq. (2006 & Supp. III 2009), not only is replete with references to parents, it also contains an entire section devoted to parental involvement.[7] See 20 U.S.C. § 6318.
Local control over education fosters and affirms parental involvement, thus comporting not only with deep civic values, but also in important respects with the interests of children as well. In this context, reconstituting a local board of education is an extraordinary act that necessarily diminishes local control into the future and, if imposed against the will of a majority of parents, threatens to undermine sustained parental involvement in the education system.[8] The dissent, in considering a local board of education's act of waiver only as an isolated political act by a duly elected representative body, wrongly concludes that "we honor the principle of local control by permitting a local board [of education] to waive the training afforded by § 10-223e (h) in order to discharge as expeditiously as possible the local board's duty to promote the interests of the schoolchildren." Local control, however, is not merely a matter of exercising political power or of expeditiously discharging legal duties; rather, it is a matter of enduring civic investment and responsibility that is formed from the dense fabric of the families and neighborhoods in which our public schools operate. The reconstitution of a local board of education, even if done with the best of intentions, risks tearing at that civic fabric, and it is not clear that a reconstituted "local" board of education will necessarily make up for the damage done.
It bears emphasizing that the children of this state have a constitutional right to an adequate and equal education. I seriously doubt, however, whether anyone on either the Bridgeport board or the state board considering reconstitution, with or without state mandated training, operated under the illusion that such a measure would be a panacea for the serious and *665 long-standing deficits in the Bridgeport public school system. In mandating training prior to reconstitution, however, § 10-223e (h) reflects a legislative determination that such a precondition ultimately is in the best interests of our schoolchildren. In other words, the legislature has determined that the potential benefits that might be gained by providing training to local or regional boards of education in long-term, low achieving school districts outweighs the benefits of a more expedited procedure that would displace locally elected or appointed boards in favor of a new board that has no particular attachment, or political accountability, to the community it serves.
I also take note of the fact that, in their complaints and in arguments to this court, the plaintiffs have leveled accusations that certain members of the Bridgeport board colluded with the mayor, superintendent, private parties and certain members of the state board to engineer a takeover of the Bridgeport board for purely political purposes. They suggest that these actions were undertaken for the purpose of ousting a vocal minority who had opposed the mayor's policies. I underscore that these allegations are unproven; they are not part of the stipulated facts. As a general matter, this court assumes that public officials are acting in good faith. Kinsella v. Jaekle, 192 Conn. 704, 729, 475 A.2d 243 (1984). Accordingly, in the absence of clear evidence to the contrary, I operate under the assumption that Bridgeport board members have exercised their authority in good faith, solely for the purpose of advancing the educational interests of the children. Indeed, the fact that no member of the Bridgeport board was appointed to the reconstituted board and that the superintendent's ability to retain his position was placed in jeopardy by supporting reconstitution undermines these accusations.[9] If true, however, such allegations might raise a fundamental question as to the fitness of certain board members to serve. The Bridgeport board has a broad grant of authority under the Bridgeport charter, but only insofar as its actions relate to educational considerations. See Bridgeport Charter, c. 15, § 2 ("[t]he board of education shall have all the powers vested in, and shall perform all the duties imposed [upon], boards of education under the laws of this state and the United States").
I observe, however, one adverse inference in support of the plaintiffs' allegations that readily can be drawn from the stipulated facts and exhibits submitted as part of that stipulation, namely, that the reconstitution process was undertaken in a manner that not only limited transparency, but intentionally limited opportunity for community involvement and for board members to marshal opposition. Only certain Bridgeport board members were privy to private discussions about reconstitution that took place many months before the resolution was adopted requesting that action. Thereafter, at 4:55 p.m. on Friday, July 1, 2011, just before a three day holiday weekend was to commence, notice was issued for a special meeting of the Bridgeport board to be held at 6 p.m. on Tuesday, July 5, to consider the reconstitution resolution. At its regularly scheduled meeting on the morning of July 6, the state board voted in favor of adding the reconstitution resolution to its agenda and acted on that issue later that same day. Thus, essentially two business days lapsed between the initiation and the resolution *666 of the reconstitution issue. Although a handful of Bridgeport citizens spoke at the board meeting in opposition to reconstitution, it seems likely that the speed at which this action was finalized deprived members of the community who hold passionate views for or against the wisdom or propriety of reconstituting their duly elected board the opportunity to participate in this process. Although one member of the state board strongly advocated for a delay in voting on reconstitution in order to give the citizens of Bridgeport sufficient opportunity to voice their views on the matter, that suggestion did not garner support.
In making these observations, I am mindful that the plaintiffs have not advanced a claim that these procedures violated the public hearing requirements of the Freedom of Information Act, General Statutes § 1-200 et seq., or their constitutional right to procedural due process. Indeed, the legislature has not mandated any procedural requirements in connection with reconstitution generally or the training precondition specifically.[10] To the extent, however, that the legislature has imposed the training precondition as a protection against the arbitrary and capricious ousting of elected or appointed representatives and the advancement of educational interests, it may want to consider whether those interests might better be served by enacting some procedural guidelines. It would seem evident that parents will be more likely to remain invested in their children's education when they are given a voice in as essential a matter as who governs that educational process.
Undoubtedly, it is for the legislature, not this court, to determine whether it is good policy for the state to reconstitute a duly elected or appointed local school board. Nonetheless, we need not be blind to the implications of the lawful exercise of authority. Poor urban districts like Bridgeport are among the state's longest, low achieving school districts. I cannot help but note that parents in such districts often are cited as being less involved in their children's education than their more affluent suburban counterparts. One reason posited for this difference is that "low-income families often perceive themselves as outside the school system. . . ." P. McDermott & J. Rothenberg, "Why Urban Parents Resist Involvement in their Children's Elementary Education," 5 The Qualitative Report (October, 2000) p. 1, available at http://www.nova.edu/ssss/QR/QR5-3/mcdermott. html (last visited February 28, 2012) (copy contained in the file of this case with the Supreme Court clerk's office). Thus, it has been recommended that "[s]chools serving low income, ethnically diverse neighborhoods . . . must make greater efforts to welcome families, because those are the parents who often feel excluded because of differences in their ethnicity, income, and culture." Id., at p. 2. Failure to provide procedures that allow for optimum community involvement in a decision of the magnitude of reconstituting a locally elected board of education would seem to reinforce the perception of parents in such districts that they are outsiders. I feel confident that the legislature would not intend such an effect.
In sum, I conclude that the state board violated § 10-223e (h) by authorizing the commissioner of education to reconstitute the Bridgeport board in disregard of its independent obligation to ensure that the Bridgeport board completed training to improve its operational efficiency and effectiveness *667 as leaders of its districts' improvement plans.
I respectfully concur.
PALMER, J., dissenting.
Acknowledging their inability to fix a school system that has failed to meet minimum state standards for seven consecutive years, Bridgeport's mayor, superintendent of schools, and school board formally requested that the state board of education authorize the commissioner of education to reconstitute the Bridgeport school board,[1] as authorized by General Statutes § 10-223e (h). In response, the state board, acting in furtherance of its constitutional and statutory duties to ensure that this state's schoolchildren receive an adequate public education,[2] acceded to Bridgeport's request and directed the commissioner to reconstitute the Bridgeport board. For approximately seven months now, the reconstituted board has endeavored to repair Bridgeport's broken school system.
Today, the majority deals the schoolchildren of Bridgeport a major setback, striking down the state board's action without any legitimate basis for doing so. The majority holds that the Bridgeport board was not free to waive the training provision of § 10-223e (h). Yet it is axiomatic that a statutory requirement typically may be waived by the requirement's intended beneficiary or by the beneficiary's duly authorized representative, and this case presents no exception to that general rule: a local board of education is free to waive the training provision of § 10-223e (h) because that provision obviously exists to protect a local school district from an unwanted state takeover, not to force a local board of education to retain control even after the local board has determined that it cannot discharge its constitutional duty to provide an adequate public education. There is not a shred of evidence to support the majority's contrary conclusionnot in the statutory text, not in the legislative history, and not in our case law. The majority achieves its unfounded conclusion only by misapplying the law and ignoring this state's recent sea change in public policy toward failing school districts.
Not only does the majority disregard established principles of law, relying instead on superficially favorable language that it lifts from an assortment of largely irrelevant opinions, but the majority also invokes a nonexistent principle of statutory interpretation to rationalize ignoring the legislative history of § 10-223e and to justify saddling the training provision of § 10-223e (h) with an entirely fictional purpose: to provide "notice" of an impending *668 reconstitution to the citizens of the entire state and to promote "transparen[cy]" and "delibera[tion]" during the ensuing reconstitution process. This purported statutory purpose receives no support from the evidence on which the majority relies, nor does it provide any support to the majority's conclusion that the training provision is nonwaivable. The majority does not even attempt to justify its assumption that permitting a local board of education to waive the mandated training would deprive the citizens of this state of adequate notice of an impending reconstitution or render the reconstitution process impermissibly opaque or overhasty. The majority also does not attempt to explain how the citizens of Connecticut's various towns and cities could have an overriding interest in the transparency and deliberateness of the reconstitution process in Bridgeport, an interest so strong as to outweigh that city's own interest in permitting the Bridgeport board, acting on behalf of the local electorate, to waive the training contemplated by § 10-223e (h) in order to discharge as expeditiously as possible the Bridgeport board's duty to protect the schoolchildren's constitutional right to an adequate public education.
In analyzing the training provision of § 10-223e (h), the majority refuses to consider the legislative history of the comprehensive statutory scheme of which the training provision is but a small part, a statutory scheme that grants the state sweeping power to rescue failing schools and school districts. In reading the majority opinion, one would scarcely know the extent to which this grant of power represents a dramatic shift away from what was once a blanket preference for local control of education. Where our most profoundly troubled school systems are concerned, this state has abandoned any preference for local control. Oddly enough, however, it is in fact the majority opinion that disregards the value of local control, offering an analysis of § 10-223e (h) that yields an absurdly paternalistic result, namely, that the training provision could not have been waived even upon a 9 to 0 vote of the local board and upon unanimous community and political agreement that the Bridgeport school system required immediate state intervention. This irrational statutory construction defies common sense, not to mention settled principles of law. Compounding the problem is the majority's holding that the training provision serves the purpose of providing for a "transparent and deliberative process." This holding yields the additional irrational result that, even if the members of a local board of education have voluntarily undergone all of the training that the state board possibly can have required of them, the state board could not reconstitute the local board without requiring the board members to undergo the training all over again.
It seems that what really drives the majority opinion is a general sense of unease with Connecticut's dramatic shift away from a policy of local control of failing school systems and a lack of affection for the state's newfound statutory power to reconstitute a local school board unable to stem the tide of chronic failure. Expressly agreeing with Justice Harper's critical view of the reconstitution authority, the majority proclaims that "local control over education fosters a beneficial and symbiotic relationship between the parents, students and local school administrators, a relationship that should not be lightly disregarded." Footnote 24 of the majority opinion. Yet this case simply is not about whether permitting the state board to reconstitute failing school districts *669 is good public policy.[3] That is a question already answered by the legislature, and answered resoundingly.[4]
In sum, it is clear that a local board of education is competent to waive the protection of § 10-223e (h) both because it is the locality's duly elected representative and because it is an agent of the state charged with fulfilling the state's constitutional obligation to provide schoolchildren with a suitable education. That constitutional obligation adverts to what this case really is about: the dismal state of affairs confronting Connecticut's poorest schoolchildren. Absent from the majority opinion is anything more than a passing reference to this calamity.[5] Yet the plight of *670 Bridgeport schoolchildren is what prompted the state board to honor the Bridgeport board's request for state intervention and is what the legislature generally sought to remedy when it enacted a statutory scheme making that intervention possible. Because the state board's intervention in Bridgeport was statutorily authorized, and because the plaintiffs' constitutional claims are meritless, I disagree with the majority's conclusion that the state board's reconstitution of the Bridgeport board was unlawful. I therefore dissent.

I
Before explaining my disagreement with the majority's waiver analysis, I find it necessary to discuss in some detail this case's historical and statutory backdrop.[6] The majority pays scant attention to this important context, which amply reflects the state's dominant role with respect to failing school districts. This context makes it crystal clear that § 10-223e serves one overriding purpose: to endow the state with sweeping power to rescue failing schools and school districts. In light of the statute's interventionist purpose, it is obvious that the training contemplated by § 10-223e (h) serves simply to put a modest[7] brake on the process of reconstituting a local board of education in order to protect the locality's still existing but minimal interest in retaining control over public education. In short, the training provision is a shield, a measure meant to protect a locality against what it might perceive as an unwarranted state takeover.[8] The training provision is not a sword, a measure meant to force a local board of education to retain control over the education of the district's schoolchildren even after the local boardand, in the present case, the mayor and the superintendenthas determined that it cannot discharge its duty to provide an adequate public education. Because the shield can serve no function when a locality requests reconstitution instead of opposing it, and because mandatory statutory provisions *671 typically may be waived,[9] it is clear that a local board of education is free to waive the training provision.
I begin, then, by describing the sad state of affairs confronting Connecticut's poorest schoolchildren. It was this state of affairs that the legislature sought to rectify when it enacted a statutory scheme enabling the state to intervene in the educational affairs of municipalities like Bridgeport, whose schools chronically have failed to deliver on this state's constitutional obligation to provide an adequate public education. Of all fifty states, Connecticut has the largest "`achievement gap,'" that is, the gravest disparity between the educational performance of "students who are from low-income families compared with those from more affluent circumstances."[10] Connecticut Commission on Educational Achievement, "Every Child Should Have a Chance to Be Exceptional. Without Exception. A Plan to Help Close Connecticut's Achievement Gap" (2011) p. 7. A commission established by former governor M. Jodi Rell to study Connecticut's achievement gap recently reported that fourth and eighth grade low income students are on average about three grade levels behind fourth and eighth grade non-low income students in reading and mathematics; id.; at 42 percent of third through eighth grade low income students score at "goal level" in reading, compared with 80 percent of their non-low income peers; id., at p. 8; 18 percent of tenth grade low income students score at "goal level" in reading, compared with 57 percent of their non-low income peers; id.; only 60 percent of Connecticut's low income students graduated from high school in 2009, compared with 86 percent of their non-low income peers; id.; and, even among Connecticut students who manage to graduate from high school and to go on to college, more than one half of these students entering Connecticut's public two year and four year colleges require immediate remediation in mathematics or English. Id.
The plight of Connecticut's poorest schoolchildren is unusually dire in Bridgeport. As the members of the reconstituted Bridgeport board note in their brief to this court, a vivid snapshot of Bridgeport's education crisis is its dropout rate. For the statewide high school graduating class of 2008, the cumulative dropout rate was 6.6 percent, meaning that one out of fifteen members of the class of 2008 withdrew along the four year path to graduation. Connecticut Department of Education, Data Bulletin: High School Dropout Rates in Connecticut (November 2009) p. 4. In the Bridgeport school district, by contrast, the cumulative dropout rate for the class of 2008 was a staggering 23.3 percent, that is, nearly one out of every four students. Id., at p. 10. This dropout rate is deplorable, even in comparison with Connecticut's *672 other underperforming school districts. For the class of 2008, the dropout rate for students in the Bridgeport school district was more than double that in Hartford (11.9 percent); id., at p. 11; and substantially higher than that in New Haven (15.7 percent). Id. Similarly deplorable is the annual high school graduation rate in the Bridgeport school district, that is, the percentage of high school seniors who actually graduate in a given year. On the basis of data collected by the state department of education in 2008, Connecticut Coalition for Achievement Now found that Bridgeport's graduation rate was lower than that of every other school district in the state. Connecticut Coalition for Achievement Now, Connecticut Graduation Rates, pp. 17-22.
No less tragic than Bridgeport's high school dropout rate is its abysmal student performance. In the 2010-2011 school year, according to data collected by the state department of education, fewer than one in four third graders in the Bridgeport school district read at "goal" level or above, compared with a clear majority of third graders statewide; approximately 43 percent of eighth graders in the Bridgeport school district read at "goal" level or above, compared with approximately 75 percent statewide; approximately 31 percent of eighth graders in the Bridgeport school district attained "goal" level in mathematics, compared with approximately 67 percent statewide; and just one in ten tenth graders in the Bridgeport school district read at "goal" level or above, compared with nearly one half of tenth graders statewide. Similarly poor performance in previous years has consistently placed the Bridgeport school district in the lowest achieving 5 percent of school districts, on average, in Connecticut. See Strategic School Profile (2008-2009) of the Bridgeport School District (produced by state department of education); Strategic School Profile (2007-2008) of the Bridgeport School District (produced by state department of education).
These heartbreaking statistics provide a context for the key stipulated facts in this case: that the state board designated the Bridgeport school district as a low achieving school district under § 10-223e (c)(1) for at least seven consecutive years; that the Bridgeport school district has failed to make acceptable progress toward benchmarks established by the state board, pursuant to § 10-223e (a) and (c); and that the Bridgeport school district has failed to make adequate yearly progress, as defined by the federal No Child Left Behind Act of 2001, Pub.L. No. 107-110, 115 Stat. 1425, codified as amended at 20 U.S.C. § 6301 et seq. (2006 & Sup. III 2009), for at least two consecutive years while being designated as a low achieving school district. Contrary to the majority's assertion, these troubling statistics are hardly "irrelevant."[11] Footnote 14 of the majority opinion. To the contrary, they demonstrate the urgency of the Bridgeport board's constitutional duty to provide the schoolchildren with an adequate public education and therefore help explain why barring local boards of education from *673 waiving the training provision would frustrate the purpose of § 10-223e.
The relevant statistics also serve to illuminate the legislative intent, painting a vivid picture of the crisis that the legislature sought to remedy when it created the statutory scheme of which § 10-223e (h) is but a small component.[12] The bulk of that statutory scheme came into being in June, 2007, when the legislature passed An Act Implementing the Provisions of the Budget Concerning Education (2007 act), Public Acts, Spec. Sess., June, 2007, No. 07-3 (Spec.Sess.P.A.07-3). Supported by a virtually unanimous General Assembly; 50 H.R. Proc., Pt. 28, 2007 Spec. Sess., p. 9070 (vote of 138 to 0 in favor of passage in House of Representatives); 50 S. Proc., Pt. 19, 2007 Spec. Sess., p. 6219 (vote of 32 to 1 in favor of passage in Senate); the 2007 act made sweeping changes to Connecticut's education law.
Of greatest significance to the present case, the 2007 act amended § 10-223e to give the state unprecedented power to intervene in failing schools and school districts. See Spec. Sess. P.A. 07-3, § 32. As amended by the 2007 act, § 10-223e provided that low achieving schools and school districts would be subject to "intensified supervision and direction" by the state board. Spec. Sess. P.A. 07-3, § 32, codified at General Statutes (2008 Sup.) § 10-223e (c)(1). To improve student performance in these schools and school districts, the 2007 act empowered the state board, inter alia, (1) to require a local or regional board of education to use state and federal funds for critical needs, as directed by the state board, (2) to provide incentives to attract highly qualified teachers and principals, (3) to direct the transfer and assignment of teachers and principals, (4) to require that teachers, principals, and office staff receive additional training, (5) to require local boards to implement model curricula, including recommended textbooks, materials and supplies approved by the state department of education, (6) to identify schools for reconstitution as state or local charter schools, (7) to identify schools for management by an entity other than the local or regional board of education for the district in which the school is located, (8) to direct a local or regional board to develop and implement a plan addressing deficits in achievement, (9) to assign a technical assistance team to a school or district to guide local initiatives and to report progress to the commissioner, and (10) to direct schools to establish "learning academies" requiring continuous monitoring of student performance by teacher groups. Spec. Sess. P.A. 07-3, § 32, codified at General Statutes (2008 Sup.) § 10-223e (c)(2). With respect to school districts and elementary schools that, for two successive years, had failed to make "adequate yearly progress," and accordingly had been designated as low achieving, the 2007 act empowered the commissioner, after an evaluation, to order the school or *674 school district to provide full day kindergarten classes, summer school, an extended school day, weekend classes, tutorial assistance to students, or professional development for administrators, principals, teachers, and others, provided that either 30 percent or more of the students in any subgroup, as defined by the federal No Child Left Behind Act of 2001, had not achieved the level of proficiency on any subpart of the third grade statewide mastery test, or the commissioner determined "that it would be in the best educational interests of the school or the school district to have any of [the aforementioned] programs." Spec. Sess. P.A. 07-3, § 32, codified at General Statutes (2008 Sup.) § 10-223e (e).
The 2007 act further provided that, if a school district failed to make adequate yearly progress, as defined by the federal No Child Left Behind Act of 2001, for two consecutive years while being designated as a low achieving school district and also failed to make acceptable progress toward benchmarks established by the state board, the state board, after consulting with the governor and the chief elected official of the failing school district, could request that the General Assembly enact legislation authorizing the state board or another entity to take control of the school district, thereby entirely supplanting the local administration. Spec. Sess. P.A. 07-3, § 32, codified at General Statutes (2008 Sup.) § 10-223e (d). This remedy is even more comprehensive and thoroughgoing than the remedy of reconstitution.
Speaking on the Senate floor, Senator Thomas P. Gaffey, co-chairman of the education committee, described the 2007 act as "a historic investment in education in the school districts throughout Connecticut"; 50 S. Proc., Pt. 19, 2007 Spec. Sess., p. 6185; that "establishes far more accountability measures than ever before"; id., at p. 6186; and "will give [the state department of education and the commissioner] broad and sweeping powers" to intervene in failing school districts. Id., at p. 6187; see also id., at pp. 6197, 6199, remarks of Senator Thomas J. Herlihy (speaking strongly in favor of 2007 act and calling it "[a] huge increase in spending for education" and "accountability with teeth").
In 2008, the legislature passed An Act Concerning Minor Changes to the Education Statutes, Public Acts 2008, No. 08-153 (P.A. 08-153), which augmented the state board's already robust power to intervene in failing school districts.[13] In particular, P.A. 08-153 added a new subparagraph (M) to § 10-223e (c)(2), which gave the state board the authority to "require local and regional boards of education [in designated low achieving school districts] to (i) undergo training to improve their operational efficiency and effectiveness as leaders of their districts' improvement *675 plans, and (ii) submit an annual action plan to the Commissioner of Education outlining how, when and in what manner their effectiveness shall be monitored. . . ." P.A. 08-153, § 4, codified at General Statutes (Rev. to 2009) § 10-223e (c)(2)(M).
The operational training delineated in General Statutes (Rev. to 2009) § 10-223e (c)(2)(M) would two years later become an ingredient in another interventionist tool, namely, the state's authority to reconstitute a local or regional school board pursuant to § 10-223e (h), the focal point of this case. The legislature enacted § 10-223e (h) in the course of implementing a substantial piece of education reform legislation, namely, An Act Concerning Education Reform in Connecticut, Public Acts 2010, No. 10-111 (P.A. 10-111), which aimed in part to improve Connecticut's chances of obtaining funds under the federal Race to the Top program.[14] Race to the Top is a competitive grant program designed to reward states for implementing significant reforms in four areas of education policy: "enhancing standards and assessments, improving the collection and use of data, increasing teacher effectiveness and achieving equity in teacher distribution, and turning around struggling schools." United States Department of Education, Race to the Top Program: Guidance and Frequently Asked Questions (May 27, 2010), p. 3. In rejecting Connecticut's first round Race to the Top application, four out of five federal reviewers had found deficiencies in the state's capacity to turn around struggling schools, noting features of state law that made it difficult for the state to intervene in the lowest achieving "[l]ocal [e]ducation [a]gencies," that is, the lowest achieving local boards of education.[15] See, e.g., Race to the Top, Technical Review FormTier 1, Connecticut Application # 1680CT-3, comments from reviewer 3 ("Before the state can intervene in the lowest achieving [local education agencies] it must consult with the [g]overnor, [and the] chief elected officials of the district and may request the General Assembly to authorize that control of the [local education agency] be reassigned to the [state]. This statutory requirement makes intervention very difficult."), available at http://www.ctmirror. org/sites/default/files/documents/ connecticut-2.pdf.[16] To rectify this short-coming, *676 the legislature added one more facet to the state board's substantial power to intervene in low achieving school districts: the authority to reconstitute a local board of education.[17]
Viewed in its entirety, the statutory scheme provides a range of increasingly interventionist tools: (1) the state board may oversee and direct the principal activities of an existing local board of education; see General Statutes § 10-223e (c); (2) the state board may reconstitute a local board of education for a limited period while leaving the local administration substantially in place; see General Statutes § 10-223e (h); or (3) the General Assembly may divest control from the local administration entirely and reassign it to the state board or another entity for an unspecified period. See General Statutes § 10-223e (d).
Given the statutory scheme and the legislative history, the clear purpose of § 10-223e is to enhance the state's power to intervene in failing school districts. Viewed in the light of that overriding purpose, the training provision obviously serves to put a modest brake on the process of reconstituting a local board in recognition of the locality's still existing but dramatically reduced interest in retaining control.[18] As I discuss more fully in *677 parts II and III of this opinion, a locality is perfectly free to waive this limited protection, acting through its elected representative, the local board of education.

II
Before I address the various arguments that the majority offers in support of its interpretation of § 10-223e (h), I must observe that the majority's interpretation of that statute violates a cardinal rule of statutory construction, namely, that a court must not construe a statute to reach a bizarre or irrational result; if there are two asserted interpretations of a statute, the court must adopt the reasonable one over the unreasonable one.[19] E.g., State v. Courchesne, 296 Conn. 622, 710, 998 A.2d 1 (2010). Under the majority's interpretation of § 10-223e (h), no local board of education could ever waive the training provision, not even a unanimous board acting with the full support of the populace and the municipality's other elected officials.[20] This result is untenable because there is no rational justification for mandating that such a board undergo training before being reconstituted. A second irrational result follows from the majority's conclusion that the training provision cannot be waived because it provides for a "transparent and deliberative process." This aspect of the majority's holding entails that, even if the members of a local board of education had voluntarily undergone all of the training that the state board possibly could have required of them, the state board nevertheless could not reconstitute the local board without requiring the board members to undergo the training all over again. Any other result would deprive the local board of education and all other interested persons of notice of the state board's intention to reconstitute the local board, thereby defeating the supposed statutory purpose of "delibera[tion]" and "transparen[cy]. . . ."
Having noted that the majority's interpretation of § 10-223e (h) has several irrational consequences, I turn now to the majority's reasons for offering that interpretation. Three principal strains of argument emerge from the majority's discussion. First, the majority asserts that the legislative history of § 10-223e (h) indicates that the legislature did not intend that the training provision could be *678 waived; in doing so, the majority all but ignores the legislative history and genealogy of the interventionist statutory scheme of which § 10-223e (h) is only one part, and pays little regard to whether the legislators whom it quotes actually voted in favor of § 10-223e (h). Second, the majority contends that, because the training provision embodies a public obligation that inures to the benefit of the citizens of Connecticut as a whole, and because a public obligation created by statute cannot be waived by any individual or group of individuals, the training provision embodies a public obligation that no one, and, a fortiori, no local board of education, is competent to waive. Third, the majority asserts that, if a local board of education could waive the training provision, a local board could expand the scope of the state board's power, which would be impermissible.
The majority's three main arguments contain severe flaws. Most glaringly, none of the sources on which the majority relies actually supports its view of waiver, and many of these sources in fact support the opposite view. Nowhere is this last flaw more vivid than in the majority's selective reliance on legislative history. The majority refuses to consider the legislative history of the 2007 act; Spec. Sess. P.A. 07-3; the very act that created the comprehensive statutory scheme of which § 10-223e (h) is but one of several substantive provisions. Ignoring this crucial source of evidence, the majority looks only to the legislative history of P.A. 10-111, § 21, which gave rise to § 10-223e (h). The legislative history of P.A. 10-111, § 21, obviously tells us very little about the legislative intent behind the overall statutory scheme, most of which was enacted three years earlier. Had the majority consulted the legislative history of the 2007 act, it would have been forced to confront the fact that a virtually unanimous General Assembly approved the unprecedented interventionist measures that stand alongside the reconstitution process outlined in § 10-223e (h), measures that suggest anything but a legislative preference for local control of education in failing school districts.[21] By the time § 10-223e (h) became law in 2010, Connecticut's low achieving school districts already had been subject to "intensified supervision and direction" by the state board for three years. Spec. Sess. P.A. 07-3, § 32, codified at General Statutes (2008 Sup.) § 10-223e (c)(1). Such supervision and direction consisted of an assortment of interventionist programs, only some of which are canvassed in part I of this opinion. The majority nevertheless asserts that these unprecedented interventionist measures were intended "to promote local control. . . ." Contrary to the majority's assertion, it is perfectly clear that these statutory provisions do not increase local control; rather, they dramatically enhance state power over failing school districts. It also is perfectly clear that the key historical fact in this case is Connecticut's sea change in education policy, *679 not what the majority describes as "the legislature's decision to initially restrict to the General Assembly the power to reconstitute local boards." The historic set of legislative developments that preceded the enactment of § 10-223e (h) demonstrate that the advent of the reconstitution authority was the final step in a steady march toward enhanced state power to rescue failing school districts, a step that the legislature had been intent on taking after Connecticut failed to obtain a grant under the Race to the Top program, in part as a result of the state's then limited capacity to turn around struggling schools.
The majority avoids interpreting § 10-223e (h) in the light of what it acknowledges to be "a sea change in educational policy in this state" only by announcing a heretofore unknown principle of statutory construction: when construing a statutory amendment, the court must look primarily to the legislative history of the amendment and must pay little or no attention to the purpose and legislative history of the underlying statute. To state this principle is to refute it. This principle also runs counter to the established practice of this and other courts of construing a statutory amendment by reference to the legislative history of previous versions of the statute. See, e.g., McCoy v. Commissioner of Public Safety, 300 Conn. 144, 172-73 n. 23, 12 A.3d 948 (2011) ("the legislative history of [General Statutes] § 14-227a demonstrates that many of the amendments to § 14-227a over the years have been intended to make our driving under the influence law consistent with the law of other states and federally recommended guidelines"); see also Bell v. United States, 366 U.S. 393, 411, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961) ("[n]othing in the legislative history of the original statute or of its many re-enactments offers support for any other construction").
The majority's use of legislative history is flawed in yet another respect as well. In support of its conclusion that "there was a concern that reconstitution . . . would trample on the rights of the people who had duly and democratically elected their representatives to the local board," the majority relies to a significant extent on the statements of legislators who actually voted against P.A. 10-111. The statements of legislators who voted against P.A. 10-111 establish little if anything about the legislative intent behind § 10-223e (h). They certainly do not establish that the training provision signifies a deep-seated preference for local control of failing school districts. Even less do they establish that the training provision is nonwaivable. If the remarks of legislators who voted against the law establish anything at all, they likely establish that the legislature knew about and discounted the concerns of those legislators.[22] The majority's *681 attempt to divine the legislature's intent by relying on the statements of legislators who voted against P.A. 10-111 is a good example of the sort of use of legislative history that arouses "concerns over the manipulation by legislators or interest groups seeking to influence judicial interpretation after having failed to have their view adopted in the text of the legislation"; State v. Courchesne, 262 Conn. 537, 636, 816 A.2d 562 (2003) (Zarella, J., dissenting); and gives rise to "the appearance of . . . result-oriented decision-making." (Internal quotation marks omitted.) Id., at 632, 816 A.2d 562 (Zarella, J., dissenting); see also id. (Zarella, J., dissenting) (Criticizing majority's use of legislative history as result driven and explaining that "[t]he trick [employed by the majority] is to look over the heads of the crowd and pick out your friends. The variety and specificity of result that [the majority's approach] can achieve is unparalleled." [Internal quotation marks omitted.]).
Even if the selection of legislative sources on which the majority relies truly were representative of the legislature's intent, these sources would not support the majority's conclusion that the training provision is nonwaivable. The majority's conclusion simply is a non sequitur, a non sequitur concealed behind a sequence of purported inferences. From an assemblage of legislative quotations, the majority first infers "three general principles of legislative intent": (1) reconstitution is an "extreme remedy, to be used only sparingly after it becomes apparent that other remedial measures have failed to produce results"; (2) "the testimony and remarks [concerning § 10-223e (h)] track the plain [mandatory] language of the statute"; and (3) reconstitution is a "usurpation of local democratic will." From these three general principles, the majority then infers that the legislature intended the training provision to serve three "purposes": (1) to afford notice to a local board of education and its electors of a potential takeover; (2) to provide the local board with an opportunity to prevent its reconstitution; and (3) to allow the state board to reconstitute the local board only if "it first requires the local board to undergo and complete training"in other words, the training provision is mandatory. "View[ing]" these three purposes "together," the majority infers that the overarching purpose of the training provision is to afford notice of a potential takeover to the local board, its electors, and the citizens of this state as a whole, and to foster transparency and deliberation during the process of reconstitution. Having saddled the training provision with this overarching purpose, the majority then concludes that the provision is nonwaivable.
As I explain hereinafter, none of the purposes or principles that the majority ascribes to the training provision supports the conclusion that the provision is nonwaivable, and only some of these purposes or principles find any support in the legislative sources that the majority cites. I address these principles and purposes in turn.
First, the majority repeatedly emphasizes that the legislature understood § 10-223e (h) to be mandatory. This is irrelevant. As a conceptual matter, only a mandatory provision can be waived; thus, only in the context of a mandatory provision does the issue of waiver even arise. The fact that "the testimony and remarks track the plain [mandatory] language of the statute" *682 does not lend one iota of support to the majority's conclusion that the provision is nonwaivable. On the contrary, because the issue of waiver arises only in the context of a mandatory provision, if the mandatory language of § 10-223e (h) is evidence of anything, it is evidence that the provision might be waivable.[23] I therefore am baffled by the majority's lengthy discussion of why the training provision of § 10-223e (h) is mandatory.[24] There is little to discuss. Not only does the provision employ presumptively mandatory language; see General Statutes § 10-223e (h) ("[t]he [b]oard shall not grant such authority to the commissioner unless" [emphasis added]); but the defendants concede that the provision is mandatory. The clear effect of this long discussion is to give the false impression that, because the training provision is mandatory, it therefore is likely nonwaivable.
Second, the majority observes that the training provision serves the protective purpose of affording a local board of education an opportunity to prevent its reconstitution. I agree, but if the training provision serves to protect a local board from an unwanted takeover, then of course the local board can waive that protection. Indeed, every single legislative remark that the majority quotes evinces a desire to protect local boards of education from unwanted reconstitution. These remarks therefore support the very conclusion that majority eschews, namely, that the local board of education is free to waive the training provision because that provision serves only to protect the locality's greatly reduced interest in retaining control of its *683 chronically failing public schools. Furthermore, contrary to what the majority implies, the legislature's failure to consider whether a local board of education could seek out reconstitution or waive the training provision lends no support at all to the majority's conclusion that the training provision is not waivable. Rather, the absence of any evidence of legislative intent to preclude waiver strongly suggests that the training provision is indeed waivable. As this court previously has recognized, mandatory statutory provisions "typically" are subject to waiver. See, e.g., Santiago v. State, 261 Conn. 533, 543, 804 A.2d 801 (2002). Our permissive approach to waiver accords with that of the United States Supreme Court, which has noted that "in the context of a broad array of constitutional and statutory provisions . . . [r]ather than deeming waiver presumptively unavailable absent some sort of express enabling clause, we instead have adhered to the opposite presumption. . . . [A]bsent some affirmative indication of Congress' intent to preclude waiver, we have presumed that statutory provisions are subject to waiver by voluntary agreement of the parties." (Citations omitted.) United States v. Mezzanatto, 513 U.S. 196, 200-201, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995); see Shutte v. Thompson, 82 U.S. (15 Wall.) 151, 159, 21 L.Ed. 123 (1873) ("[a] party may waive any provision, either of a contract or of a statute, intended for his benefit").
Third, the majority contends that the legislature regarded reconstitution as an "extreme remedy, to be used only sparingly after it becomes apparent that other remedial measures have failed to produce results."[25] Although I agree that reconstitution is an "extreme remedy," it is beyond dispute that no circumstances could be more extreme than those of the present case, in which student performance in the locality is chronically abysmal; see part I of this opinion; oversight measures have failed to yield appreciable improvement,[26] and the mayor, the superintendent, and *684 the Bridgeport board itself all have made impassioned pleas for state intervention. Testifying before the state board, former Bridgeport board member Thomas Mulligan, who had served just six months of his first term when he voted for reconstitution, explained that the Bridgeport board could not possibly fulfill its obligations to Bridgeport schoolchildren because of the "toxic" atmosphere at board meetings and because the board could not agree on anything, even a budget. Mulligan testified that he would not have voted for the reconstitution measure if he had believed there was any other way to promote the educational interests of Bridgeport schoolchildren. He added that, although a few of his colleagues might be disappointed about losing their jobs, "more important than elective office is to do the job that you have been elected to do. . . . [I]t is more important that the students get the education that they are entitled to. . . . The kids in the city of Bridgeport need a functional board more than any other municipality [in the state]. They deserve it." Barbara Bellinger, former president of the Bridgeport board, expressed a similar sentiment. She testified that reconstitution was necessary because the Bridgeport board simply was incapable of "delivering the education that the children deserve and the state says they should have. . . . We might disagree as to the reasons for our current problems, but the status quo is not working or acceptable. We need the state to step in and be our partners." John Ramos, the superintendent, described the reconstitution measure as the "last and best hope for our district and its students."
Fourth, the majority contends that the legislature viewed reconstitution as a "usurpation of the local democratic will." Whether true or not, this contention is irrelevant. Reconstitution may represent a usurpation of the local democratic will only when it occurs over the objection of an elected local board of education. Reconstitution represents no such usurpation when it occurs at the urging of the local board, as it did in the present case. Indeed, in the present case, reconstitution received strong support not only from the Bridgeport board but also from the superintendent and from the mayor, the city's highest elected official.
Fifth, the majority asserts that the training provision serves the overarching purpose of benefiting the citizens of the entire state by ensuring that reconstitution can occur only upon adequate public notice and in a manner that is deliberate and transparent. Although the majority does not say so, this assertion derives no support from the statutory scheme or the legislative history and, in fact, runs counter to our rules of statutory construction. It also runs counter to common sense; the majority does not explain why the residents of Torrington and Greenwich and New London have any interest at all, much less an overriding one, in the transparency and deliberateness of the reconstitution process in Bridgeport. Nor does the majority bother to explain exactly how such an interest could possibly trump Bridgeport's own interest in permitting its board of education, acting on behalf of the local electorate, to waive the training contemplated by § 10-223e (h) in order to discharge as expeditiously as possible the Bridgeport board's duty to protect the schoolchildren's constitutional right to an adequate public education.
Perhaps even more fundamentally, the majority seems oblivious to the fact that § 10-223e (h) enables the state board to reconstitute a local board of education in a manner that affords the locality no notice whatsoever. It would be perfectly lawful under § 10-223e (h) for the state board to take several of the remedial actions specified *685 in § 10-223e (c)(2), including requiring the local board of education to undergo training, and then, months later, without warning, authorize the commissioner to reconstitute the local board. Because this sequence of events is perfectly lawful under § 10-223e (h), it makes no sense to suppose that the legislature meant for the training contemplated by § 10-223e (h) to serve the purpose of providing a locality notice of an impending takeover.[27] Unsurprisingly, the majority has produced no evidence that the legislature intended any such thing. Not a single remark that the majority has quoted evinces the belief that the purpose of the training provision is to afford notice of an impending takeover or to foster transparency and deliberation during the process of reconstitution. Indeed, given that the legislature made notice an express component of another part of § 10-223e; see General Statutes § 10-223e (d) (requiring state board to give "notice" to local board of education in low achieving school district of that district's "progress toward meeting the benchmarks established by the State Board"); we must presume that, if the legislature had intended for the state board to provide further notice before reconstitution, the legislature would have said so explicitly. See, e.g., Genesky v. East Lyme, 275 Conn. 246, 258, 881 A.2d 114 (2005) ("if the legislature wants to [engage in a certain action], it knows how to do so"); Carmel Hollow Associates Ltd. Partnership v. Bethlehem, 269 Conn. 120, 135, 848 A.2d 451 (2004) (same).
Even if the purpose of the training provision truly were to afford notice of a potential takeover and to promote transparency and deliberation during the reconstitution process, the majority's reasoning still would not yield the conclusion that the training provision is not waivable, for the majority does not even attempt to explain how permitting a local board of education to waive the training provision would deprive the locality of adequate notice or render the reconstitution process impermissibly opaque or overhasty. To the extent that the training provision serves incidentally to afford notice or to promote transparency and deliberation, it does so most obviously in the case of a recalcitrant board, that is, one unwilling to *686 give up control, not in the case of a board like the one in Bridgeport, which waived the training provision by passing a lawful resolution at a properly noticed public meeting. See part III of this opinion. Evidently, the majority believes that the resulting reconstitution occurred with less notice and deliberation than might have been desirable as a matter of good public policy. Regardless of whether the majority's belief is correctand the majority offers no evidence to suggest that it isthis court may not rewrite a statute in order to promote the policy that it happens to prefer. E.g., AvalonBay Communities, Inc. v. Zoning Commission, 280 Conn. 405, 422, 908 A.2d 1033 (2006) ("[the court] cannot rewrite a statute to accomplish a particular result" [internal quotation marks omitted]).[28]
In seeking to establish that a local board of education cannot waive the training provision of § 10-223e (h), the majority appears to place the greatest weight on its "public obligation" argument. This argument rests on two premises. The first is that the training provision "embodies a public obligation that . . . inures to the benefit of the citizens of Connecticut as a whole." The second is that a public obligation created by statute "cannot be waived by any individual or group of individuals." From these two premises, the majority infers that the training provision of § 10-223e (h) embodies a public obligation that no one, including local boards of education, is competent to waive.
The problem with this argument is that neither premise is plausible. In support of the first premise, that the training provision "embodies a public obligation that . . . inures to the benefit of the citizens of Connecticut as a whole," the majority asserts that the purpose of the training provision is to ensure that reconstitution occur only upon adequate public notice and in a manner that is deliberate and transparent. As I have explained, this purported purpose is something that the majority simply creates out of whole cloth.
In support of its second premise, that a public obligation created by statute cannot be waived by any individual or group of individuals, the majority provides a rather lengthy argument, which I discuss more fully hereafter. In brief, no part of this argument withstands scrutiny. Far from analyzing any of our prior holdings, the majority merely plucks superficially favorable language from various judicial opinions, paying little regard to whether the language in question is dictum or holding, and paying even less regard to whether the underlying opinions are on point. Not one of the five opinions that the majority cites in the text of its opinion[29] is on point; only two would be binding even if they were on point;[30] and of these two, only *687 one[31] contains favorable language that can fairly be characterized as a holding. It is hardly surprising, then, that the majority says so little about the facts or reasoning underlying these cases.
The majority relies foremost on several sentences from a dissenting opinion in In re Application for Petition for Writ of Habeas Corpus by Dan Ross, 272 Conn. 676, 719-20, 866 A.2d 554 (2005) (Lavery and Dranginis, Js., dissenting), a case in which the court permitted a death row inmate to waive his statutory right to seek habeas review of his sentence. See id., at 678-79, 866 A.2d 554. The majority omits the fact that the bulk of the following passage, including the sentence that the majority italicizes, is a verbatim quotation from a long since deleted portion of an almost half-century-old edition of a legal encyclopedia, namely, American Jurisprudence 2d: "[W]aiver is not . . . allowed to operate so as to infringe [on] the rights of others, or to transgress public policy or morals.
"The public interest may not be waived. [When] a law seeks to protect the public as well as the individual, such protection to the state cannot, at will, be waived by any individual, an integral part thereof. The public good is entitled to protection and consideration and if, in order to effectuate that object, there must be enforced protection to the individual, such individual must submit to such enforced protection for the public good. . . . Accordingly, a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." (Citation omitted; emphasis added; internal quotation marks omitted.) In re Application for Petition for Writ of Habeas Corpus by Dan Ross, supra, 272 Conn. at 719-20, 866 A.2d 554, quoting 28 Am. Jur.2d 847, Estoppel and Waiver § 161 (1966). Even if this language were the law, instead of an excerpt from a defunct portion of an encyclopedia entry, the language still would not support the majority's position that the training provision of § 10-223e (h) is not waivable. First, the Bridgeport board is not an individual; it is a duly elected representative body. Second, the training provision of § 10-223e (h) is not "a statutory right conferred on a private party . . . but affecting the public interest. . . ." Id., at 720, 866 A.2d 554. Rather, it is a benefit conferred on the locality as a whole. Third, the Bridgeport board's waiver of the training provision did not "contravene the statutory policy." Id. On the contrary, when that board waived the training provision with the stated intention of "enabl[ing] the Bridgeport public schools to fulfill their statutory and constitutional responsibilities," the board clearly was acting in furtherance of the statute's policy of "improv[ing] student performance and remov[ing] the . . . district from the list of . . . districts designated. . . as . . . low achieving. . . ." General Statutes § 10-223e (c)(2).
Also irrelevant for present purposes are Beasley v. Texas & Pacific Railway Co., 191 U.S. 492, 24 S.Ct. 164, 48 L.Ed. 274 (1903), a case having nothing to do with waiver, in which the court held that specific *688 performance of a contract prohibiting the construction of a railway depot would contravene public policy; id., at 497, 24 S.Ct. 164; and Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), in which the court concluded that an employee who had accepted a delayed payment of the basic statutory wages due under the Federal Labor Standards Act of 1938, Pub.L. No. 75-718, c. 676, 52 Stat. 1060, could not validly waive any further right to recover liquidated damages under that act. Brooklyn Savings Bank v. O'Neil, supra, at 704-706, 65 S.Ct. 895. The court in Brooklyn Savings Bank concluded that there could be no waiver on the ground that the legislative history of the act "show[ed] an intent on the part of Congress to protect certain groups of the population from sub-standard wages and excessive hours which endangered the national health and wellbeing and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accomplish this purpose standards of minimum wages and maximum hours were provided." Id., at 706-707, 65 S.Ct. 895. The court observed that "[n]either [party] suggest[ed] that the right to the basic statutory minimum wage could be waived by any employee subject to the [a]ct. No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the [a]ct." Id., at 707, 65 S.Ct. 895. The court then concluded "that the same policy considerations which forb[ade] waiver of basic minimum and overtime wages under the [a]ct also prohibit[ed] waiver of the employee's right to liquidated damages." Id. None of the court's reasoning in Brooklyn Savings Bank applies in the present case. A local school board is not a private individual; it is a public entity. Nor does a local board of education suffer from unequal bargaining power. Most important, insofar as § 10-223e serves to protect the interests of a vulnerable "segment of the population"; id., at 706, 65 S.Ct. 895; the segment that § 10-223e serves to protect is neither the local board of education nor the local board's electorate; it is instead the locality's schoolchildren, a group on whose behalf the local board of education is both statutorily and constitutionally obligated to act. In sum, none of the considerations that led the United States Supreme Court to conclude that an employee could not validly waive the right to liquidated damages under the Federal Labor Standards Act indicate that a local board of education cannot validly waive the protection afforded by § 10-223e (h).
L'Heureux v. Hurley, 117 Conn. 347, 168 A. 8 (1933), which I discuss later, is the only binding case from which the majority culls language that fairly can be characterized as a holding. The other binding case on which the majority relies is Hatch v. Merigold, 119 Conn. 339, 343, 176 A. 266 (1935). Quoting Hatch, the majority observes that this court "previously [has] held that `[o]ne cannot waive a public obligation created by statute . . . but he may waive a statutory requirement the purpose of which is to confer a private right or benefit.'" (Emphasis added.) Contrary to what the majority implies, Hatch did not hold that "[o]ne cannot waive a public obligation. . . ." Hatch v. Merigold, supra, at 343, 176 A. 266. Rather, Hatch held, inter alia, that a particular statutorily created presumptionspecifically, a presumption that the decedent in a wrongful death case had exercised reasonable *689 carewas a statutory benefit that a party could waive. See id. ("By affirmatively pleading her decedent's lack of contributory negligence, the plaintiff waived her right to claim the benefit of the statute. The plaintiff in this case having done this, the trial court was not in error in failing to instruct the jury that under the statute there was still a presumption that her decedent had been in the exercise of reasonable care."). In view of what the court in Hatch actually held, its assertion that one cannot waive a public obligation was merely dictum, which the court supported by citing L'Heureux v. Hurley, supra, 117 Conn, at 356, 168 A. 8.
The upshot is that the majority cites only one Connecticut case that, on its face, might seem to provide any support for the majority's position. That case is L'Heureux v. Hurley, supra, 117 Conn. at 347, 168 A. 8, a 1933 personal injury case in which the court held that a tenant could not waive a landlord's statutory duty to illuminate common areas of a building at night. Id., at 355-56, 168 A. 8. L'Heureux provides no actual support for the majority's position because a tenant is a private individual who, unlike the Bridgeport board, obviously is not entitled to act on behalf of the segment of the public that the statute in question aims to protect. Ignoring this difference, the majority divines a holding of sweeping breadth in the court's observation in L'Heureux that "[o]ne cannot give what one does not possess. One may waive a personal obligation of another to the one waiving. One cannot waive an obligation owed by another to the public." Id. The majority seizes on this language and reads the word "one" so broadly as to encompass not just private individuals but also duly elected representative bodies. There is no basis for this broad reading, either in the reasoning of L'Heureux or in that of any other case the majority cites.[32]
In a final attempt to prove that the training provision is not waivable, the majority offers the following argument based in general principles of administrative law: "Because the training provision [in § 10-223e (h)] defines the scope of the grant of [the reconstitution] power from the legislature *690 to the state board, a local board of education, as a separate agent of the state, cannot alter the scope of this grant of power. See Kinney v. State, [213 Conn. 54, 60 n. 10, 566 A.2d 670 (1989)] (`administrative agencies . . . must act strictly within their statutory authority and cannot unilaterally modify, abridge or otherwise change . . . provisions because the act's enabling legislation does not expressly grant that power' . . .). It therefore follows that the local board cannot expand this grant of power by waiving the training obligation." I am perplexed by the majority's assertion that, "[b]ecause the training provision defines the scope of the grant of power from the legislature to the state board, the local board of education, as a separate agent of the state, cannot alter the scope of this grant of power." If I understand what this assertion means, and I am not sure I do, I certainly am aware of no legal authority that supports it, especially not Kinney, the only case that the majority cites. Kinney states that "administrative agencies . . . cannot unilaterally modify, abridge or otherwise change" their statutory authority. (Citation omitted.) Kinney v. State, supra, at 60 n. 10, 566 A.2d 670. Because the fundamental question in this case is whether a local board's authority encompasses the authority to waive the training provision, the majority simply begs the question when it asserts that, if the local board could waive the training provision, it thereby could unilaterally modify, abridge or change its authority.

III
Having explained why each of the majority's arguments is meritless, I now explain why I would resolve this fundamentally straightforward case by concluding that a local board of education is competent to waive whatever protection § 10-223e (h) might afford a locality against a state takeover. I begin with a few basic principles. It well established that waiver is the "intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); accord Rosado v. Bridgeport Roman Catholic Diocesan Corp., 292 Conn. 1, 57, 970 A.2d 656, cert. denied sub nom. Bridgeport Roman Catholic Diocesan Corp. v. New York Times Co., ____ U.S. ____, 130 S.Ct. 500, 175 L.Ed.2d 348 (2009). "As a general rule, both statutory and constitutional rights and privileges may be waived." Rosado v. Bridgeport Roman Catholic Diocesan Corp., supra, at 57, 970 A.2d 656. Indeed, as I noted previously, this court has recognized that mandatory statutory provisions are "typically" subject to waiver. Santiago v. State, supra, 261 Conn. at 543, 804 A.2d 801; see also United States v. Mezzanatto, supra, 513 U.S. at 200-201, 115 S.Ct. 797 ("[r]ather than deeming waiver presumptively unavailable absent some sort of express enabling clause, we instead have adhered to the opposite presumption"); Shutte v. Thompson, supra, 82 U.S. (15 Wall.) at 159 ("[a] party may waive any provision, either of a contract or of a statute, intended for his benefit").
Because of the general presumption in favor of waiver, and because it is fundamental that a representative body possesses the authority to make binding decisions on behalf of its constituents, it is self-evident that a local board of education possesses the authority to waive the locality's interest in retaining control of public education. Besides being self-evident, this result also follows from general principles. Because the role of a local board of education is not to make law but to implement it; see General Statutes § 10-220(a); a local board is functionally an arm of the executive branch. As an arm of the executive branch, a local board serves as an *691 agent of the electorate. Cf. Loving v. United States, 517 U.S. 748, 777, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (Scalia, J., concurring) ("[w]hat Congress does is to assign responsibilities to the [e]xecutive; and when the [e]xecutive undertakes those assigned responsibilities it acts, not as the `delegate' of Congress, but as the agent of the [p]eople"). It is axiomatic that a duly authorized agent may waive rights on behalf of its principal. The only possible question is whether a local board, as agent of the local electorate, is duly authorized to waive the electorate's interest in retaining control of public education. This question must be answered in the affirmative, not only because a representative body self-evidently possesses the authority to make binding decisions on behalf of its constituents, but also because a local board serves as an agent of the electorate and as an agent of the state, insofar as the local board performs the state's statutory and constitutional duty to furnish an education for the public. Cheshire v. McKenney, 182 Conn. 253, 257-58, 438 A.2d 88 (1980); see Connecticut Coalition for Justice in Education Funding, Inc. v. Rell, 295 Conn. 240, 314-15, 990 A.2d 206 (2010) (state has constitutional obligation to ensure that students receive suitable educational opportunities); Sheff v. O'Neill, 238 Conn. 1, 46, 678 A.2d 1267 (1996) (same); Horton v. Meskill, 172 Conn. 615, 649, 376 A.2d 359 (1977) (same); see also General Statutes § 10-4a ("the educational interests of the state shall include, but not be limited to, the concern of the state that (1) each child shall have ... equal opportunity to receive a suitable program of educational experiences"); General Statutes § 10-220(a) ("[e]ach local or regional board of education shall maintain good public elementary and secondary schools, implement the educational interests of the state as defined in section 10-4a and provide such other educational activities as in its judgment will best serve the interests of the school district"). As an agent of the state responsible for discharging the state's duty to furnish an education for the public that meets state constitutional and statutory requirements, a local board of education clearly has a duty to promote the interests of the schoolchildren. When local control no longer serves the interests of the schoolchildren, a local board's duty to promote these interests evidently entails a duty to waive the locality's interest in retaining control of public education.
If a local board of education can have a duty to waive the locality's interest in control, then, a fortiori, it can have the authority to waive the locality's interest in control. To conclude otherwise, as the majority effectively does, is to countenance the possibility of a conflict between the local board's role as agent of the local electorate and its role as agent of the state. If such a conflict were possible, it would be necessary to resolve the conflict in favor of the local board's role as an agent of the state, because, in its role as agent of the state, the local board acts under a duty of constitutional magnitude. See Connecticut Assn. of Boards of Education, Inc. v. Shedd, 197 Conn. 554, 563, 499 A.2d 797 (1985) ("[a]lthough the local boards [of education] may at times have divided loyalties, [i]t is an established principle that local charter powers must yield to the superior power of the state when the two enter a field of statewide concern" [internal quotation marks omitted]). In reality, however, no such conflict is possible. As I stated at the outset, we honor the principle of local control by permitting a local board of education to waive the training contemplated by § 10-223e (h) in order to discharge as expeditiously as possible the local board's duty to promote the interests of the schoolchildren.[33]
*692 Having established that a local board of education may waive the protection afforded by § 10-223e (h), I find it undeniable that the Bridgeport board waived such protection. "Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied.... In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) Rosado v. Bridgeport Roman Catholic Diocesan Corp., supra, 292 Conn. at 58, 970 A.2d 656. Furthermore, "although the question of whether a privilege has been waived ordinarily presents a question of fact reviewed under a clearly erroneous standard, the standard of review is plenary when the trial court has made its determination on the basis of pleadings and other documents, rather than on live testimony." Id., at 57, 970 A.2d 656. Here, we must inquire into the issue of waiver de novo. Such a de novo inquiry is entirely proper, not only because there is no trial court determination for us to review, but also because the stipulated facts in this case enable us to resolve the issue of waiver as a matter of law "on the basis of pleadings [or] other documents...." Id.
The present case readily may be resolved on the basis of the Bridgeport board's July 5, 2011 resolution "concerning a request to the state board of education." It is undisputed that, on July 5, 2011, by a vote of six to three, the Bridgeport board passed a resolution stating: "WHEREAS, the Bridgeport [b]oard has received training in the skills needed to function effectively as a [b]oard of [e]ducation, but such training has not enabled the [b]oard to carry out its statutory responsibilities, and the Bridgeport [b]oard does not believe that further training would be productive or would enable the [b]oard to carry out those responsibilities....
"[T]he Bridgeport Board hereby requests that the [s]tate [b]oard, acting pursuant to the ... General Statutes, including, but not limited to ... § 10-223e (h), authorize the [c]ommissioner ... to reconstitute the Bridgeport [b]oard ... in accordance with statutory authority, and that the [s]tate [b]oard take such other statutorily authorized actions as may enable the Bridgeport public schools to fulfill their statutory and constitutional responsibilities." On its face, this resolution plainly constitutes the "intentional relinquishment... of a known right" to the training contemplated by § 10-223e (h); Johnson v. Zerbst, supra, 304 U.S. at 464, 58 S.Ct. 1019; accord Rosado v. Bridgeport Roman Catholic Diocesan Corp., supra, 292 Conn. at 57, 970 A.2d 656; a relinquishment that the Bridgeport board undertook in the avowed belief that further training would not enable it to carry out its responsibility to provide a suitable education to Bridgeport schoolchildren. Because the Bridgeport board waived the training provision, the state board acted lawfully when it reconstituted the Bridgeport board pursuant to § 10-223e (h).[34]
*693 *694 Furthermore, contrary to the plaintiffs' arguments, the Bridgeport board plainly had the legal power or authority to adopt a resolution requesting that the state board reconstitute it. As I explained earlier, a local board of education is competent to waive the protection afforded by § 10-223e (h), both in its capacity as a duly elected representative of the locality and in its capacity as an agent of the state charged with carrying out the state's obligation to provide a suitable education. Moreover, when the Bridgeport board passed a resolution requesting that the state board intervene pursuant to § 10-223e (h), the board clearly acted within the scope of its authority under the Bridgeport Charter. See Bridgeport Charter c. 15, § 2 ("[t]he board of education shall have all the powers vested in, and shall perform all the duties imposed [on], boards of education under the laws of this state and the United States").[35]
The plaintiffs offer several meritless arguments in support of their contention that the Bridgeport board lacked the authority to enact a resolution requesting the state board to reconstitute it. The plaintiffs in the Farrar-James case contend that the Bridgeport board did not have the authority to remove its own members by resolution. This is true but irrelevant because the Bridgeport board simply did not remove its own members, either by resolution or by any other means. Rather, it was the state board that removed the Bridgeport board members. The Bridgeport board merely invited the state board to act. When the state board authorized reconstitution, it acted autonomously, not at the command of the Bridgeport board. *695 The state board obviously could have rejected or ignored the Bridgeport board's request for reconstitution. Thus, the Bridgeport board did not remove its own members any more than a person arrests his neighbor when he alerts the police to the neighbor's criminal activity.[36] Nor did the Bridgeport board dissolve itself, as the plaintiffs in the Pereira case contend. The Bridgeport board merely made its own dissolution more likely. Finally, it is entirely irrelevantcontrary to the assertion of the plaintiffs in the Farrar-James casethat the Bridgeport board lacked the authority to delegate its vacancy appointing power to the state board. The process of reconstituting a local board of education pursuant to § 10-223e (h) does not result in the sort of vacancy contemplated by statute; see General Statutes § 10-219;[37] because the reconstitution process results in both the appointment of new members and the removal of existing ones. Even if the reconstitution process did result in the sort of vacancy contemplated by § 10-219, thereby giving rise to a conflict between § 10-219 and § 10-223e (h), the latter would control because it is more specific. See, e.g., Housatonic Railroad Co. v. Commissioner of Revenue Services, 301 Conn. 268, 301-302, 21 A.3d 759 (2011) (invoking "the well established principle of statutory interpretation that requires courts to apply the more specific statute relating to a particular subject matter in favor of the more general statute that otherwise might apply in the absence of the specific statute").

IV
Finally, the plaintiffs raise several constitutional challenges to § 10-223e (h) that it is necessary for me to address in light of my conclusion that a local board of education is competent to waive the protections embodied in that statute and that the Bridgeport board validly waived them. The plaintiffs contend that § 10-223e (h) is unconstitutional because it violates the home rule provision of article tenth, § 1,[38] *696 the free suffrage provision of article sixth, § 4,[39] and article first, §§ 1,[40] 4,[41] and 20[42] of the Connecticut constitution. In considering these claims, this court must "indulge in every presumption in favor of the statute's constitutionality...." (Internal quotation marks omitted.) State v. McKenzie-Adams, 281 Conn. 486, 500, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S.Ct. 248, 169 L.Ed.2d 148 (2007). The plaintiffs bear the heavy burden of demonstrating that the statute is unconstitutional beyond a reasonable doubt. See, e.g., Kinney v. State, 285 Conn. 700, 710, 941 A.2d 907 (2008) ("legislative enactments carry with them a strong presumption of constitutionality, and ... a party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt" [internal quotation marks omitted]). For the reasons that follow, the plaintiffs cannot meet their burden. Indeed, the plaintiffs' constitutional claims warrant little discussion because with respect to none of these claims can the plaintiffs even satisfy the relevant threshold requirement.

A
The plaintiffs contend that § 10-223e (h) violates the home rule provision of article tenth, § 1, of the state constitution because § 10-223e (h) interferes with municipal charter provisions governing the organization and election of local boards of education and because it undermines municipal control over local budgetary concerns. This claim is wholly meritless because it is beyond dispute that education is a matter of statewide concern. Our case law establishes unequivocally that a statute of general application, such as § 10-223e (h), runs afoul of article tenth, § 1, only when it purports to regulate a matter of purely local concern and, even then, only if it conflicts with a local charter provision governing the same general subject matter. See, e.g., Board of Education v. Naugatuck, 268 Conn. 295, 307, 843 A.2d 603 (2004) (in determining whether statute violates home rule provision, "we must determine whether [it] pertains to a matter of statewide concern such that it preempts any conflicting provisions of the charter"); Carofano v. Bridgeport, 196 Conn. 623, 631, 495 A.2d 1011 (1985) (statute of general applicability conflicts with home rule provision of state constitution only when "its purpose or its operation involves subjects of purely local concern"); Caulfield v. Noble, 178 Conn. 81, 87, 420 A.2d 1160 (1979) ("a general law, in order to prevail over a conflicting charter provision of a city having a home rule charter, must pertain to those things of general concern to the people of the state").
*697 "By its terms, article tenth restricts only the enactment of special and not of general legislation.... [W]hen the legislature deals with matters that are primarily of statewide concern, it may deal with them free of any restriction contained in the home-rule amendment. The legislature can thus make effective a law touching on a matter of statewide concern in one city and not in another, provided that the classification is proper. The home-rule amendment does not limit the right of the legislature to deal with matters of statewide concern, even if, in so dealing, some cities and not others are affected." (Citation omitted; internal quotation marks omitted.) Shelton v. Commissioner of Environmental Protection, 193 Conn. 506, 521-22, 479 A.2d 208 (1984), quoting West Allis v. Milwaukee, 39 Wis.2d 356, 365-66, 159 N.W.2d 36 (1968), cert. denied, 393 U.S. 1064, 89 S.Ct. 717, 21 L.Ed.2d 707 (1969).
Even if § 10-223e (h) conflicted with a provision of the Bridgeport Charter governing the same general subject matter, the plaintiffs could not prevail on their claim under article tenth, § 1, because "[t]here can be no dispute ... that the education of our schoolchildren is an issue of statewide concern." (Emphasis added.) Board of Education v. Naugatuck, supra, 268 Conn. at 309, 843 A.2d 603; see also Cheshire v. McKenney, supra, 182 Conn. at 257-58, 438 A.2d 88 ("[T]he furnishing of an education for the public is a state function and duty.... This duty is placed [on] the state by article eighth, § 1, of the state constitution and is delegated to local school boards by state statute.... There is no question but that local boards of education act as agencies of the state when they are fulfilling the statutory duties imposed [on] them pursuant to the constitutional mandate of article eighth, § 1." [Citations omitted.]).
Furthermore, to the extent that any local charter provision conceivably might conflict with the state's constitutional and statutory authority to furnish a suitable education to the schoolchildren of this statein this case by reconstituting the local board of education in a chronically failing school districtthere can be no question but that such a charter provision would have to yield to the state's authority to carry out its mandate. Connecticut Assn. of Boards of Education, Inc. v. Shedd, supra, 197 Conn. at 563, 499 A.2d 797 ("[a]lthough the local boards may at times have divided loyalties, [i]t is an established principle that local charter powers must yield to the superior power of the state when the two enter a field of statewide concern" [internal quotation marks omitted]); see also City Council v. Hall, 180 Conn. 243, 248, 429 A.2d 481 (1980) ("the only powers a municipal corporation has are those which are expressly granted to it by the state"); Waterford v. State Board of Education, 148 Conn. 238, 245, 169 A.2d 891 (1961) ("local boards of education are creatures of the state," exercising only such powers that state has conferred on them).

B
The plaintiffs also contend that § 10-223e (h) violates the free suffrage provision of article sixth, § 4, of the Connecticut constitution because it authorizes the removal from office of duly elected school board officials prior to the expiration of their terms, and because it prevents other candidates from running for office during the reconstitution period. In support of this claim, the plaintiffs argue, inter alia, that § 10-223e (h) "restricts the right of suffrage by disenfranchising the citizens who voted for the [removed] official" and "infringes [on] the free suffrage rights of those from ... Bridgeport ... who are *698 eager to perform the duties of school board members...."
This claim founders on the plaintiffs' false assumption that the right to free suffrage, as established under article sixth, § 4, encompasses a right to elect and serve on local boards of education. The plaintiffs can cite no authority to support this assumption because it is well settled that there simply is no right to elect and serve on local boards of education. See, e.g., Moore v. Detroit School Reform Board, 293 F.3d 352, 365 (6th Cir.2002) ("The comparison that the plaintiffs seek to make between their ability to elect school board members before the [Michigan School Reform Act (act)] was enacted and their inability to do so under the [act] thus involves circular reasoning. Specifically, they appear to complain about lacking the right to do something [elect school board members] that they never had a fundamental right to do."). As the United States Supreme Court stated in Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967): "Political subdivisions of [s]tatescounties, cities, or whatever [including local boards of education]never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the [s]tate to assist in the carrying out of state governmental functions.... [T]hese governmental units are created as convenient agencies for exercising such of the governmental powers of the [s]tate as may be entrusted to them, and the number, nature and duration of the powers conferred upon [them] ... and the territory over which they shall be exercised rests in the absolute discretion of the [s]tate. We find no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., at 107-108, 87 S.Ct. 1549. The plaintiffs simply ignore this precedent, which establishes that there is no right to elect or serve on local boards of education.
The plaintiffs also ignore precedent establishing that the state has virtually unfettered authority to set the terms by which local boards of education may exist and carry out their delegated duties. See id., at 109, 87 S.Ct. 1549 ("[T]he state legislatures have constitutional authority to experiment with new techniques ... when it comes to municipal and county arrangements within the framework of a [s]tate. Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs." [Citations omitted; internal quotation marks omitted.]); City Council v. Hall, supra, 180 Conn. at 250 n. 6, 429 A.2d 481 ("[t]he number, nature and duration of the powers conferred [on municipal] corporations and the territory over which they shall be exercised rests in the absolute discretion of the [s]tate" [internal quotation marks omitted]).
The legislature, acting pursuant to the state's authority to set the terms by which local boards of education may exist and carry out their delegated duties, has enacted General Statutes § 9-185,[43] which expressly conditions the election of local boards of education on the state's right to *699 reconstitute such boards under the circumstances specified in § 10-223e (h). The plaintiffs do not even mention § 9-185 in their briefs, let alone explain how their claim could possibly be reconciled with its provisions or with the provisions of § 10-223e (d)(2), which expressly provides that the state board may grant the commissioner the authority to reconstitute a regional or local board of education in accordance with § 10-223e (h) "notwithstanding the provisions of chapter 146 [relating to election law], any special act, charter or ordinance...." (Emphasis added.) I can only interpret the plaintiffs' failure to address §§ 9-185 and 10-223e (d)(2) as a tacit acknowledgement that their claim under article sixth, § 4, simply cannot be reconciled with the foregoing provisions.

C
Finally, the plaintiffs contend that § 10-223e (h) violates the equal protection provisions of article first, §§ 1 and 20, of the Connecticut constitution because it impinges on their "fundamental right to seek election" to the Bridgeport board. As I explained earlier, the plaintiffs possess no such right, fundamental or otherwise.[44] Accordingly, the plaintiffs' equal protection claim must submit to the well established principle that "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (Internal quotation marks omitted.) Harris v. Commissioner of Correction, 271 Conn. 808, 834, 860 A.2d 715 (2004). This court has stated that "[r]ational basis review is satisfied [as] long as there is a plausible policy reason for the classification..... [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature.... To succeed, the party challenging the legislation must negative every conceivable basis which might support it...." (Internal quotation marks omitted.) Contractor's Supply of Waterbury, LLC v. Commissioner of Environmental Protection, 283 Conn. 86, 93, 925 A.2d 1071 (2007).
To their credit, the plaintiffs do not argue that § 10-223e (h) fails rational basis review. Indeed, no such argument legitimately could be maintained, both because of the pressing problem that § 10-223e seeks to addressthat of chronically underperforming school districtsand because reconstituting an intractably dysfunctional local board of education is a manifestly rational way of carrying out the statute's purpose. The plaintiffs' equal protection challenge therefore fails.

V
It has long been said that hard cases make bad law. This case shows that easy cases can make bad law as well. It is evident that the state board did not violate § 10-223e (h) in authorizing the commissioner to reconstitute the Bridgeport board; the Bridgeport board had the authority to adopt a resolution requesting that the state board reconstitute it, and § 10-223e does not violate the home rule provision of article tenth, § 1, of the state constitution, the free suffrage provision of article sixth, § 4, or the equal protection provisions of article first, §§ 1, 4, and 20. Accordingly, I dissent.
NOTES
[*] February 28, 2012, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.
[1] General Statutes § 10-223e (h) provides: "The State Board of Education may authorize the Commissioner of Education to reconstitute a local or regional board of education pursuant to subdivision (2) of subsection (d) of this section for a period of not more than five years. The board shall not grant such authority to the commissioner unless the board has required the local or regional board of education to complete the training described in subparagraph (M) of subdivision (2) of subsection (c) of this section. Upon such authorization by the board, the commissioner shall terminate the existing local or regional board of education and appoint the members of a new local or regional board of education for the school district. Such appointed members may include members of the board of education that was terminated. The terms of the members of the new board of education shall be three years. The Department of Education shall offer training to the members of the new board of education. The new board of education shall annually report to the commissioner regarding the district's progress toward meeting the benchmarks established by the State Board of Education pursuant to subsection (c) of this section and making adequate yearly progress, as defined in the state accountability plan prepared in accordance with subsection (a) of this section. If the district fails to show adequate improvement, as determined by the State Board of Education, after three years, the commissioner may reappoint the members of the new board of education or appoint new members to such board of education for terms of two years."
[2] Specifically, the primary question reserved for this court's advice is: "Did the state board. . . violate . . . § 10-223e (h) in its decision to authorize the commissioner . . . to reconstitute the [local board]?"

Four other questions are presented in the reservation: (1) whether § 10-223e (h) violates article tenth, § 1, of the constitution of Connecticut; (2) whether § 10-223e (h) violates article sixth, § 4, of the constitution of Connecticut; (3) whether § 10-223e (h) violates article first, §§ 1, 4 and 20, of the constitution of Connecticut; and (4) whether the local board had the legal power or authority to adopt a resolution requesting its reconstitution by the state board.
Because we decide the issues presented by the reservation solely on a statutory basis, we do not reach the constitutional questions. See, e.g., In re Shanaira C., 297 Conn. 737, 754, 1 A.3d 5 (2010) ("we must be mindful that [t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" [internal quotation marks omitted]). Moreover, we need only address the question of whether the local board had the authority to request that the state board authorize reconstitution to the extent that it is germane to our statutory analysis of § 10-223e (h).
[3] General Statutes § 10-223e (c)(1) provides in relevant part: "Any school or school district identified as in need of improvement pursuant to subsection (a) of this section and requiring corrective action pursuant to the requirements of the [federal] No Child Left Behind Act . . . shall be designated and listed as a low achieving school or school district and shall be subject to intensified supervision and direction by the State Board of Education."

General Statutes § 10-223e (a) provides in relevant part: "In conformance with the [federal] No Child Left Behind Act . . . the Commissioner of Education shall prepare a state-wide education accountability plan, consistent with federal law and regulation. Such plan shall identify the schools and districts in need of improvement, require the development and implementation of improvement plans and utilize rewards and consequences."
[4] Specifically with regard to training, the resolution provided: "WHEREAS, the [local board] has received training in the skills needed to function effectively as a [b]oard of [e]ducation, but such training has not enabled the [local] [b]oard to carry out its statutory responsibilities, and the [local board] does not believe that further training would be productive or would enable [it] to carry out those responsibilities. . . ."

The resolution concluded by stating: "NOW THEREFORE BE IT RESOLVED that the [local board] hereby requests that the [s]tate [b]oard, acting pursuant to the . . . General Statutes, including, but not limited to. . . . § 10-223e (h), authorize the [c]ommissioner. . . to reconstitute the [local board] in accordance with statutory authority, and that the [s]tate [b]oard take such other statutorily authorized actions as may enable the Bridgeport public schools to fulfill their statutory and constitutional responsibilities."
[5] Due to the posture of the case as it reaches us in this reservation, we have somewhat simplified the procedural history. In particular, we focus on the nature of the parties and their claims as they existed at the time the reservation came to this court. Additionally, for simplicity, we hereinafter refer to the three sets of plaintiffs collectively as the plaintiffs. Similarly, we refer to all defendants collectively as the defendants.
[6] The myriad claims of the various plaintiffs have been condensed and simplified for purposes of this reservation.
[7] Practice Book § 73-1 provides in relevant part: "(a) Any reservation shall be taken to the supreme court or to the appellate court from those cases in which an appeal could have been taken directly to the supreme court, or to the appellate court, respectively, had judgment been rendered. Reservations in cases where the proper court for the appeal cannot be determined prior to judgment shall be taken directly to the supreme court."

"(b) All questions presented for advice shall be specific and shall be phrased so as to require a Yes or No answer.
"(c) Before any question shall be reserved by any court, counsel shall file in that court a stipulation which shall clearly and fully state the question or questions upon which advice is desired; that their present determination by the appellate court having jurisdiction would be in the interest of simplicity, directness and economy in judicial action, the grounds for such allegation being particularly stated; that the answers to the questions will determine, or are reasonably certain to enter into the final determination of the case; and that the parties request that the questions be reserved for the advice of the appellate court having jurisdiction. The stipulation shall also designate the specific pleadings in the trial court case file which are necessary for the presentation of the question or questions sought to be reserved and shall state the undisputed facts which are essential for determination of the question or questions sought to be reserved. . . .
* * *
"(e) The court will not entertain a reservation for its advice upon questions of law arising in any action unless the question or questions presented are such as are, in the opinion of the court, reasonably certain to enter into the decision of the case, and it appears that their present determination would be in the interest of simplicity, directness and economy of judicial action. . . ."
[8] The defendants do not dispute that the plain language of § 10-223e (h) directs the state board to require the local board to participate in training before the state board can authorize reconstitution. Furthermore, the defendants do not argue in their briefs that the state board complied or substantially complied with this statutory mandate to require training. Indeed, during oral argument, counsel for the defendants conceded that, in the absence of waiver, the statute requires strict compliance. The defendants do advance an argument with regard to the apparent futility of requiring training in the present case. We address this argument in part III of this opinion.
[9] We pause to address the issue of whether the defendants' waiver argument is properly before this court, as such an argument is not found explicitly in the questions in this reservation. We believe the argument falls within the scope of the first question of the reservation, namely, whether the state board violated § 10-223e (h) when it authorized the commissioner to reconstitute the local board. If the statutory provision is not waivable, the state board violated the statute by failing to provide training. Conversely, if the provision is waivable, and waivable by a local board of education, the state board did not violate the statute, provided that the waiver actually occurred. We acknowledge the plaintiffs' argument, advanced in their reply brief and during oral argument, that the issue of waiver is not properly before this court because it is an issue of fact, not included in the stipulated facts in this reservation. Nevertheless, our determination of whether the provision is waivable, and by whom, is a matter of pure statutory interpretation. The only issue of fact is whether the local board's resolution serves as a proper and effective waiver. Because we conclude, as a matter of law, that the waiver doctrine is inapplicable to the present case, we need not reach the factual question of whether the local board effectively waived the training requirement.
[10] General Statutes § 10-223e (c) provides in relevant part: "(2) Notwithstanding any provision of this title or any regulation adopted pursuant to said statutes, except as provided in subdivision (3) of this subsection, in carrying out the provisions of subdivision (1) of this subsection, the State Board of Education shall take any of the following actions to improve student performance and remove the school or district from the list of schools or districts designated and listed as a low achieving school or district pursuant to said subdivision (1), and to address other needs of the school or district: (A) Require an operations audit to identify possible programmatic savings and an instructional audit to identify any deficits in curriculum and instruction or in the learning environment of the school or district; (B) require the local or regional board of education for such school or district to use state and federal funds for critical needs, as directed by the State Board of Education; (C) provide incentives to attract highly qualified teachers and principals; (D) direct the transfer and assignment of teachers and principals; (E) require additional training and technical assistance for parents and guardians of children attending the school or a school in the district and for teachers, principals, and central office staff members hired by the district; (F) require the local or regional board of education for the school or district to implement model curriculum, including, but not limited to, recommended textbooks, materials and supplies approved by the Department of Education; (G) identify schools for reconstitution, as may be phased in by the commissioner, as state or local charter schools, schools established pursuant to section 10-74g, innovation schools established pursuant to section 10-74h, or schools based on other models for school improvement, or for management by an entity other than the local or regional board of education for the district in which the school is located; (H) direct the local or regional board of education for the school or district to develop and implement a plan addressing deficits in achievement and in the learning environment as recommended in the instructional audit; (I) assign a technical assistance team to the school or district to guide school or district initiatives and report progress to the Commissioner of Education; (J) establish instructional and learning environment benchmarks for the school or district to meet as it progresses toward removal from the list of low achieving schools or districts; (K) provide funding to any proximate district to a district designated as a low achieving school district so that students in a low achieving district may attend public school in a neighboring district; (L) direct the establishment of learning academies within schools that require continuous monitoring of student performance by teacher groups; (M) require local and regional boards of education to (i) undergo training to improve their operational efficiency and effectiveness as leaders of their districts' improvement plans, and (ii) submit an annual action plan to the Commissioner of Education outlining how, when and in what manner their effectiveness shall be monitored; or (N) any combination of the actions described in this subdivision or similar, closely related actions. . . ."
[11] We note that the training provision in § 10-223e (c)(2)(M), when employed outside the context of reconstitution under § 10-223e (h), is not necessarily mandatory, as it is but one of many actions that the state board can take with respect to low achieving schools and districts. Nevertheless, the fact that the legislature chose to incorporate by reference that sole provision of § 10-223e (c)(2)(M) in § 10-223e (h) suggests, if not compels, the conclusion that training is a precondition to the state board's authority to authorize the reconstitution of a local or regional board of education.
[12] See footnote 8 of this opinion. We reiterate that the defendants do dispute whether this training is a mere formality, that is, whether satisfactory completion of the training would have any effect on the state board's ultimate decision to authorize reconstitution. We analyze this argument in more detail in part III of this opinion.
[13] We note that the defendants raised the argument of waiver for the first time in their brief before this court, and, for that reason, the plaintiffs were limited to responding to this argument in their reply brief and at oral argument. The plaintiffs' principal arguments focus instead on the fact that (1) the state board lacked statutory authority to authorize reconstitution because it failed to require the local board to undergo training, and (2) there was no substantial compliance with the training requirement by virtue of the local board's partial participation in discretionary training, which the local board itself sought.
[14] The dissent attempts to paint a different picture through citations to various statistics and social science data demonstrating the poor performance of the local school district. We do not debate that the local school district has faced and continues to face difficulty in achieving a minimum level of satisfactory performance in recent years. Indeed, the parties have stipulated to that fact. Nevertheless, the dissent's reliance on this datawhich, we note, the parties did not include in their stipulated factsis otherwise irrelevant. The plaintiffs are not seeking a determination about whether the local board qualified for reconstitution under § 10-223e on the basis of the underperformance of the local school district. Instead, they have asked us to determine whether the state board followed the requirements of § 10-223e (h) when it authorized reconstitution. Thus, the statistics and social science data on which the dissent relies do nothing to contextualize the issue beyond the parties' stipulation. To the extent that the dissent relies on these data to suggest that the issue before this court is the broader policy issue of whether and when the state board should reconstitute local or regional boards of education, the dissent improperly expands the scope of this reservation. See, e.g., Phelps Dodge Copper Products Co. v. Groppo, 204 Conn. 122, 136 n. 10, 527 A.2d 672 (1987) (this court will decline to address claim that is outside issue presented by reserved question).

Additionally, we note that the dissent relies on these statistics to "help explain why barring local boards of education from waiving the training provision would frustrate the purpose of § 10-223e." We disagree. As evidenced by the language of the statute and the legislative history on which both the majority and dissent rely, one of the purposes of the statute is to provide training and other assistance to local boards of education in order to improve the performance of local schools and school districts. Thus, contrary to the dissent's reasoning, barring local boards from waiving the training provision furthers, rather than frustrates, the statute's purpose.
[15] These remarks occurred prior to the vote on the proposed legislation in the House of Representatives. It appears that the Senate did not debate this aspect of the proposed legislation before the Senate voted on it.
[16] The following colloquy ensued between Representatives Candelora and Fleischmann:

"[Representative Candelora]: . . . [O]nce a school is deemed to be low achieving, as I read this, the mechanism would be that the commissioner would send that board of education to complete a training course. If that board of education completes that training course, as I read this, it seems that the commissioner could then sort of monitor, but would still have the ability to recommend reconstitution of that board of education. Am I correct in that?
* * *
"[Representative Fleischmann]: . . . I believe that power resides in the [s]tate [b]oard of [e]ducation, but I think the rest of the characterization was accurate." (Emphasis added.) 53 H.R. Proc., Pt. 15, 2010 Sess., p. 4675.
[17] McQuillan did not state, during this hearing, whether he or the state board considered the local board to be one of the "rare instances" in which reconstitution would be appropriate.
[18] The dissent criticizes our reliance on legislative history as selective and "flawed," in part because "[we rely] to a significant extent on the statements of legislators who actually voted against the [proposed legislation adding subsection (h) to § 10-223e]." As the foregoing analysis demonstrates, we give the most weight to the remarks of Representative Fleischmann, a cochairman of the education committee and the legislator who introduced the bill amending § 10-223e to add subsection (h). Doing so accords with this court's previous treatment of legislative history. See, e.g., Manchester Sand & Gravel Co. v. South Windsor, 203 Conn. 267, 275, 524 A.2d 621 (1987) ("[t]he statement of the legislator who reported the bill out of committee carries particular weight and deserves careful consideration"). So too does our reliance on other statements made during the floor debate in the House of Representatives. E.g., id., at 276, 524 A.2d 621 ("[s]tatements made on the floor of the house, although not controlling, may be judicially noticed and are a strong indication of legislative intent"). Additionally, "[a]lthough the comments of opponents of a bill ordinarily are entitled to less weight than those of its proponents, there are instances in which we have found them to be relevant." Cotto v. United Technologies Corp., 251 Conn. 1, 12 n. 7, 738 A.2d 623 (1999); see, e.g., Washington v. Meachum, 238 Conn. 692, 713-14, 680 A.2d 262 (1996) (relying on statements of Senators opposed to bill to discern legislative intent). This case is one of those instances. The legislative history of § 10-223e (h) on which we rely in this opinion demonstrates that both the legislators in support of and the legislators in opposition to the proposed legislation spoke about (1) the importance of preserving locally elected boards of education, and (2) the specific process of reconstitution envisioned by subsection (h), namely, that the state board would consider authorizing reconstitution only after it had required the local board of education to undergo training. Thus, while we agree with the dissent that legislative history can be manipulated, we dismiss the dissent's accusation that we have done so in the present case. The dissent's criticism in this regard, through its references to the dissent in State v. Courchesne, 262 Conn. 537, 597, 816 A.2d 562 (2003) (Zarella, J., dissenting), which was authored by the author of this opinion, is unwarranted. We do not understand how our reliance on the statements of legislators who expressed identical concerns, regardless of being in favor of or opposed to the enactment of § 10-223e (h), reasonably could be viewed as manipulating the legislative history. Indeed, our opinion canvasses the legislative debate and remarks concerning the nature of § 10-223e (h). We therefore reject the dissent's claim that we have selectively and incorrectly relied on legislative history.
[19] This legislative intent is further supported by the structure of § 10-223e (c)(2) and its relationship to § 10-223e (h), as we noted previously in this opinion.
[20] This notion is further supported by comparison to the state board's role in monitoring low achieving schools or school districts pursuant to § 10-223e (c). During the course of its monitoring, the state board is obligated to "provide notice to the local or regional board of education for each [low achieving] school or district of the school or district's progress toward meeting the benchmarks established by the State Board of Education pursuant to subsection (c) of [§ 10-223e]." General Statutes § 10-223e(d).
[21] For example, both the Connecticut Association of Boards of Education and the Middletown Federation of Teachers, American Federation of Teachers Local 1381, submitted written testimony regarding the 2010 proposed legislation amending § 10-223e, in which they expressed concern with the granting of reconstitution authority to the state board and the commissioner. See Conn. Joint Standing Committee Hearings, supra, at pp. 1358-59, written testimony of Ann Lohrand, President of the Middletown Federation of Teachers, American Federation of Teachers Local 1381; id., at p. 1320, written testimony of the Connecticut Association of Boards of Education.
[22] We are cognizant that Representative Giuliano ultimately voted against the proposed legislation in 2010. We rely on her remarks merely to show that the legislature was aware of the full implications of § 10-223e (h). Ultimately, the legislature passed the proposed legislation and provided the state board with a means to authorize the reconstitution of local boards of education, notwithstanding the concerns voiced by Representative Giuliano. That does not, however, negate the veracity of these concerns; reconstitution of a local board of education remains a significant usurpation of power. Indeed, the defendants appear not to argue to the contrary.
[23] We acknowledge the defendants' arguments that not every local board of education in this state is elected. We do not perceive this as contradicting the remarks of the legislators who were concerned with protecting those local boards of education whose members are democratically elected.
[24] We also agree with Justice Harper's reasoning with regard to the importance of local control over education. According to Justice Harper, local control over education fosters a beneficial and symbiotic relationship between the parents, students and local school administrators, a relationship that should not be lightly disregarded.
[25] The preference for local control of education also is manifest in the remarks that Representative Lawrence F. Cafero, Jr., made prior to voting on the legislation granting the state board the authority to reconstitute local boards of education: "[W]e take [great] pride. . . here in New England, and Connecticut in particular, about local control. Citizens electing their representatives on a state level and certainly on a local level; their mayors and first selectman, their legislative body and most importantly, their board of education.

"The referendum that people mostly have is at the polling booth. If they believe their [b]oard of [e]ducation is failing . . . [t]hey could vote them out. . . . That's democracy." (Emphasis added.) 53 H.R. Proc., Pt. 15, 2010 Sess., pp. 4631-32.
Like Representative Giuliano, Representative Cafero ultimately voted against the bill. Although that may weaken the force of Representative Cafero's argument with regard to whether reconstitution itself is a proper power to grant the state board, it does not alter the fact that his view of Connecticut's educational administration coincides with the policy embodied in the statutory scheme. Indeed, although Representative Fleischmann clarified or corrected some of Representative Cafero's statements, he did not challenge Representative Cafero's emphasis on the importance of local control. See generally id., at pp. 4633-35, remarks of Representative Fleischmann. It does not appear that any representatives disagreed with the overall preference for local control of education in Connecticut.
[26] Even this might not always be the case, as § 10-223e (h) allows the state board to appoint former members of a local board of education to the newly reconstituted board.
[27] The dissent argues otherwise, stating that the state board properly could "reconstitute a local board of education in a manner that affords the locality no notice whatsoever"; (emphasis added) footnote 27 of the dissenting opinion; notwithstanding the clear legislative intent that the state board should authorize reconstitution only if a procedure for doing so is in place. See Conn. Joint Standing Committee Hearings, supra, at pp. 1049-50, remarks of Representative Fleischmann ("[W]hen we look at the question of reconstituting a board, it isn't simply throwing them all out. . . . [I]t would involve a process of having a procedure in place. . . ."). We also reject this argument because it frustrates one of the purposes of the training requirement that we have identified, namely, to provide notice. The dissent's reasoning in this regard would require us to read the training provision language as being unconnected from the reconstitution authority language in the statute, contrary to our principles of statutory interpretation. See, e.g., Historic District Commission v. Hall, 282 Conn. 672, 684, 923 A.2d 726 (2007) ("Legislative intent is not to be found in an isolated sentence; the whole statute must be considered. . . . In construing [an] act . . . this court makes every part operative and harmonious with every other part insofar as it possible. . . ." [Citation omitted; internal quotation marks omitted.]).

Moreover, subsection (h) is not "a statutory amendment that construes and clarifies a prior statute [and therefore] operates as the legislature's declaration of the meaning of the original act." Darak v. Darak, 210 Conn. 462, 471, 556 A.2d 145 (1989). Subsection (h) constitutes a recent grant of power to the state board that the legislature did not initially confer under the original framework of § 10-223e. Indeed, the dissent's recitation of the genesis of subsection (h) supports this conclusion. For that reason, the dissent's primary focus on the legislative history of § 10-223e prior to the enactment of subsection (h), rather than the legislative history surrounding subsection (h), is misplaced. Nor could it be reasonably argued that the failure to provide reconstitution authority was an initial oversight by the legislature, subsequently corrected with the addition of subsection (h). Indeed, the legislative history on which the dissent relies suggests that one of the principal reasons why the legislature amended § 10-223e by adding subsection (h)as part of an omnibus education reform bill that concerned, inter alia, charter schools and local governance councilswas to secure federal funding. See Public Acts 2010, No. 10-111, §§ 11, 21; see also part I of the dissenting opinion.
[28] We note that the defendants and the dissent also focus on the statutory and constitutional roles of the state to provide adequate educational opportunities. We wholly agree with their understanding of educational policy in this state. Indeed, as the dissent notes, the low achieving schools in Bridgeport are a matter of statewide concern. At its core, this case raises issues directly concerning the students in the Bridgeport public schools. We are fully cognizant of the dire situation in Bridgeport, and are sensitive to the importance of providing its students, and students throughout this state, with adequate educational opportunities.

Nevertheless, to the extent that the defendants and the dissent rely on either article eighth, § 1, of the Connecticut constitution or the plurality's reasoning in Connecticut Coalition for Justice in Education Funding, Inc. v. Rell, 295 Conn. 240, 990 A.2d 206 (2010) (Connecticut Coalition), as informing whether a local board of education can waive the state board's obligation to provide training prior to the authorization of reconstitution under § 10-223e (h), that reliance is misplaced. Specifically, in Connecticut Coalition, the plurality concluded that "article eighth, § 1, entitles Connecticut public school students to an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting. A constitutionally adequate education also will leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy. To satisfy this standard, the state, through the local school districts, must provide students with an objectively `meaningful opportunity' to receive the benefits of this constitutional right." (Emphasis added.) Id., at 314-15, 990 A.2d 206. The plurality expressly clarified the limits of its reasoning: "We emphasize that our conclusion. . . is not intended to supplant local control over education . . . [or to] deprive parents [of] a true say in their children's education. We are cognizant of the risks and separation of powers concerns attendant to intensive judicial involvement in educational policy making . . . and emphasize that our role in explaining article eighth, § 1, is to articulate the broad parameters of that constitutional right . . . and to leave their implementation to the expertise of those who work in the political branches of state and local government, informed by the wishes of their constituents." (Citation omitted; internal quotation marks omitted.) Id., at 317 n. 59, 990 A.2d 206. Thus, we do not find support in either article eighth, § 1, of the Connecticut constitution or the reasoning of the plurality in Connecticut Coalition for the proposition that the state board has the constitutional authority to reconstitute a local board of education by any means other than those enumerated in § 10-223e (h). We therefore also disagree with the dissent's focus on the general statutory and constitutional educational obligations of the state board and local boards of education as being determinative of whether the training requirement in § 10-223e (h) can be waived. The legislature's decision to delineate a specific process that must be followed for reconstitution is its expression of how the state board can further the educational policy in this state.
[29] We note that the defendants do not provide any other legal authority for their waiver argument. Moreover, the legislative history is devoid of any mention of waiver with regard to the training requirement. At no time during the legislative debates was the issue of waiver raised, including by McQuillan. Nor was any suggestion made that the state board could forgo the training requirement if it received a waiver from a local board of education. Although we do not suggest that waiver is only applicable when there is precedent or legislative history on point; see footnote 33 of this opinion; in the present case, an utter lack of authority to the contrary and the clear legislative intent compel the conclusion that the legislature did not intend that this provision would be waivable. Cf. Forest Walk, LLC v. Water Pollution Control Authority, 291 Conn. 271, 284, 968 A.2d 345 (2009) ("[i]n the absence of any indication of legislative intent, we cannot engraft additional requirements onto an otherwise silent provision").
[30] We clarify that we are not addressing the state board's jurisdiction in the present case to authorize reconstitution but only whether the state board had the authority to do so. "[T]he issue of subject matter jurisdiction is distinct from the authority to act under a particular statute. Subject matter jurisdiction involves the authority of a court [or agency] to adjudicate the type of controversy presented by the action before it. . . . A court [or agency] does not truly lack subject matter jurisdiction if it has competence to entertain the action before it. . . . Although related, the court's [or agency's] authority to act pursuant to a statute is different from its subject matter jurisdiction. The power of the court [or agency] to hear and determine, which is implicit in jurisdiction, is not to be confused with the way in which that power must be exercised in order to comply with the terms of the statute." (Internal quotation marks omitted.) Southern New England Telephone Co. v. Dept. of Public Utility Control, 261 Conn. 1, 3 n. 2, 803 A.2d 879 (2002); see also Tele Tech of Connecticut Corp. v. Dept. of Public Utility Control, 270 Conn. 778, 791-92, 855 A.2d 174 (2004) ("[T]he mere fact that the procedures employed by the department [of public utility control (department)] . . . do not satisfy the requirements of [General Statutes] § 4-182[c] does not mean that the department lacks jurisdiction to revoke the license, as the department's power to revoke emanates from [General Statutes] § 16-247g [g]. Therefore, it cannot be said that the department acted without jurisdiction merely because it failed to comply with § 4-182[c]; instead, any failure to comply with § 4-182 [c] suggests that the department, in exercising its proper jurisdiction, failed to abide by the dictates of the law."). In the present case, the plaintiffs do not appear to be challenging the state board's subject matter jurisdiction, and we do not construe their arguments as such. Instead, the plaintiffs challenge, as unlawful, the state board's decision to authorize the reconstitution of the local board.
[31] In that connection, the statute speaks solely to the nature of the power granted to the state board regarding reconstitution of certain local boards of education and is silent as to whether a local board can waive the training requirement. This is so because the legislature, in delineating the scope of the grant of power to the state board, would not need to concern itself with the authority of local and regional boards of education.
[32] We note that the state board's obligation to require training would unlikely be considered an onerous one. Although, as we note in this opinion, there are no procedures or guidelines with respect to § 10-223e (h), whatever training is required under § 10-223e (h) is unlikely to be any significant impediment to reconstitution.

This does not, however, diminish the importance of the training requirement. We reject the dissent's mischaracterization of our reasoning here as stating that the requirement is only a "speed bump. . . ." Footnote 6 of the dissenting opinion.
[33] For example, "[a] criminal defendant has the capacity to waive many of his or her fundamental procedural rights. [A] defendant can waive the right to counsel . . . the right to remain silent . . . the right to be present during trial . . . and, by entering a guilty plea, the rights to trial by jury and to confrontation, and the right against self-incrimination." (Citations omitted; internal quotation marks omitted.) New Haven v. Local 884, Council 4, AFSCME, AFL-CIO, supra, 237 Conn. at 385, 677 A.2d 1350. Similarly, "[i]t is well established that [during trial] a party that fails to object timely to the introduction of evidence or fails to assert a privilege in connection with disclosed material is deemed to have waived such objection or privilege and may not subsequently resurrect it to protect that material from subsequent disclosure." Rosado v. Bridgeport Roman Catholic Diocesan Corp., supra, 292 Conn. at 58, 970 A.2d 656; see also State v. Kitchens, 299 Conn. 447, 476-82, 10 A.3d 942 (2011) (defendant can waive claim of error by failing to object to jury instructions). "The waiver doctrine [also] applies to arbitration because [w]e have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." (Internal quotation marks omitted.) C.R. Klewin Northeast, LLC v. Bridgeport, supra, 282 Conn. at 87, 919 A.2d 1002. Additionally, we have held that "statutory time limits may be waived." New Haven v. Local 884, Council 4, AFSCME, AFL-CIO, supra, at 385-86, 677 A.2d 1350. We also have applied the waiver doctrine in other circumstances, none of which is applicable to the present case. We therefore do not address them, although we clarify that this list is not intended to be comprehensive or to limit future application of the waiver doctrine.
[34] We note that whether a right is waivable does not necessarily depend on the importance of that right, as even fundamental constitutional rights can be waived by the person possessing those rights. See, e.g., New Haven v. Local 884, Council 4, AFSCME, AFL-CIO, supra, 237 Conn. at 385, 677 A.2d 1350. But see Singer v. United States, 380 U.S. 24, 36, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) (holding that, because of nature of adversary system, defendant can waive constitutional right to jury trial only with consent of prosecutor and trial judge). Rather, as we explain in this opinion, the determination as to waivability concerns the nature of the right, that is, whether it inures to the benefit of the individual or whether it primarily serves the public interest.
[35] In New Haven v. Local 884, Council 4, AFSCME, AFL-CIO, supra, 237 Conn. 378, 677 A.2d 1350, the issue was "whether a party may waive misconduct, as defined in [General Statutes] § 52-418(a)(3), by an arbitration board." Id., at 380, 677 A.2d 1350. Although we concluded that a party may waive such misconduct, our conclusion was grounded in both "the general rule that rights may be waived and the strong public policy that favors arbitration. . . ." (Citation omitted; emphasis added.) Id., at 386-87, 677 A.2d 1350.
[36] In the context of L'Heureux v. Hurley, supra, 117 Conn. 347, 168 A. 8, we employed the term with regard to a landlord's statutory obligation to provide adequate lighting in the public areas of an apartment building. See id., at 351, 168 A. 8; see also id., at 356, 168 A. 8 (specifically referring to "obligation owed by another to the public"). Specifically, we addressed the defendant landlord's attempt to avoid liability for injuries that the plaintiff had sustained in a dark hallway on the ground that the plaintiff had knowledge of the lack of lighting and therefore had assumed the risk by using the hallway. See id., at 355, 168 A. 8. We acknowledged that the defendant's assumption of risk argument was equivalent to an argument that the plaintiff had waived the defendant's obligation to provide hallway lighting. See id., at 355-56, 168 A. 8. Nevertheless, we rejected the defendant's claim, concluding that the statutory obligation to provide lighting in public areas existed not for the benefit of any specific individual but for the public generally. See id. Accordingly, the plaintiff could not be deemed to have waived the defendant's obligation because the statute did not exist to benefit the plaintiff himself.
[37] This concept finds long-standing support in numerous other jurisdictions. See, e.g., Cal. Civ.Code § 3513 (Deering 2005) ("Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."); Hillside v. Sternin, 25 N.J. 317, 325-26, 136 A.2d 265 (1957) ("The fact that the waiver is attended by good faith on both sides and is not harmful in the particular situation is not sufficient to justify it. If erosion of the policy is to be avoided, even in such a state of affairs, the municipality cannot be permitted to breathe validity into an invalid bid by waiver."); Isenhower v. Isenhower, 666 P.2d 238, 241 (Okla.App.1983) ("A statute founded on public interest and prescribing the manner in which the public interests must be performed is mandatory and cannot be waived. While we agree that a right may be waived whether conferred by law or contract, when a statute contains provisions that are founded [on] public policy, such provisions cannot be waived by a private party if such waiver thwarts the legislative policy which the statute was designed to effectuate. Courts must give effect to legislative acts and may not amend, repeal or circumvent them."); cf. Campbell v. Campbell, 87 Ohio App.3d 48, 50, 621 N.E.2d 853 (1993) ("It is well established that neither the defense of laches nor principles of estoppel will apply against the state, its agencies or agents when exercising governmental functions. . . . The rationale behind this rule is one of public policy. The public should not suffer due to the inaction of public officials. . . . This reasoning applies with equal force to the defense of implied waiver. Waiver is a concept which applies to an individual who freely waives his own rights and privileges. . . . The public interest may not be waived." [Citations omitted.]).
[38] We also disagree with the dissent's reasoning that the jurisprudence governing waiver of individually held constitutional rights informs whether statutory provisions with no clear individual beneficiary are waivable. A criminal defendant's ability to knowingly and intelligently waive his sixth amendment rights at trial is beyond question. We nevertheless fail to see the relevance of this proposition to the issue in this reservation, that is, whether a statutory provision that creates a condition precedent to the state board's power to act can be waived by an inferior local board of education. In attempting to connect the two, the dissent elides a key distinction between the sixth amendment to the United States constitution and § 10-223e (h). The rights afforded under the sixth amendment clearly confer a benefit on an individual criminal defendant and therefore may be waived by that defendant. Section 10-223e (h) does not clearly confer a benefit on any individual. Indeed, the fact that it is so difficult to discern any specific individual or body that § 10-223e (h) is intended to benefit supports the conclusion that the training provision was not meant to confer a right or benefit on anyone. See footnote 39 of this opinion. Rather, as we concluded in part II of this opinion, the legislature intended the training provision to serve as part of a clear, deliberate process when the state board seeks to authorize reconstitution.
[39] The dissent takes issue with our waiver analysis on the ground that "mandatory statutory provisions are `typically' subject to waiver." We are somewhat perplexed by this statement, as our opinion clearly upholds the general rule that rights are typically waivable by the individual who possesses them. The dissent apparently fails to discern that the operative word in this principle is "typically." As our analysis demonstrates, the training provision set forth § 10-223e (h) is best characterized not as a right or protection that inures to the local board's benefit but as a condition precedent to the grant of authority to the state board to reconstitute a local board of education. To the extent that the training provision could be construed as providing an additional protective benefit, that benefit is one that inures to the citizens of the state as a whole and not to any particular local board of education. It therefore cannot be waived by any individual person or group. Furthermore, the dissent appears to misunderstand our reliance on the myriad of cases cited in support of the public obligation doctrine. Like the dissent, we have identified no precedent that supports the proposition that a local board of education may waive an obligation imposed on a state board. We do, however, find it instructive that courts in this state and other jurisdictions have precluded application of the waiver doctrine in cases in which a statute does not exist for any individual's benefit. Thus, we adopt the principles espoused by these courts and determine that the public obligation doctrine militates against a conclusion that the waiver doctrine applies to the training provision in § 10-223e(h).

Additionally, we find the dissent's contrary analysis unpersuasive. The dissent provides no basis for its conclusion that waiver occurred in the present case other than by relying on the inherently ambiguous language of the local board's resolution. Despite the dissent's attempt to portray the language of that resolution as supporting only one conclusion, namely, that the local board intended to waive training, it is equally if not more clear that the language supports a conclusion that the local board believed that the statute had been substantially complied with because the local board already had received some training. Indeed, both the local board hearing held on July 5, 2011, and the state board hearing held on July 6, 2011, are notable for the absence of any discussion of waiver. Remarkably, during the state board hearing, only one state board member tangentially raised the issue of training with Bellinger, the president of the local board. In response, Bellinger stated that the local board had not received enough training and could benefit from additional training. We initially note that the dissent dismisses these statements and instead selectively focuses only on those statements made by local board members that support the dissent's conclusion. Thus, in contrast to the dissent's conclusion that the local board resolution plainly supports a finding of waiver, the discussion at the state board meeting militates against such a finding. At the very least, it injects ambiguity into the meaning of the local board resolution, ambiguity that the dissent ignores.
[40] We note that there is substantial overlap between this argument and the defendants' waiver argument. The difference we perceive between the two is that, in this argument, the defendants focus on the fact that, although § 10-223e (h) requires strict compliance, we should not raise statutory form over factual substance when it appears that no added benefit would have been achieved by requiring the local board to undergo the statutorily mandated training.

We also clarify that, in addressing this argument, we do not accept the defendants' claim that the training in which certain of the local board members participated in 2010 should be treated as the functional equivalent of the training required under § 10-223e (h). As appellate counsel for the defendants conceded during oral argument before this court, as of October, 2011, there were no regulations, policies or standards in place for the specific type of training that the state board would require a local board of education to complete under § 10-223e (h). Indeed, the local board appears to be the first local or regional board of education reconstituted under § 10-223e (h). Because the local board did not undergo training specifically ordered by the state board pursuant to § 10-223e (h), there also is no precedent for determining what type of training the state board would require under the statute, or for determining how the state board factors satisfactory completion of training into its ultimate decision to authorize reconstitution.
[41] With regard to one aspect of the futility argument, we note that the state board clearly has the statutory authority to mandate training under § 10-223e (c)(2), as well as the authority to take various other remedial actions. If, for some reason, members of a local board of education or the local board of education as a whole refused to attend or complete training, it would appear that the state board could enforce its mandate through administrative and judicial procedures. See New Haven v. State Board of Education, supra, 228 Conn. at 704-705, 638 A.2d 589 ("[i]f the local board of education fails or is unable to implement the educational interests of the state by carrying out these mandates, the state board may conduct an investigation, hold an administrative hearing pursuant to the Uniform Administrative Procedure Act, order appropriate remedial steps, and, if necessary, enforce its order in the Superior Court"). Nevertheless, we do not foreclose the possibility that the state board may be able to rely on a futility argument under certain circumstances. In the present case, however, for the reasons noted in this opinion, the defendants reliance on a theory of futility is not supported by the record.
[42] This conclusion is further bolstered by the legislative history and intent that the state board would reassess the need to reconstitute a local board following completion of training. See, e.g., 53 H.R. Proc., Pt. 14, 2010 Sess., p. 4582, remarks of Representative Fleischmann ("if after that training [required under § 10-223e (h)] that board continues to be an impediment to execution of reforms, then and only then would the commissioner consider reconstituting that board of [education]" [emphasis added]). In other words, the legislature viewed the required training as a specific and identifiable benchmark to be used in the state board's overall assessment of whether a local board of education should be reconstituted. At no point does it appear that the legislature intended that local boards of education would undergo their own, self-motivated, training to supplant the requirement in § 10-223e(h).
[43] Because we only address the reserved question of whether the state board violated § 10-223e (h) under the stipulated facts of this case and the waiver argument advanced by the defendants, we agree with the dissent that our holding indicates "that the training provision could not be waived even upon a 9 to 0 vote of the local board and upon unanimous community and political agreement" only, however, insofar as it concerns waiver. Whether the unanimous vote of a local board of education seeking reconstitution could serve to obviate the training requirementfor example, as the equivalent of a board's resignation contingent on reconstitution and, therefore, not in violation of § 10-223e (h) is a question not presented by this reservation. Accordingly, we do not address it.
[1] This case involves three separate complaints in which the state board, various city and school officials of the city of Bridgeport, members of the reconstituted Bridgeport board and the state board of education are named as defendants. See the text of the majority opinion for a more detailed identification of the various defendants.
[2] The plaintiffs in these three cases were comprised of various former Bridgeport board members, electors of the city of Bridgeport, and residents of the city. We, like the majority, refer to these individuals collectively as the plaintiffs.
[3] The record includes the transcript of the Bridgeport board's special meeting at which it voted on the resolution and the DVD of the state board meeting in which it addressed the issue of reconstitution.
[4] The procedures by which the General Assembly may reconstitute a local board of education are set forth in § 10-223e (d). Well before the legislature enacted this provision in 2007; see Public Acts, Spec. Sess., June, 2007, No. 07-3, § 32; it had employed this procedure when the state took over the Hartford school system in 1997.
[5] The Bridgeport board members supporting reconstitution acknowledged that there consistently was a six person majority that permitted the board to act on matters before it, but asserted that the three member minority had made that process more protracted through the use of various procedural mechanisms. Democracy assumes, however, the utility of dissent, and procedural mechanisms adopted by a collective body necessarily are tools deemed legitimate by that body.
[6] See General Statutes § 10-223e (a) ("[i]n conformance with the No Child Left Behind Act . . . the Commissioner of Education shall prepare a statewide education accountability plan, consistent with federal law and regulation").
[7] "[P]arents are mentioned over 300 times in various part[s] of the No Child Left Behind [A]ct [of 2001]. . . ." NCLB Action Briefs, "Parental Involvement," (April 23, 2004), p. 1, available at http://www.ncpie.org/nclbaction/ parent_involvement.html (last visited February 28, 2012) (copy contained in the file of this case with the Supreme Court clerk's office). Numerous studies document the relationship between parental involvement and student performance. See, e.g., Michigan Department of Education, "What Research Says About Parent Involvement In Children's Education In Relation to Academic Achievement," (March 2002), available at http://www. michigan.gov/documents/Final_Parent_ Involvement_fact_sheet_14732_7.pdf (last visited February 28, 2012) (copy contained in the file of this case with the Supreme Court clerk's office).
[8] The dissent dismisses this concern by pointing to the lack of evidence that reconstitution was imposed against the will of a majority of parents and by deeming any such evidence to be irrelevant if it existed. As I explain later in this concurring opinion, lack of information bearing on this question is directly attributable to the haste with which reconstitution was raised and decided, and I disagree that such evidence necessarily would have been irrelevant to the state board in deciding whether reconstitution was the best course of action.
[9] The reconstituted Bridgeport board appointed by the state has in fact replaced the Bridgeport superintendent.
[10] The state board also has not enacted regulations specifying procedures to be followed for reconstitution or for the provision of training.
[1] I hereinafter refer to the board of education of the city of Bridgeport as the "Bridgeport board," the commissioner of education as the "commissioner" and the state board of education as the "state board."
[2] Under article eighth, § 1, of the constitution of Connecticut, the schoolchildren of this state are entitled to a free public elementary and secondary education. This right requires the state "to provide a substantially equal educational opportunity to its youth in its free elementary and secondary schools." Horton v. Meskill, 172 Conn. 615, 649, 376 A.2d 359 (1977). The right is a substantive one that "guarantees Connecticut's public school students educational standards and resources suitable to participate in democratic institutions, and to prepare them to attain productive employment and otherwise to contribute to the state's economy, or to progress on to higher education." Connecticut Coalition for Justice in Education Funding, Inc. v. Rell, 295 Conn. 240, 244-45, 990 A.2d 206 (2010). Moreover, it is the public policy of this state that "each child shall have . . . equal opportunity to receive a suitable program of educational experiences. . . ." General Statutes § 10-4a (1). Under General Statutes § 10-220(a), each local and regional board of education is required to implement this policy.
[3] Nor is this case about the set of inflammatory and unsubstantiated allegations to which Justice Harper, in his concurrence, accords unwarranted attention, allegations to the effect that "certain members of the Bridgeport board colluded with the mayor, superintendent, private parties and certain members of the state board to engineer a takeover of the Bridgeport board for purely political purposes." These unsubstantiated allegations show up, among other places, in the complaint filed by Maria Pereira and other plaintiffs, which begins: "When, in the course of human events, it becomes necessary for one group of duly elected public officials [presumably, members of the original Bridgeport board who brought the present actions] to bring to light the corrupt bands which have connected them with another, and to expose the shadowy usurpations of the people's rights by a cabal of petty tyrants [presumably, the state board] and corporate private interests with no regard for the rule of law or the votes of the people, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to an action such as this. . . ." I agree with Justice Harper when he notes that "these allegations are unproven; they are not part of the stipulated facts. As a general matter, this court assumes that public officials are acting in good faith. . . . Accordingly, in the absence of clear evidence to the contrary, [it can be assumed] that [the members of the] Bridgeport board . . . have exercised their authority in good faith, solely for the purpose of advancing the educational interests of the children." (Citation omitted.) Because these inflammatory allegations are utterly unsubstantiated, it is inappropriate to accord them any attention at all, let alone to rely on them as "giv[ing] context to the plaintiffs' claims and explain[ing] the deep passions that motivated their opposition to reconstitution." Dwelling on these inflammatory allegations is profoundly unfair to the defendants and can serve only to undermine this court's image as an arbiter of impartial justice. The public has a right to know with certainty that this court's decisions are not tainted by unproven allegations or other irrelevant considerations.
[4] Although I wholeheartedly agree with Justice Harper that parental involvement is to be encouraged as an extremely important component of a child's educational experience, I do not agree with his suggestion that reconstituting a local board of education against the will of a majority of parents in a chronically failing school district necessarily discourages parental involvement, and there is no evidence in the record even remotely indicating that it does. Much less is there any evidence in the record indicating that a majority of parents in this case opposed reconstitution of the Bridgeport board. Even if there were, such evidence would be completely irrelevant to the issue in this case, which is whether the state board's action was lawful, not whether it was wise. Moreover, I do not hold the view that Justice Harper ascribes to me, namely, that "evidence [of parental preferences] necessarily would have been irrelevant to the state board in deciding whether reconstitution would have been the best course of action." Be that as it may, my view on the wisdom of reconstituting a local board does not actually matter at all, and neither does the view of any of my colleagues. The only view that matters is that of the legislature, as expressed in a governing statutory scheme that provides that the state board, in its sound discretion, may reconstitute chronically failing school districts.
[5] The majority observes that it "cannot ignore the fact that the foundational issue . . . is how to provide students with the best possible education"; text accompanying footnote 24 of the majority opinion; but then proceeds to ignore this issue entirely. Nowhere does the majority explain how a failing school district's students possibly would benefit from a local board of education retaining control over the district even after the mayor, the superintendent, and the local board itself all have made impassioned pleas for state intervention.
[6] With respect to my discussion of this case's historical and statutory backdrop, the majority writes, "To the extent the dissent relies on these data to suggest that the issue before this court is the broader policy issue of whether and when the state board should reconstitute local or regional boards of education, the dissent improperly expands the scope of this reservation." Footnote 14 of the majority opinion. I do not know why the majority insists on transmuting my statutory analysis into something it is not and criticizing a "suggest[ion]" I do not make, instead of engaging the argument that I do make.
[7] The majority in fact acknowledges that, whatever the training provision's purpose, its effect is to erect little more than a speed bump on the road to reconstitution: "We note that the state board's obligation to require training would unlikely be considered an onerous one. Although . . . there are no procedures or guidelines with respect to § 10-223e (h), whatever training is required under § 10-223e (h) is unlikely to be any significant impediment to reconstitution." Footnote 31 of the majority opinion.
[8] The majority simply mischaracterizes my view when it asserts that, "without any analysis or authority to support [my] position," I claim that the training provision "protects the [Bridgeport] board." On the contrary, I state repeatedly in this dissent that the training provision serves to protect the locality's interest in retaining control over public education. It does not serve to protect the local board of education as such. I do not know why the majority refuses to engage my analysis on its own terms.
[9] See, e.g., Santiago v. State, 261 Conn. 533, 543, 804 A.2d 801 (2002) (mandatory statutory provisions are "typically" subject to waiver); see also United States v. Mezzanatto, 513 U.S. 196, 200-201, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995) ("[I]n the context of a broad array of constitutional and statutory provisions . . . [r]ather than deeming waiver presumptively unavailable absent some sort of express enabling clause, we instead have adhered to the opposite presumption. . . . [A]bsent some affirmative indication of Congress' intent to preclude waiver, we have presumed that statutory provisions are subject to waiver by voluntary agreement of the parties." [Citations omitted.]); Shutte v. Thompson, 82 U.S. (15 Wall.) 151, 159, 21 L.Ed. 123 (1873) ("[a] party may waive any provision, either of a contract or of a statute, intended for his benefit").
[10] In the interest of simplicity, we hereinafter refer to students from low income families as low income students and refer to students from more affluent circumstances as non-low income students.
[11] The majority also implies that, because the parties did not include these statistics in their stipulated facts, my reliance on them is improper. See footnote 14 of the majority opinion. On the contrary, it is perfectly appropriate to take judicial notice of unchallenged statistical data pertaining to the state of public education in Bridgeport and elsewhere; see, e.g., Sheff v. O'Neill, 238 Conn. 1, 38 n. 42, 678 A.2d 1267 (1996) (taking judicial notice of statistics compiled by board of education of city of Hartford); and the majority would have been free to rely on such data itself if it had chosen to resolve this case on the basis of what really is at stake: the precarious constitutional right of Bridgeport schoolchildren to an adequate public education.
[12] See, e.g., 50 S. Proc., Pt. 19, 2007 Spec. Sess., p. 6203 ("In my three years . . . [in] this body, I don't think I've ever been as distressed by any one statistic as I have by the academic gap that exists in the public schools of Connecticut, a gap which, according to scholars and economists who have studied it, is actually greater than [that of] any other state in the United States. It's a gap between the underachieving students, the underachieving schools and the rest of the schools in the state. And Senator [Thomas P.] Gaffey [co-chairman of the education committee] is presenting to us today a blueprint to overcome that gap. And there's no doubt if this blueprint is enforced by us and by the [s]tate [d]epartment of [e]ducation, that we will make a significant dent in the gap."), remarks of Senator Edward Meyer on the proposed legislation that became Public Acts, Spec. Sess., June, 2007, No. 07-3.
[13] See 51 H.R. Proc., Pt. 10, 2008 Sess., p. 3215 (P.A. 08-153 "expands actions the [s]tate [b]oard of [e]ducation can take to improve student performance") remarks of Representative Andrew M. Fleischmann, co-chairman of the education committee; id., at pp. 3218-19, remarks of Representative Kevin M. DelGobbo ("I appreciate the [d]istinguished [c]hair of the [e]ducation [c]ommittee [Representative Fleischmann] in presenting this amendment to clarify a concern that was expressed by myself and some others [about] the accountability measures that we adopted last year [in the 2007 act], which were so critical. . . . [T]here was concern that the underlying bill might have in some way constrained the [c]ommissioner . . . from being able to implement those accountability measures. So I appreciate very much Representative Fleischmann's [a]mendment here at this moment to make it clear that in fact all of those provisions of authority that we gave to the [c]ommissioner to go into [a] school district and make certain changes if necessary, that in fact . . . this bill would not in any way impinge [on] that. . . .").
[14] See 53 S. Proc., Pt. 7, 2010 Sess., p. 2078 ("[w]hat this amendment focuses on is changes to our education statutes to respond to . . . the criteria in the application for federal funding for education, the so-called `Race to the Top' program"), remarks of Senator Gaffey; 53 H.R. Proc., Pt. 14, 2010 Sess., p. 4554 ("the amendment that stands before us is essentially Connecticut's Race to the Top of education reform legislation for the year"), remarks of Representative Andrew M. Fleischmann, co-chairman of the education committee.
[15] Regs., Conn. State Agencies § 10-295-5(b)(16) ("`Local Education Agency' or `LEA' refers to a public board of education or other public authority legally constituted within Connecticut for either administrative control or direction of or to perform a service function for public elementary schools or secondary schools in a town, city, school district or other political subdivision of the state or for such combination of towns, cities or school districts as are recognized in Connecticut as an administrative agency for its public elementary schools or secondary schools").
[16] See also Race to the Top, Technical Review FormTier 1, Connecticut Application # 1680CT-1, comments from reviewer 1 ("The state has legal authority to intervene in persistently low-achieving schools, but to intervene in the [local education agencies] they need to get the [g]overnor and [l]egislature to approve the intervention, which is very difficult to do."); id., Connecticut Application # 1680CT-2, comments from reviewer 2 ("the approval of [the] legislature is needed for district takeover, and this may be difficult to obtain"); id., Connecticut Application # 1689CT10, comments from reviewer ("It is not clear that the state could take over an entire [local education agency] without legislative approval. . . . The state is authorized to `retrain' local boards but not to remove them for alleged failures.").
[17] The majority asserts that "the legislative history on which the dissent relies suggests that one of the principal reasons why the legislature amended § 10-223e by adding subsection (h) [the reconstitution authority]. . . was to secure federal funding"; footnote 27 of the majority opinion; as if thereby to imply that the legislature did not add the reconstitution authority for the primary purpose of enhancing the state's power to rescue failing schools or school districts. This is a false dichotomy. Obviously, when the legislature enacted § 10-223e (h), the legislature's primary purpose was to secure federal funding by enhancing the state's power to rescue failing schools and school districts.
[18] That the training provision of § 10-223e (h) serves simply to protect local control draws ample support from the legislative history. For example, during the education committee hearing on the proposed addition of subsection (h) to § 10-223e, Representative Andrew M. Fleischmann, co-chairman of the education committee, noted: "There's a tension between trying to get things done and respecting the will of the people in democracy. And one of the concerns . . . would be taking a body that had been elected by the folks in a given town and dispersing them . . . and, instead, giving the power, essentially, to [the commissioner] and the [s]tate board." Conn. Joint Standing Committee Hearings, Education, Pt. 4, 2010 Sess., p. 1049. Former commissioner of education Mark McQuillan responded that "it is very, very important that . . . the democratic-elected officials remain in the positions if they are prepared and demonstrate the capacity to do the leadership." Id. McQuillan subsequently explained that "in rare instancesand I'm staying `in rare instances,' not the general patternwe have found that it would be necessary to have [the] authority" to reconstitute a local board. Id., at p. 1051. During debate on the House floor, Representative Marilyn Giuliano noted that reconstituting a local board of education was a "significant usurpation of powers" and asked Representative Fleischmann about the "exact criteria that would give the commissioner such full-blown powers to dissolve a duly-elected, by the people, [b]oard of [e]ducation." 53 H.R. Proc., Pt. 14, 2010 Sess., p. 4581. Seeking to assuage Representative Giuliano's concern about usurping local control, Representative Fleischmann replied that "the commissioner would first have to find that he had a school board that was overseeing a school district that was a low-achieving district consistently for several years, and that the board was actually an impediment to moving forward with reforms. . . . [I]f that's happening, and I'm not sure if it's happening in Connecticut . . . [t]he members of the board can be retrained by the [s]tate [d]epartment of [e]ducation. And if after that training that board continues to be an impediment to execution of reforms, then and only then would the commissioner consider reconstituting that board. . . ." Id., at pp. 4581-82. These remarks all evince a modest but real concern to protect localities from unwanted state intervention.
[19] This is true even when the plain and unambiguous text of the statute leads to a bizarre or irrational result. See General Statutes § 1-2z ("The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.").
[20] Although the majority agrees that, on the basis of its analysis of § 10-223e (h), the training provision could not be waived even upon a 9-0 vote of the local board and upon unanimous community and political agreement, the majority suggests that there might be circumstances in which "the unanimous vote of a local board of education seeking reconstitution could serve to obviate the training requirementfor example, as the equivalent of a board's resignation contingent on reconstitution . . . [which would] not [be] in violation of § 10-223e (h). . . ." Footnote 43 of the majority opinion. Whatever the majority might mean by "resignation contingent on reconstitution," it seems clear that any such attempt to circumvent the training provision would contravene the purpose that the majority ascribes to § 10-223e (h)to afford notice of a potential reconstitution and to promote transparency and deliberation during the reconstitution processnotwithstanding the majority's contrary suggestion.
[21] The majority seems unable to make up its mind about the extent of this state's preference for local control over education. The majority begins by proclaiming "the long-standing policy in Connecticut of local, rather than state, control over schools and school districts" but then performs an abrupt about-face in stating that § 10-223e (h) "remove[d] the last vestige of local control over low achieving schools and school districts", and that it "agree[s] . . . that § 10-223e . . . represented a sea change in educational policy in this state," only to perform another about-face by stating "that the legislature did not intend § 10-223e (h) to supplant Connecticut's long-standing policy of preferring and preserving locally elected boards of education," and that this state has a supposed "policy of maintaining a locally elected board of education to the maximum extent possible. . . ." (Emphasis added.)
[22] In its defense, the majority cites two cases, Cotto v. United Technologies Corp., 251 Conn. 1, 738 A.2d 623 (1999), and Washington v. Meachum, 238 Conn. 692, 680 A.2d 262 (1996), for the proposition that "[a]lthough the comments of opponents of a bill are entitled to less weight than those of its proponents, there are instances in which we have found them to be relevant." Footnote 18 of the majority opinion, quoting Cotto v. United Technologies Corp., supra, at 12 n. 7, 738 A.2d 623. I of course agree with the majority that the comments of a bill's opponents sometimes are relevant to the task of deciphering a statute's meaning. For example, the comments of a bill's opponents may be relevant when a court seeks to identify "the problem that the legislature intended to address"; Cotto v. United Technologies Corp., supra, at 12, 738 A.2d 623; or when a court seeks to discern what type of activity the legislature intended to regulate; see Washington v. Meachum, at 714, 680 A.2d 262 (holding that various comments in legislative history of wiretapping statutes, including several comments by legislators who opposed those statutes, "confirm[ed][the] conclusion that the wiretapping statutes were intended to apply only to monitoring and recording done without the knowledge of either party to the conversation"). Yet the majority fails to show that this case is one of those "instances" in which the comments of a bill's opponents are relevant to the task of deciphering a statute's meaning. Although the majority correctly observes that "both the legislators in support of and the legislators in opposition to [P.A. 10-111] spoke about . . . the importance of preserving locally elected boards of education"; footnote 18 of the majority opinion; the majority does not acknowledge that the opponents accorded far greater importance to preserving locally elected boards than did the supporters. Only the opponents expressed grave reservations about the reconstitution authority. Ignoring this obvious disparity, the majority asserts inaccurately that the opponents and supporters of P.A. 10-111 "expressed identical concerns.. . ." Id.

In support of its reliance on the remarks of Representative Marilyn Giuliano, who voted against P.A. 10-111, the majority claims that her remarks are relevant "to show that the legislature was aware of the full implications of § 10-223e (h)"; footnote 21 of the majority opinion; in particular, that § 10-223e (h) empowered the state to dissolve a duly elected body. In making this claim, the majority ignores the incontrovertible fact that, if the legislature passed P.A. 10-111 despite being aware that it empowered the state to dissolve a duly elected body, the legislature could not have found this grant of power to be troubling or problematic. The majority also contends that the fact that the legislature passed P.A. 10-111 over Representative Giuliano's concerns "does not negate the veracity of these concerns. . . ." Id. No matter how "veraci[ous]" Representative Giuliano's concerns might have been, however, the fact that the legislature passed P.A. 10-111 notwithstanding those concerns certainly calls into question whether they reflected the concerns of the legislature as a whole. In addition to quoting Representative Giuliano, the majority quotes Representative Lawrence F. Cafero, Jr., another opponent of P.A. 10-111, who stated: "[W]e take [great] pride . . . here in New England, and Connecticut in particular, about local control. . . . The referendum that people mostly have is at the polling booth. If they believe their [b]oard of [e]ducation is failing . . . [t]hey could vote them out. . . ." 53 H.R. Proc., Pt. 15, 2010 Sess., pp. 4631-32. The majority acknowledges that Representative Cafero voted against P.A. 10-111 but asserts that his remarks are relevant nonetheless because his "view of Connecticut's educational administration coincides with the policy embodied in the statutory scheme." Footnote 24 of the majority opinion. In light of the fact that the statutory scheme unquestionably undermines local control of failing schools, I am unable to understand the majority's assertion.
In its search for the legislature's intent, the majority relies not only on irrelevant legislative history but also on an assortment of cases and other statutes that actually support the opposite of the majority's conclusion. The majority cites two cases, namely, New Haven v. State Board of Education, 228 Conn. 699, 638 A.2d 589 (1994), and West Hartford Education Assn., Inc. v. DeCourcy, 162 Conn. 566, 295 A.2d 526 (1972), in support of its contention that the legislature did not intend that § 10-223e (h) would supplant Connecticut's long-standing policy of preferring local control over education. Both of these cases were decided many years before the sweeping changes to Connecticut's education law that culminated in the enactment of § 10-223e (h). More to the point, both of these cases, in language that the majority itself quotes, affirm that the predominant interest in public education belongs not to Connecticut's various localities but to the state. New Haven v. State Board of Education, supra, at 703, 638 A.2d 589 ("[t]he state board is charged with the broad and general power to supervise and control the educational interests of the state" [emphasis added; internal quotation marks omitted]); West Hartford Education Assn., Inc. v. DeCourcy, at 573, 295 A.2d 526 ("[t]he state has had a vital interest in the public schools from the earliest colonial times"). The majority also cites a handful of statutes in the same or surrounding chapters of the General Statutes§ 10-220(a), (b) and (e), § 10-4g (a) and (b), and § 10-221(a) and (b)that, in the majority's view, "demonstrate a clear policy of defining a supervisory role for the state board separate and distinct from local boards. . . ." Footnote 22 of the majority opinion. These statutes are irrelevant to the present case. To the extent that the statutes evince a policy of defining a supervisory role for the state board separate and distinct from local boards, they evince such a policy only with respect to school districts that are not failing. With respect to school districts that are failing, § 10-223e establishes a contrary policy, one of robust state direction and control. Connecticut education law may still evince a general policy of preferring and preserving local control, but no such policy pertains to Connecticut's failing school districts.
[23] Nor is the supposed strength of the statute's mandatory language evidence that the training contemplated by § 10-223e (h) is nonwaivable. Examples abound of provisions that are forcefully worded, mandatory, and waivable. For instance, the sixth amendment to the United States Constitution provides: "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." (Emphasis added.) Notwithstanding the sixth amendment's strong, mandatory language, a criminal defendant can waive nearly all of his sixth amendment rights. See, e.g., Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 2534 n. 3, 174 L.Ed.2d 314 (2009) (confrontation); Barker v. Wingo, 407 U.S. 514, 528-29, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (speedy trial); Levine v. United States, 362 U.S. 610, 618, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960) (public trial); Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (assistance of counsel); Patton v. United States, 281 U.S. 276, 308-309, 50 S.Ct. 253, 74 L.Ed. 854 (1930) (trial by jury). For similar reasons, it is insignificant that § 10-223e (h) does not explicitly provide for waiver. The Bill of Rights does not explicitly provide for waiver, either. Also insignificant is whether the training provision of § 10-223e (h) is unusually important. No mandatory provision in our law is more important than any provision in the sixth amendment, yet nearly all of the rights guaranteed by the latter can be waived. Indeed, many important rights may be waived by defense counsel without prior consultation with the defendant. See State v. Gore, 288 Conn. 770, 779 n. 9, 955 A.2d 1 (2008).
[24] I also find this discussion highly unpersuasive. To begin with, the fact that § 10-223e (c)(1) "uses strong, presumptively mandatory language in describing the role that the state board occupies with regard to low achieving schools and districts" has no bearing whatsoever on whether § 10-223e (h)a separate subsectionis mandatory. Equally irrelevant is the fact that § 10-223e (d) employs mandatory language. I fail to see how italicizing every occurrence of the word "shall" in § 10-223e (c)(1) and (2), and (d) lends any support to the majority's otherwise sensible, and unchallenged, conclusion that § 10-223e (h) is mandatory.
[25] I disagree with the majority's related contention that, "when § 10-223e (h) is analyzed in the context § 10-223e (c)(1) and (2), the logical inference is that the state board should pursue the remedial actions in § 10-223e (c)(2), with regard to the low achieving school or school district overseen by a local or regional board of education, before it pursues the seemingly severe remedy of reconstituting that local or regional board of education under § 10-223e (h)." The legislature made just one of the actions enumerated in § 10-223e (c)(2) a precondition to reconstitution under § 10-223e (h). Our rules of statutory construction require us to assume that, if the legislature had intended to make all of the remedial actions enumerated in § 10-223e (c)(2) a precondition to reconstitution, it would have done so explicitly. See, e.g., Genesky v. East Lyme, 275 Conn. 246, 258, 881 A.2d 114 (2005) ("if the legislature wants to [engage in a certain action], it knows how to do so"); Carmel Hollow Associates Ltd. Partnership v. Bethlehem, 269 Conn. 120, 135, 848 A.2d 451 (2004) (same). Also unsound is the majority's contention that, in view of the legislative history, "the reference in § 10-223e (h) to § 10-223e (c)(2)(M) can easily be understood as signaling the legislature's preference that the state board pursue the cooperative remedial and supervisory options under § 10-223e (c)(2) prior to eliminating all local control through reconstitution." Even if the majority's characterization of the legislative history were correctand none of the materials that the majority cites suggests that any legislator understood § 10-223e (h) to oblige the state board to perform all of the actions enumerated in § 10-223e (c)(2) before reconstituting a local boardthe majority ignores the bedrock principle that "[t]he intent of the legislature . . . is to be found not in what the legislature meant to say, but in the meaning of what it did say." (Internal quotation marks omitted.) Cruz v. Montanez, 294 Conn. 357, 370, 984 A.2d 705 (2009).
[26] At the meeting of the state board, state board member Joseph Vrabely, Jr. stated: "We've already intervened in Bridgeport with our programs, and those programs are not working."
[27] Notwithstanding the plain meaning of § 10-223e (h), the majority denies that the state board properly could reconstitute a local board of education in a manner that affords the locality no notice whatsoever, relying on what it describes as "the clear legislative intent that the state board should authorize reconstitution only if a procedure for doing so is in place." Footnote 27 of the majority opinion. Regardless of whether there is any such "clear legislative intent," the majority again ignores the bedrock principle that "[t]he intent of the legislature . . . is to be found not in what the legislature meant to say, but in the meaning of what it did say." (Internal quotation marks omitted.) Cruz v. Montanez, 294 Conn. 357, 370, 984 A.2d 705 (2009). The legislature said nothing about there being any pre-reconstitution procedure other than the training provision itself.

A further reason why the majority disputes my assertion that the state board properly could reconstitute a local board in a fashion that affords the locality no notice whatsoever is that, in the majority's view, reconstituting a board in such a fashion would "[frustrate] one of the purposes of the training requirement that [it has] identified, namely, to provide notice." Footnote 27 of the majority opinion. The majority simply begs the question, arguing that, because the training provision serves to provide notice of an impending reconstitution, the state board properly could not reconstitute a local board of education in a manner that affords the locality no notice whatsoever. The far more logical inference runs the other way. Because it is obvious from the plain meaning of the statute that the state board properly could reconstitute a local board of education in a manner that provides the locality no notice whatsoever, providing notice cannot possibly be the training provision's purpose.
[28] In this connection, the majority baldly asserts that the training provision "furthers a policy of maintaining a locally elected board of education to the maximum extent possible. . . ." (Emphasis added.) The majority offers no evidence to show that this state has any such policya policy that would force a local board of education to remain in place even after it has made a desperate plea for state intervention with the backing of the municipality's mayor and superintendent of schools.
[29] In a footnote, the majority cites four out-of-state authorities in support of the proposition that a public obligation created by statute cannot be waived by any individual or group of individuals. See footnote 37 of the majority opinion. As I explain more fully hereinafter; see footnote 32 of this opinion; none of these authorities supports the majority's premise.
[30] The two cases that would be binding if they were on point are Hatch v. Merigold, 119 Conn. 339, 176 A. 266 (1935), and L'Heureux v. Hurley, 117 Conn. 347, 168 A. 8 (1933). We are not bound by In re Application for Petition for Writ of Habeas Corpus by Dan Ross, 272 Conn. 676, 717, 866 A.2d 554 (2005) (Lavery and Dranginis, Js., dissenting), because it is a dissenting opinion. Nor are we bound by Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), a case in which the United States Supreme Court interpreted a federal statute. Id., at 698, 65 S.Ct. 895. The fifth case that the majority cites in the text of its opinion is Beasley v. Texas & Pacific Railway Co., 191 U.S. 492, 24 S.Ct. 164, 48 L.Ed. 274 (1903), a case that has nothing at all to do with waiver.
[31] See L'Heureux v. Hurley, 117 Conn. 347, 355-56, 168 A. 8 (1933).
[32] In a footnote, the majority cites four additional authorities for the proposition that a public obligation created by statute cannot be waived by any individual or group of individuals. See footnote 37 of the majority opinion. Again, the majority does little more than pluck superficially favorable language from these authorities; not one of them actually stands for the broad proposition that statutorily created public obligations cannot be waived by anyone. Three of these authorities establish at most that public obligations cannot be waived by individuals. Cal. Civ.Code § 3513 (Deering 2005) ("Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." [Emphasis added.]); Campbell v. Campbell, 87 Ohio App.3d 48, 50, 621 N.E.2d 853 (1993) ("The public interest may not be waived. [28 Am.Jur.2d, supra, at § 161, p. 847]. Just as with laches and estoppel, it would not be sound public policy to allow individuals employed by [the county child support enforcement agency] to waive the public's right to the support arrearages owed by [the appellee]."); Isenhower v. Isenhower, 666 P.2d 238, 241 (Okla.App.1983) ("when a statute contains provisions that are founded [on] public policy, such provisions cannot be waived by a private party if such waiver thwarts the legislative policy which the statute was designed to effectuate" [emphasis added]). The fourth authority establishes not that statutorily created public obligations cannot be waived by anyone but, rather, that a municipality cannot waive bidding requirements when "the statute evinces a clear intention to provide maximum protection for the taxpayer." Hillside v. Sternin, 25 N.J. 317, 325, 136 A.2d 265 (1957); see also id., at 326, 136 A.2d 265 ("[o]nly by this approach can the desirable protection be afforded to the taxpayers; only in this way can perfect equality be maintained among bidders").
[33] The majority argues against an obvious straw man when it asserts that "the legislature did not intend that the state board's reconstitution authority would supersede the existing, comprehensive statutory scheme that provided for other means of supervising and intervening in local educational issues." Text accompanying footnote 27 of the majority opinion. Nowhere do I claim that § 10-223e (h) was meant to "supersede" the rest of § 10-223e. Indeed, I have no idea what such a claim would even mean. Nor do I have any idea what the majority means when it states, "we construe the reconstitution [power] ... narrowly, so as not to supplant the other remedies already available to the state board." (Emphasis added.)
[34] The majority asserts that the record is "ambiguous" with respect to whether the Bridgeport board, in passing the July 5 resolution, intended to waive the training provision or simply "believed that the statute had been substantially complied with because the [Bridgeport] board already had received some training." Footnote 39 of the majority opinion. Contrary to the majority's assertion, there is no ambiguity at all in the Bridgeport board's July 5 resolution, which expressly requests that the state board reconstitute the Bridgeport board and notes that "further training would [not] be productive or [otherwise] enable the [b]oard to carry out [its] responsibilities...." Moreover, even if the resolution did appear ambiguous on its face, no such appearance could survive the assertion of the defendant board members, in their briefs and at oral argument before this court, that relinquishing the benefit of additional training is precisely what the board intended to do.

In asserting that the July 5 resolution was ambiguous with respect to whether the Bridgeport board intended to waive the training provision, the majority trades on the law's well-known aversion to countenancing ambiguous waivers. That aversion simply is irrelevant to this case. The obvious rationale behind the law's aversion to countenancing ambiguous waivers is to protect those who might claim that they did not waive a right, specifically by requiring the adverse partythe party claiming that waiver occurredto prove its claim through competent evidence. I am not aware of any case, and the majority cites none, in which the law's reluctance to countenance ambiguous waivers was invoked to defeat a party's claim that it did waive a right.
Even if such a case existed, the defendants would have no trouble demonstrating that the Bridgeport board waived the training requirement. To do so, the defendants would need to demonstrate only that, when the Bridgeport board voted for reconstitution, it was aware of its statutory right to training. See, e.g., Wadia Enterprises, Inc. v. Hirschfeld, 224 Conn. 240, 252, 618 A.2d 506 (1992) ("[a]ssuming [the threshold applicability of the doctrine of] implied waiver [to the present case]... the plaintiff[s] would ... have to make a showing that the defendants knew of their right[s] [under the statute] ... before they could [intentionally] waive [them]"). The record is replete with evidence that the Bridgeport board was aware of that statutory right. Not only did the July 5 resolution expressly reference § 10-223e (h), but the transcript of the hearing at which the resolution was adopted reveals that the discussion actually centered on the issue of whether the mandatory training provision precluded the Bridgeport board from adopting the proposed resolution. One of the named plaintiffs, Maria Pereira, argued vehemently that it did, reading aloud from the statute in an unsuccessful attempt to persuade her fellow board members that the Bridgeport board could not pass the resolution until after it had received training. Barbara Bellinger, president of the Bridgeport board, took the opposite position, stating: "I disagree [that the state board cannot authorize reconstitution unless and until there has been compliance with mandatory training]. [W]e have already discussed this with the state board ... and they have indicated that we [can] move forward, that efforts for training have been fulfilled and that further training would not ameliorate the situation....
"[H]aving experienced some training with some members of this board, [I] do not believe that further training, given the level of dysfunctionality that we're experiencing, will help us. We need a new idea, we need the state's assistance, we need [the state] to step in and help fix these issues.... And training isn't the answer to that. Training is the answer to a lot of things, especially when people are willing to collaborate and work together on issues."
Furthermore, even though no one at the Bridgeport board hearing formally described the board's resolution as a "waiver" of the training provision, it is indisputable that "[w]aiver need not be express, but may consist of acts or conduct from which a waiver may be implied.... In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) Wadia Enterprises, Inc. v. Hirschfeld, supra, 224 Conn, at 252, 618 A.2d 506. In the present case, one would have to blink at reality in order to maintain that the Bridgeport board waived the training requirement without full awareness of its right to receive additional training prior to reconstitution. It is clear that the Bridgeport board was aware of that right but had concluded that, given its extreme level of dysfunction and acrimony, no amount of training would have enabled it to fulfill its constitutional duties to the schoolchildren of Bridgeport.
In view of these facts, the majority's assertion that the evidence is inadequate to support a finding of waiver is nothing short of astounding. This court has found an implicit waiver of a constitutional right on the basis of far less evidence. See State v. Kitchens, 299 Conn. 447, 482-83, 10 A.3d 942 (2011) (holding that defendant will be found to have knowingly and intentionally waived by implication his constitutional right to adequate jury instruction when counsel was provided copy of proposed instructions and, after meaningful opportunity to review and comment on them, counsel affirmatively accepted proposed instructions even though record contained no other indicia of waiver).
The majority accuses me of dismissing a statement that Bellinger made at the state board hearing on July 6, 2011, a statement that, according to the majority, "injects ambiguity" into the meaning of the July 5 resolution and calls into question whether the local board intended to waive its right to training. Footnote 39 of the majority opinion. In the majority's words, Bellinger "stated that the [Bridgeport] board had not received enough training and [perhaps] could benefit from additional training." Id. Viewed in their proper context, however, Bellinger's actual statements inject no ambiguity at all into the meaning of the July 5 resolution. When a member of the state board asked Bellinger to identify the main "divide" on the Bridgeport board, she responded, "the divide is on almost every issue." The same state board member then queried: "I know you are a training professional You said [the Bridgeport board] had training. What kind of training have you had? Have you had lighthouse training?" Bellinger responded: "We had training that I arranged for with an outside consultant, to help people understand their roles and responsibilities. It was not attended by 100 percent of [our members], nor do I feel that that was adequate training. Don't forget, I am a training person. I really think that training is important." Whatever the significance of these particular remarks, Bellinger's testimony as a whole contains repeated assertions that no amount of training could enable the Bridgeport board to achieve its objectives, given its profound level of dysfunction. Marion Martinez, a representative of the state department of education, reinforced Bellinger's view, explaining that the training programs then offered by the state, including the lighthouse program, simply were not designed to address the kind of problem that the Bridgeport board was experiencing. As Martinez succinctly put it, "lighthouse does not repair damaged relationships."
[35] Because there is ample legal support for the Bridgeport board's competency to waive the protection afforded by § 10-223e (h), it is irrelevant, contrary to the assertion of Maria Pereira and other plaintiffs, that § 10-223e (h) does not explicitly provide that a local board of education can request reconstitution.
[36] Even though the state board was perfectly free to reject or ignore the Bridgeport board's request for reconstitution, Justice Harper appears to believe that the Bridgeport board did in fact dispossess its three member minority. He states that "the resolution adopted by six members of the Bridgeport board to forgo training cannot logically be separated from the intended effect of that decisionto displace duly elected board members through a state created reconstituted board." I am unable to discern why Justice Harper accords this purported dispossession any significance at all, given that he joins a majority opinion under which a local board of education could not waive the training provision even upon a unanimous votea vote that dispossess no one.
[37] General Statutes § 10-219 provides: "If a vacancy occurs in the office of any member of the local board of education, unless otherwise provided by charter or special act, such vacancy shall be filled by the remaining members of said board until the next regular town election, at which election a successor shall be elected for the unexpired portion of the term, the official ballot specifying the vacancy to be filled."
[38] The constitution of Connecticut, article tenth, § 1, provides: "The general assembly shall by general law delegate such legislative authority as from time to time it deems appropriate to towns, cities and boroughs relative to the powers, organization, and form of government of such political subdivisions. The general assembly shall from time to time by general law determine the maximum terms of office of the various town, city and borough elective offices. After July 1, 1969, the general assembly shall enact no special legislation relative to the powers, organization, terms of elective offices or form of government of any single town, city or borough, except as to (a) borrowing power, (b) validating acts, and (c) formation, consolidation or dissolution of any town, city or borough, unless in the delegation of legislative authority by general law the general assembly shall have failed to prescribe the powers necessary to effect the purpose of such special legislation."
[39] The constitution of Connecticut, article sixth, § 4, provides: "Laws shall be made to support the privilege of free suffrage, prescribing the manner of regulating and conducting meetings of the electors, and prohibiting, under adequate penalties, all undue influence therein, from power, bribery, tumult and other improper conduct."
[40] The constitution of Connecticut, article first, § 1, provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."
[41] The constitution of Connecticut, article first, § 4, provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."
[42] The constitution of Connecticut, article first, § 20, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."
[43] General Statutes § 9-185 provides in relevant part: "Unless otherwise provided by special act or charter, (1) members of boards of assessment appeals, (2) selectmen, (3) town clerks, (4) town treasurers, (5) collectors of taxes, (6) constables, (7) registrars of voters, (8) subject to the provisions of subsection (h) of section 10-223e, members of boards of education, and (9) library directors shall be elected...." (Emphasis added.)
[44] For the same reason, there is no merit to the plaintiffs' contention that § 10-223e (h) violates article first, § 4, of the state constitution because it burdens their "access to the ballot."